EXHIBIT A

# INVENTOR LICENSE AGREEMENT

MEMORANDUM OF AGREEMENT, effective as of the 29th day of September, 2000, by and between, on the one hand, INVENTOR'S GREENHOUSE, with a principal place of business at 21 Melrose Street #2, Boston, MA 02116-4705, MICRO PROS TECHNOLOGY SOLUTIONS, with a principal place of business at 35 Scott Avenue, Nashua, NH 03062, and R.H. BAER CONSULTANTS, with a principal place of business at 134 Mayflower Drive, Manchester, NH 03104, (Inventor's Greenhouse, MicroPROS Technology, and R.H. Baer Consultants jointly referenced as "Licensor") and, on the other hand, HASBRO, INC. (the "Company"), a Rhode Island corporation with a principal place of business at 615 Elsinore Place, Cincinnati, OH 45202, and HASBRO INTERNATIONAL, INC. ("HI"), a Delaware corporation, with a principal place of business at 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059, U.S.A. (the Company and HI jointly referenced herein as "Licensee").

For and in consideration of the mutual promises, covenants and undertakings herein contained and for other good and valuable consideration by each of the other given, receipt of which is hereby mutually acknowledged, the parties hereby agree as follows:

1. LICENSED PROPERTY:

(a) Definition: "Item" means the concept, product, design, and/or invention presented by Licensor to Licensee, currently known as "TALKIN' TOOLS," and described as a pre-school tool toy having a fanciful "face" embedded in the operating elements of the tool or its casing and an electronic voice-producing chip which issues audible statements evocative of the function of the tool and triggered by those functions. The sample disclosed is a tape measure with a smiling face and voice which uses statements pertinent to issuing or retracting the tape or measuring an object, determined by the user's interaction with the tape spool. Other versions of the Item embodying the combined face and voice characteristics of the Item could include a hammer, screwdriver and pliers, and could be sold individually or in sets. The Item does not include non-speaking tools or a speaking workbench or other accessories which speak or which do not speak, but the product is limited to the speaking tool as described above.

(b) Licensor's Intellectual Property Rights: Any and all intellectual property rights owned or controlled by Licensor which may be embodied in or may relate to the Item shall be deemed subject to the grant of rights contemplated by this Agreement, including, without limitation, applications for or patents issued in the Item; copyrights in the Item or in any visual or audible material related thereto; trademarks either previously used in commerce by Licensor in connection with the Item, or with respect

to which Licensor has officially, and in a manner sanctioned by applicable laws, indicated its intent to use (it being understood that the mere creation or coining of a trademark by Licensor without such use does not create rights therein); and proprietary or confidential data or information or trade secrets relating to the Item or its design or manufacture, including but not limited to know how pertaining thereto.

(c) Modifications: Licensor agrees that any improvement, modification, or enhancement of the Item created, owned, or controlled by Licensor during the Term of this Agreement, as defined hereinbelow, regardless of its creation prior or subsequent to Licensor's presentation of the Item to Licensee, will be deemed to be included within the scope of those rights granted by Licensor to Licensee hereunder.

(d) Licensed Property: "Licensed Property" means the Item as above defined and all of Licensor's rights and interests in the Item, including but not limited to all of the property rights described in this Paragraph 1.

2. GRANT.

(a) Use: Licensor grants, assigns, and transfers to Licensee the sole and exclusive right, privilege, and license to make, reproduce, modify, use, publicly perform, publicly display, transmit, broadcast, distribute, sell, and/or otherwise exploit or sublicense the Licensed Property on, as part of, and throughout all Platforms and Channels of Distribution (now known or hereafter developed) in the Territory in conjunction with any and all products and services of whatever kind or nature, now known or hereafter developed, including but not limited to:

(i) all toy, game, and child clothing and care products, including but not limited to puzzles, baby toys, girls' and boys' toys, dolls, toy vehicles (including ride-ons), robots, construction sets, electronic toys, plush items, miniatures, and craft items (including kits);

(ii) all other merchandise, including but not limited to paper goods, books, jewelry, and carrying cases;

(iii) entertainment products and services, including but not limited to television programming, motion pictures, television commercials, video games, and computer programs; and

(iv) all methods and means of advertising or promoting said products and services.

(b) Territory, Channels, and Platforms:

(i) The rights granted hereunder to the Company will be effective throughout the United States, its territories, and its possessions ("Domestic Territory").

(ii) The rights granted hereunder to HI will be effective throughout the world, but excluding the Domestic Territory ("International Territory"). (The Domestic Territory and the International Territory are jointly referenced herein as the "Territory.")

(iii) Platforms and Channels of Distribution: All jobbers, retailers, and wholesale distributors, including but not limited to mass market merchandisers, specialty stores, chains, supermarkets, drug stores, card and gift stores, catalogs, and catalog stores, as well as, direct marketing (including but not limited to direct mail, consumer solicitation, and door-to-door sales), and any network platform or analogous connected medium which multiple users can use simultaneously, including, without limitation, the Internet or intranets, by means of telephone lines, powerlines, cable television systems, optical fiber connections, Ethernet cable, cellular phone technology, satellite technology, wireless broadcast, or other means, methods, or processes of transmission or distribution now known or hereafter developed. "Platforms" include, without limitation, the delivery of content via any web site on the Internet, all other functionality or capabilities of the Internet (e.g., e-mail, files transfer protocol, etc.), other transmission media, online services (e.g., AOL, Prodigy, WebTV, MSN, etc.), transmission via satellite (e.g., Direct PC, Geocast), co-axial cable (e.g., Excite@Home), fiber optic cable, twisted pair cable, and xDSL. Notwithstanding any territorial restrictions hereunder, it is understood that exploitation of the Licensed Property via all Platforms shall be unrestricted, except so as to prohibit sales of the Primary Products outside of the Territory.

(c) Term: The term of the license granted herein will commence on the effective date of this Agreement and will continue for the life of the product or until terminated by either party in accordance with the terms and conditions hereof ("Term").

(d) Affiliates: Any entity that, directly or indirectly, through one or more intermediaries, Controls, or is under the Control of, Hasbro, Inc., where "Control" means the beneficial ownership of more than fifty percent (50%) of the voting stock or equity in an entity.

3. INTELLECTUAL PROPERTY RIGHTS:

(a) Trademarks (and Service Marks): Licensee reserves the right in its discretion to adopt any name, names, or translations of names (hereinafter "Name") for or in connection with the Item, Licensed Property, or Primary Product, as hereinafter defined,, or to change the Name as Licensee so elects. Notwithstanding the creation of the Name, if any, by Licensor or by Licensee, or any prior use, intent to use, or ownership thereof by Licensor, the Name, and the trade dress rights in the Primary Product and its packaging, will be the exclusive property of Licensee or its Affiliates during the Term and subsequent to the expiration or termination of this Agreement. Any application for, or registration of, the Name subsequent to the date of this Agreement will be in the name of, and at the expense of, Licensee, who will be the sole owner thereof. Licensor hereby assigns and transfers to Licensee any and all rights which it may have in the Name and the goodwill pertaining thereto as well as any registration or application for registration thereof which may have been made prior to the date of this Agreement, and Licensor

agrees upon request of Licensee to execute any necessary documentation of such assignment and transfer and to assist Licensee in any recordation thereof.

(b) Patents (and Similar Rights):

(i) Applications: In the event that Licensor has not sought or obtained a mechanical patent, a design patent, a registered design, or utility model protection in any feature of the Item, as presented by Licensor, and Licensee desires any such protection, Licensee may, if it so elects, initiate such applications in the name of Licensor, and Licensor agrees to cooperate with Licensee in the prosecution thereof. One half of any costs incurred by Licensee in initiating or prosecuting such application(s) (including attorneys fees), up to a limit of U.S. Five Thousand Dollars (US $5000) in any one country and a cumulative limit of US Thirty Thousand Dollars (US $30,000), and one half of any costs incurred by Licensee in the maintenance of any such rights granted, not subject to a limit, will be credited by Licensee against royalties earned by Licensor pursuant to this Agreement. Subject to the terms of the preceding sentence, Licensee shall upon Licensor's written request within 120 days after the termination of this Agreement, re-assign to Licensor any mechanical patent applications or mechanical patents relating solely to the Item as originally disclosed by Licensor if, prior to any such re-assignment, Licensor reimburses Licensee for its unrecouped costs and expenses (including attorney's fees) incurred by Licensee in applying for, obtaining, and maintaining the respective patent or patents for the Item which Licensor wishes to acquire.

(ii) Renewal of Patents: Licensor agrees to cooperate fully with Licensee in the renewal of any patents, registered designs, and/or utility model protection during the Term in countries in which such rights may be renewed. One half of any costs incurred for any such renewals will be advanced by Licensee against royalties earned by Licensor pursuant to this Agreement.

(c) Copyrights: All copyrights in the Primary Product (as hereinafter defined), and in , instructions, rules, packaging and advertising regarding the Licensed Property, will belong to Licensee. Licensor agrees to execute any documents necessary for assignment of any copyright in the Licensed Property to Licensee and to assist Licensee in any recordation thereof.

4. WARRANTY:

(a) Licensor warrants that it has such right, title, and interest in and to the Licensed Property as to enable it to vest in Licensee without any qualifications whatsoever, free from any liens or encumbrances, the sole and exclusive right, privilege, and license herein conveyed, and Licensor warrants that neither the Licensed Property nor Licensee's use or exploitation thereof in any respect contemplated by this Agreement shall violate or infringe any rights of any third party or constitute unfair competition.

(b) Licensor warrants that it has not disclosed to any party, other than in a confidential manner, any proprietary information pertaining to the Licensed Property.

5. EXCLUSIVITY: Licensor agrees that, during the Term, Licensor will not offer or license to any other party any property substantially similar to the Licensed Property, nor will Licensor utilize any such property itself in any manner which may conflict with the exclusive grant of rights hereunder.

6. TERMS OF PAYMENT: The following Advance and Royalty payments are to be divided evenly (three ways) among the above-named Licensors:

(a) Advance: Licensee agrees to pay Licensor, upon execution of this Agreement, the sum of FIFTEEN THOUSAND DOLLARS (U.S. $15,000.00) as an advance payment to be credited in full against the first royalties to be earned for Licensor in connection with Licensee's use of the Licensed Property under this Agreement. Licensor hereby acknowledges receipt of said sum.

(b) Primary Product:

(i) Royalties: Licensee, or its Affiliate, will pay Licensor a sum of money on the sale of products derived from the Licensed Property and sold by Licensee and/or such companies (hereinafter "Primary Product") equal to THREE percent (3%) of Net Sales. In respect of the Domestic Territory only, "Net Sales" is hereby defined as the gross invoice price to third party trade customers, less only returns and a deduction of ten percent (10%) of the gross invoice price to cover all other customary trade discounts and allowances. In respect of the International Territory, "Net Sales" is hereby defined as the invoice price received from unrelated third party trade customers, less deductions for returns from third party customers, allowances for defects, freight allowances, commissions, volume rebates, cash and/or other trade discounts and allowances. The term "sale" means sales by Licensee or its Affiliates to unrelated third parties. Licensee shall not be liable for any royalties hereunder for any products which it may distribute in the ordinary and usual promotion, development, and exploitation of its business such as for review, sample, advertising, publicity, or similar purposes in connection with its merchandising or promotion. With respect to entertainment products and services (which shall not be deemed Primary Products), including but not limited to those described in subparagraph 2(a)(iii), Licensee shall pay to Licensor Three Percent (3%) of its net profits after deduction from revenue of all costs, expenses and overhead of any kind or nature, provided that all entertainment products or services shall be cross-collateralized for the purpose of calculation of this participation. The royalty provisions of this Agreement shall not apply to close out sales made by Licensee or its Affiliates or by a sublicensee. A "close out" sale shall be defined as any sale of the Primary Product effectuated at a price fifty percent (50%) or more below Licensee's standard wholesale "A" price (or that of the Affiliate in question) with the intention of discontinuing the product in question and liquidating inventory.

(ii) Reports: Licensee and/or its Affiliates will furnish written reports on sales of Primary Product in Licensee's standard format to Licensor on a quarterly basis not later than thirty (30) days after each calendar quarter period ending at the close of March, June, September, and December of each year for sales to third party customers in the Domestic Territory and Canada, and not later than sixty (60) days after each calendar quarter period for sales to customers in the remainder of the International Territory. Such reports shall show the royalties received from sales of products derived from the Licensed Property subject to royalty payments, and sold during the immediately preceding quarterly period.

(iii) Payment: Payment of royalties on sales of Primary Product will accompany the royalty statements described above.

(iv) Records: Licensor or its authorized representative will have the right no more than once per calendar year to an examination of the separate records of Licensee with respect to the sales of Primary Products upon which Licensor receives a royalty and will have free and full access thereto for such purpose on reasonable notice and at a mutually convenient time during all reasonable business hours during which the office of Licensee will be open, and Licensee will retain such separate records for a period of 3 (3) years following rendition of any report. Any such examination will be conducted in such manner as to not unduly interfere with the business of Licensee. Licensor and its representatives will not disclose to any other person, firm, or corporation any information acquired as a result of any such examination; provided, however, that nothing herein contained will be construed to prevent Licensor and/or its duly authorized representatives from testifying in any arbitration or court proceeding with respect to the information obtained as a result of such examination in any proceeding instituted to enforce the rights of Licensor under the terms of this Agreement. Any proceeding to obtain payments claimed under this Agreement will be barred unless commenced, and Licensee is notified, within 3 years of the date upon which such payments should have been reported according to this Agreement. If any examination conducted by Licensor pursuant to this section discloses an underpayment to Licensor, Licensee shall pay the deficiency within 15 business days of the final determination thereof. If any examination discloses a deficiency of 5% or more for the period audited, Licensee shall pay, in addition to the deficiency, the reasonable out-of-pocket costs of the audit, not to exceed $1,500.

(v) International Sales:

[1] For sales in the International Territory, HI will make payment to Licensor in U.S. Dollars based upon the exchange rate in effect on the day the royalty is paid to HI by the Affiliates or sublicensees in the International Territory.

[2] If the payment of royalties to Licensor for sales in any country of the International Territory is blocked or subject to restrictions by governmental authorities, such royalties either may be held in the blocking or restricting country (if permitted by local regulations) or may be removed from such country and paid to

Licensor, subject to whatever restrictions, limitations and/or taxes which may be imposed by the government of such country. In no event shall Licensee be responsible to protect the value of sums against currency fluctuation, effects of inflation, or other economic or monetary adjustment.

[3] If the government of a country requires a reduction in the royalty rate set forth in this Paragraph 6 as a condition of approving the payment of royalties to Licensor, Licensor agrees to reduce such rate for that country only to the maximum allowed by such government.

[4] When deemed reasonably necessary by HI, Licensor shall enter into separate license agreements with an affiliated, subsidiary, or controlled company for the purpose of facilitating the payment of royalties.

(c) Sublicensing:

(i) Primary Product: In the event that Licensee and/or any Affiliate grants any sublicense for the use of Licensed Property by any person, firm or corporation other than Licensee or an Affiliate for products which are identical or substantially similar to the Primary Products, then Licensor will receive the lesser of (1) Fifty Percent (50%) of all net royalties received by Licensee for such sublicensing, or (2) that royalty or other amount specified above (i.e., Three Percent (3%) of Net Sales) for each sale by Licensee and/or its subsidiary, affiliated, or controlled companies regarding Primary Product royalties.

(ii) Merchandising: In the event that Licensee and/or any Affiliate grants any sublicense for the use of the Licensed Property by any person, firm or corporation other than Licensee or an affiliated, subsidiary or controlled company, for products other than those which are identical to or substantially similar to the Primary Products, then Licensor will receive Twenty Five Percent (25%) of all net royalties received by Licensee for such sublicensing.

(iii) Reports: Licensee will furnish written reports regarding sublicensing activities to Licensor, showing the name of each sublicensee, the amount received by Licensee under each sublicense during each reporting period, and, the percentage payable to Licensor under each sublicense. Such reports will be forwarded to Licensor within thirty (30) days following the close of each reporting period during which Licensee received sublicensees' good payment for sales in the Domestic Territory and not later than sixty (60) days after each quarter period during which Licensee received sublicensees' good payment for sales in the International Territory. Licensee shall be entitled to rely on the financial reports submitted to it by its sublicensees, and Licensee shall not be required to verify such reports by actual inspection of their records and books, unless it elects to do so.

(iv) Payments: Payment of royalties will accompany the royalty reports described above. Licensee will make payments to Licensor in U.S. Dollars based, where

applicable, on the exchange rate in effect on the day the royalty is received by Licensee from the sublicensee.

(v) Sublicensee's Breach: No breach by a sublicensee of any obligation relating to the Licensed Property or to this Agreement shall be attributable in any respect to Licensee or constitute cause for termination of any of Licensee's rights hereunder.

7. OFFENSIVE LITIGATION: Licensee will have the right, at its own discretion, to institute or prosecute any action or proceeding against third parties for or by reason of any unlawful infringing of the rights granted to it by this Agreement; provided, however, that any suit or suits will be instituted, maintained or prosecuted solely at the cost and expense of Licensee, and any and all sums collected or recovered in any such suit or suits, whether by decree, judgment, settlement or otherwise, belong exclusively to Licensee; provided, further, however, that Licensor will have the right to promptly elect to share equally the expense of any such action or proceeding brought by Licensee, and in that event, Licensor will share equally in any and all sums recovered in such suit or suits. Upon request of Licensee, Licensor will execute all papers, testify on all matters and otherwise cooperate in every way reasonably necessary and desirable for the prosecution of any such suits, actions or proceedings including appearing as a party plaintiff if requested by Licensee. Licensee will reimburse Licensor for the reasonable out-of-pocket expenses incurred as a result of such cooperation unless Licensor has elected to share the costs as aforesaid. Licensee will promptly notify Licensor of the institution of any action or proceeding against third parties for or by reason of any such unlawful infringements. If Licensee elects not to prosecute any infringement suit, Licensor may do so at Licensor's own expense after notice to Licensee of that intention. Licensee will cooperate in every way reasonably necessary and desirable for the prosecution of any such suits, actions or proceedings. Any sums recovered will belong exclusively to Licensor, after first reimbursing Licensee for any expenses incurred as a result of such cooperation.

8. INDEMNIFICATION AND DEFENSIVE LITIGATION:

(a) Licensor agrees to indemnify, defend and hold Licensee, its Affiliates, and all sublicensees, as well as their respective officers, directors, agents and employees harmless from and against any and all damage, loss, expense (including reasonable attorneys' fees and disbursements) award, settlement or other obligation arising out of any claims, demands, actions, suits or prosecutions that may be made or instituted against them or any of them by reason of any breach of Licensor's warranties under this Agreement or out of any other set of facts which, if proven, would involve or arise out of a breach of said warranties (hereinafter "Controversy"). After receiving notice of a Controversy, Licensee will not be required to pay any royalties pursuant to this Agreement until the favorable resolution and/or settlement of any such Controversy, but shall instead pay same into an interest-bearing account. If no breach of any of Licensor's warranties is found as a final result of such Controversy, the payment of royalties earned (as well as all interest actually accrued) will be resumed after deduction of Licensee's reasonable attorneys' fees, expenses and any losses incurred in such Controversy. If a

breach by Licensor of any of its warranties hereunder is found in such Controversy and that finding becomes final, then all of Licensor's rights and Licensee's obligations hereunder, including the obligation to pay royalties, will terminate, and any remaining right in the Licensed Property shall be transferred to and vest in Licensee; provided further that if the royalties retained during the pending of the Controversy shall not fully recompense Licensee pursuant to this paragraph, then Licensor shall, within thirty (30) days of Licensee's written request, provide such additional funds to Licensee as may be necessary to fulfill any deficiency. Defense of any Controversy shall be controlled by Licensee, and Licensor agrees to cooperate fully in such defense if requested by Licensee. Licensor agrees that, if in Licensee's judgment, such Controversy can be compromised or settled by any payment of monies or otherwise by Licensee, Licensee will have full right to compromise or settle such Controversy and to deduct the amount of any payment made from the monies then due or to become due Licensor hereunder. The parties agree that a settlement shall not prove or demonstrate a breach of Licensor's warranty.

(b) Licensee agrees that the Primary Products shall be of Licensee's usual high quality, and agrees to indemnify, defend and hold Licensor, its officers, directors, employees, and agents harmless from and against any and all claims, suits, loss, and expense (including reasonable attorneys' fees and disbursements) arising out of any claims of personal injury or property damage based on the use of the Licensed Property produced and sold by Licensee and/or its Affiliates, provided that Licensor has given Licensee prompt written notice of any such claims and permits Licensee to conduct and control the defense against any such claims or suits.

9. TERMINATION:

(a) In case either party fails to perform under or commits a material breach of any of the several covenants and conditions herein contained, the other party shall notify such party in writing of such failure or default and such party shall then have the right to remedy such failure or default by complying with the terms of this Agreement, and thereby making the notice null and void and of no effect. If the breaching party has not instituted a remedy or is not in the process of instituting a remedy within sixty (60) days of receipt of such notice, the aggrieved party may terminate this Agreement immediately by a further notice in writing; provided, however, that a termination by Licensee under this subparagraph (a) shall affect only Licensor's rights and Licensee's obligations under this Agreement but shall not affect Licensee's rights including, without limitation, its right to exploit the Item and Licensed Property; and provided further that a breach by Licensor that threatens to or in fact affects Licensee's exclusivity to the Item or Licensed Property shall immediately and irreparably harm Licensee, shall be without adequate remedy in damages and shall entitle Licensee to temporary and permanent injunctive relief and such additional remedy as may be determined by any court of competent jurisdiction. In the event of such material breach by Licensor, it shall immediately upon demand by Licensee refund any portion of any advance which may have been paid hereunder and which shall not have been credited against royalties.

(b) Licensee will further have the right to terminate this Agreement at any time and for any reason upon giving Licensor a ninety (90) day notice, in which event all rights to the Licensed Property licensed by Licensor to Licensee herein will revert to Licensor. Nothing contained in this Agreement will be construed to require Licensee to transfer to Licensor any patents or other rights to any inventions by persons other than Licensor, and/or any trademark(s) or other material which was not supplied by Licensor.

(c) Any termination under this Paragraph 9 will be without prejudice (1) to the rights and remedies of either party with respect to any provisions or covenants arising out of breaches committed prior to such termination, (2) to the right of Licensee to complete all work in progress at the date of such termination, and (3) to the right of Licensee to sell its existing stock of products and services derived from the Licensed Property after the date of termination and, except with respect to subparagraph (a), in accordance with the terms of this Agreement. Said rights are hereby acknowledged.

(d) Licensee hereby undertakes to use best efforts to introduce to the toy trade and/or the public no later than TOY FAIR 2001 (hereinafter, the "Initial On-Sale Date") products or services derived from the Licensed Property, and in the event of Licensee's failure to do so, Licensor shall have the right to terminate this Agreement forthwith upon giving Licensee written notice of such termination at any time prior to any subsequent introduction by Licensee of any such product or service. It is understood and agreed that if Licensee, having undertaken the marketing and sale of products embodying the Licensed Property, ceases sales and sublicensing of all products and services embodying the Licensed Property for a period of one (1) year, except as excused hereinbelow, Licensor may give notice to Licensee of its desire to terminate this Agreement for that reason; and if Licensee does not, within ninety (90) days of such notice, take good faith steps to resume the marketing and sale of a product or service embodying the Licensed Property, this Agreement and the license granted herein shall terminate as of the end of that ninety (90) day period, and all rights granted by Licensor to Licensee hereunder will revert to Licensor. With the exception of Licensee's fulfillment of Licensee's obligations, if any, under subparagraph 6(a) above, the termination and reversion of rights as may be permitted hereunder would be Licensor's sole remedy in the event Licensee (i) fails to introduce, (ii) publicly introduces or discloses, but does not distribute and promote, or (iii) ceases the distribution and promotion of a product or service derived from the Licensed Property. Upon commencing production of the Item, Licensee will provide six (6) samples to each identified Licensor, upon request.

10. REPRESENTATION: It is expressly agreed that Licensor is in no way the legal representative of Licensee and has no authority, expressed or implied, on behalf of Licensee to bind Licensee or to pledge its credit.

11. FORCE MAJEURE: It is understood and agreed that, in the event of an act of the government, war conditions, fire, flood, or other natural disaster, or labor or manufacturing problems which prevent the performance by Licensee of the provisions of this Agreement, such nonperformance by Licensee will not be considered a breach of this

Agreement, and such nonperformance will be excused while, but not longer than, the conditions described herein prevail.

12. RESERVATION: Licensor and Licensee agree that Licensee is in the toy and game business worldwide and reserves to itself the right to manufacture and distribute products which are similar (but not identical) to products derived from the Licensed Property. Such other products may, for example, utilize similar play patterns, packaging, and/or advertising methods as products derived from the Licensed Property, and in such regard Licensee shall not have any obligation to Licensor.

13. NOTICES: All notices, whenever required in this Agreement, will be in writing and sent by certified mail, return receipt requested, or such other method as permits the verification of delivery.

14. CONTROLLING LAW: This Agreement will be construed in accordance with the laws of the State of Rhode Island, United States of America.

15. SUBLICENSE AND ASSIGNMENT: Licensee will have the right to extend the license granted herein to any Affiliate and to sublicense to any Affiliate or third party any of the rights granted herein. Licensee will have the right to freely assign this Agreement so long as such assignee agrees to be bound by its covenants and burdens. The benefits of this Agreement will inure to the benefit of the heirs and legal representatives of Licensor, who will be liable hereunder. Licensor may assign Licensor's right to receive royalties under this agreement.

16. ENTIRE AGREEMENT: This Agreement shall be deemed and construed to convey to Licensee the full economic benefit of all possible rights, as described in Paragraph 2, in the Licensed Property, now known or hereafter created, and to contain all of the agreements and understandings binding upon the respective parties hereto, and no representations, whether oral or written, with respect to its subject matter heretofore made by either party hereto, its agents, representatives or privies will be binding upon them or either of them and said Agreement may be modified only by the written mutual agreement of the parties.

17. HEADINGS: The paragraph and other headings in this Agreement are for reference purposes only and will not affect the meaning or interpretation of this Agreement.

18. NON-DISCLOSURE: Notwithstanding anything herein to the contrary, it is hereby agreed that Licensor shall not disclose any terms of this Agreement to any third party either during or after the Term, other than to Licensor's representatives, attorneys, and/or agents under an obligation of strict confidentiality with the purpose of enforcing Licensor's rights hereunder.

19. NO WAIVER: No waiver, by either party, whether express or implied, of any provision or promise under this Agreement, or of a remedy as to any breach or default of

the other party, shall constitute a waiver of any other provision of this Agreement, and no such waiver by either party shall prevent such party from enforcing any provision of this Agreement or from seeking a remedy as to any subsequent breach or default.

20. EUROPEAN RIGHTS: In the event that the Territory hereunder shall be defined as including countries within either the European Union ("EU") or the European Economic Area ("EEA"), it is agreed that the grant of rights to Licensee as described in this Agreement shall, without limiting such rights in any manner, fully extend to the entire EU and EEA, and that the Channels of Distribution within such area shall be entirely unrestricted..

21. ILLEGAL ACTS: In no event shall this Agreement be construed as requiring Licensee to commit any unlawful act or acts whatsoever.

22. SEVERABILITY: In the event that any provision(s) of this Agreement is adjudicated by a court of competent jurisdiction to be unlawful, unconscionable, void, or invalid, that provision(s) shall be deemed severed from this Agreement and shall not affect the validity or enforceability of the remaining provisions hereof or this Agreement as a whole.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first written above.

| | |
|---|---|
| INVENTOR'S GREENHOUSE | HASBRO, INC. |
| By: | By: |
| MICRO PROS TECHNOLOGY SOLUTIONS | HASBRO INTERNATIONAL, INC. |
| By: | By: |
| R.H. BAER CONSULTANTS | |
| By: Ralph H. Baer | |