UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

INVENTOR'S GREENHOUSE, :
MICRO PROS TECHNOLOGY :
SOLUTIONS, AND R.H. BAER :
CONSULTANTS :
:
vs. : C.A. NO. 05-246S
:
HASBRO, INC. AND HASBRO :
INTERNATIONAL, INC. :

DEPOSITION OF GARY CARLIN

Produced, sworn and examined on May 25, 2006, at 9:00 A.M. before Linda S. Taylor, a Notary Public, on behalf of the Defendants at the Law Offices of Adler, Pollock & Sheehan, Inc., One Citizens Plaza, 8th Floor, Providence, Rhode Island.

APPEARANCES

For the Plaintiff:
MEREDITH & KEYHANI, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
BY: DARIUSH KEYHANI, ESQ.

For the Defendant:
ADLER, POLLOCK & SHEEHAN, INC.,
One Citizens Plaza
Providence, Rhode Island 02903
BY: TODD D. WHITE, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



INDEX


| DEPONENT | PAGE |
|---|---|
| GARY CARLIN | |
| EXAMINATION BY MR. WHITE | 3 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S | | |
| A | INVENTOR LICENSE AGREEMENT | 87 |
| B | TALKING TAPE MEASURE (OVERVIEW) | 131 |
| C | TALKING TAPE MEASURE (FUNCTIONAL DESIGN) | 132 |
| D | 3/20/01 LETTER TO D. MAURER FROM G. CARLIN | 133 |
| E | E-MAILS | 146 |
| F | E-MAILS | 151 |
| G | E-MAILS | 155 |
| H | E-MAILS | 165 |
| I | 6/10/04 LETTER TO G. CARLIN FROM D. MAURER AND K. GRADY | 181 |
| J | DOCUMENT ENTITLED TALKING TOOLS...GET THE JOB DONE!" | 183 |
| K | 1/19/99 LETTER TO G. CARLIN FROM J. BARNGROVER | 189 |
| L | 12/13/00 LETTER TO G. CARLIN FROM J. KIPLING | 191 |
| M | 12/18/00 LETTER TO G. CARLIN FROM J. KIPLING | 192 |
| N | PLAINTIFFS' RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES | 197 |






(COMMENCED AT 9:15 A.M.)
GARY CARLIN
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE DEPONENT: Gary Carlin.
EXAMINATION BY MR. WHITE
**Q. Good morning, Mr. Carlin.**
A. Good morning.
**Q. My named is Todd White. We met in the context of a couple of settlement efforts in the past.**
**Can you just tell me your present address?**
A. 227 North Lakeside Drive. That's in Lake Worth, Florida, 33460.
**Q. Have you provided deposition testimony before in any other context?**
A. One other time.
**Q. How long ago?**
A. About ten years ago.
**Q. And what was the general context, if you remember?**
A. It was regarding a trademark -- it was regarding scrabble.com, the domain. And it was a dispute between Hasbro and Mattel because Hasbro -- I was working at Hasbro at the time and Hasbro



owned the domain scrabble.com, and Mattel owns Scrabble outside the United States. So it was a dispute about how to deal with that.
**Q. Other than giving deposition testimony, did you give any testimony at trial on that matter?**
A. No.
**Q. Let me just bring you back probably to ten years ago just to refresh your recollection about the process, and you may have been spoken to Mr. Keyhani about it.**
**Simply I'm going to get an opportunity to ask you questions. The questions will be taken down by the stenographer. If you would just give me a second to finish my question, to allow your attorney to object if he sees fit, and it will make a little bit easier for the stenographer to take down all the testimony.**
**If you can give verbal responses to everything, that will be helpful. Only because it's hard to pick up shrugs of the shoulder or nods of the head.**
**If at any time I ask a question and you don't understand the question, just say, "Todd, can you rephrase it?" and I will do the best I can. I want**

EXHIBIT F

COPY

Page 109

Q. Does Hasbro still have them?
A. No, Hasbro doesn't have them, but, I mean, they're proprietary to Ralph, really. Honestly, even if I could remember, I can't remember.
Q. That's fine. And I don't want to spend a lot of time on that if you can't. Did he have drawings?
A. No. It was some rough prototypes. Rough prototypes.
Q. And what was Dave's response to -- do you remember his response to any of these?
A. Yeah. I remember that he held onto two or three of them and passed on the others. I can't tell you which ones.
Q. Sure. How long was this meeting, as best you can remember?
A. About an hour.
Q. About an hour. Had you fully pitched the seven or nine GI Joe concepts that you had intended to pitch during this meeting?
A. Yes.
Q. All right. Did Dave bring out the new toys before you had finished the GI Joe pitch?
A. No. After.
Q. Okay. Did he actually have to leave the meeting

Page 110

and say, "I've got to show you guys something"?
A. No. He had it right there. The box was sitting there.
Q. Okay. So when you came into whatever conference room you met at, there was a box of toys that were something different than GI Joe?
A. I had no idea. I didn't even notice the box in the room.
Q. Okay. Did he indicate to you he wanted to show you three toys that Hasbro was coming out with or had come out with?
A. At the end of the meeting?
Q. Right.
A. At the end of the GI Joe, yes.
Q. That's how he introduced this -- that's how he segwayed into this new issue, right?
A. Yes.
Q. Let me just take a step back. As I understand from the agreement, you're paid on a quarterly basis?
A. That's correct.
Q. So had you been receiving payments for certain tool toys subsequent to September 29?
A. Yes.
Q. And does the quarterly payment check come to

Page 111

Inventor's Greenhouse or is it a third, a third, and a third?
A. A third/a third/a third.
Q. So they make out three different checks?
(DEPONENT NODDING)
Q. When you receive the check, do you receive a statement as to what that check corresponds to?
A. Yes.
Q. Does that statement indicate which toy it corresponds to?
A. Actually, in this case, I think they were being sold as an assortment. So not the specific toy, no.
Q. Would it indicate an SKU number on the backup document for the check?
A. Yes, I believe so.
Q. And what was your understanding between September 29 of 2000 and this meeting or just prior to this meeting of the toys you were receiving royalties on? What specific toys?
A. What was my understanding which toys?
Q. You were getting royalties on.
A. Well, there was a tape --
MR. KEYHANI: Objection, form.

Page 112

A. There was a tape measure, screwdriver, hammer, a vice. Actually, I can't -- you know, there were -- I believe there were five, and then there were two more that or three more that were added to that group, and it was a refreshed assortment. So I'm not sure at which point these all happened, but there was pliers, I think. That's all I can remember right now.
Q. Okay. But at least you can remember that you were getting some compensation for tape measure, correct?
A. Yes.
Q. You remember a screwdriver had been developed?
A. Hm-mmm.
Q. You have to say yes just for the record.
A. Oh, I'm sorry. Yes.
Q. That's okay. You remember a hammer had been developed?
A. Yes.
Q. Were you a little unsure on the vice or do you feel confident on the vice?
A. I'm a little unsure about the vice.
Q. Are you more confident on pliers?
A. Yes.

**Q. And then you thought there might be three other things that you just can't remember?**
A. I think, as I recall, initially they introduced five items plus the workbench, and then that was in December when the contract was signed. And then they refreshed that assortment with new three -- I believe it was three additional tools a year later.
**Q. You just can't remember --**
A. At that meeting, I wouldn't have known yet necessarily.
**Q. Okay.**
A. I can't remember which three they were.
**Q. Now, at the September 2001 meeting with you and Ralph and Dave in which the GI Joe concepts were pitched, what were the three toys that they showed you?**
A. It was a weed whacker, like a hedger, an edger, chainsaw type, and the lawnmower.
**Q. Did you get a chance to look at each one of these toys?**
A. Yes. Very quickly.
**Q. Were they in a package or were they just out in the open?**



A. They were out in the open.
**Q. Were these rough prototypes or were these production samples?**
A. I don't know what stage they were at. They looked pretty finished.
**Q. Was there a discussion on each one of these toys?**
A. Very brief, yes.
**Q. Let's just take the chainsaw first. What do you remember was the discussion about whether or not you should be compensated for the chainsaw?**
A. You know, it's very hard to remember the specifics of what was said because I remember being so shocked at the whole discussion, but it was -- roughly, it was, "Is this a tool or not a tool?" That type of discussion. "Is this a tool or not a tool?"
**Q. What was the agreement or decision?**
A. Well, there was no agreement in that meeting, but Ralph was the one sort of speaking up. I just listened to see what was going on. And we walked out of there. The two -- the weed whacker and the edger that, I guess, Dave called a tool, and then the mower Ralph said, "That's not a tool." So...
**Q. You've said several times that you were shocked by**



**the fact that these toys were here at the end of the meeting. Is that a correct statement?**
A. Yes, it is.
**Q. What was it that shocked you?**
A. Well, I was there. I was in a pitch mode, not in a contract negotiation mode or discussion about the definition of my contract. And I was with a person who is not a businessman and a senior citizen, elder person from me. So I felt it was inappropriate.
And it was just thrown out. It was literally just thrown out on the table. And here we are trying to pitch something and hoping they're going to buy these new items, including Ralph who desperately wants to sell these GI Joe items. So we're in this mood of trying to make Dave feel good and feel good about us. So it was the wrong time. That's why it was shocking.
**Q. What would you suggest would have been a better way to do it?**
A. If he wanted to call a meeting with me to discuss talking tools, then let me know the purpose of the meeting. Don't have a double agenda and give me a chance to think about it.



**Q. But on this one, you called this meeting?**
A. I called the meeting about something else.
**Q. No, I understand that. I'm just saying who initiated the invitation for a meeting, generally speaking?**
A. For this meeting, I did.
**Q. If Hasbro wrote a check separately to Mr. Baer, did he not have authority to speak?**
A. I am -- the reason they hired me as their business partner was to be the negotiator of the contracts. So does he have authority? You know, it's not for me to say if he has authority, but that wasn't his role in this contract at all.
**Q. Do you have relationships with inventors in which you enter an agreement and the royalties are paid to Inventor's Greenhouse and then you pay the inventor a percentage you guys agreed on?**
A. No.
**Q. So in all of the inventions, toy inventions you've pitched to toy companies, if payment is made, it's made by that company to you and whichever partner you're partnered up with?**
A. Yes.
**Q. So they always do separate checks?**

A. That's right.
**Q. Is there anything in any of the agreements which say that all negotiations should go through you as the business person of the group?**
A. In the agreement with the?
**Q. Toy company.**
A. In any of my agreements?
**Q. Yes, in any of the agreements.**
A. Yes. I have agreements with my inventors sometimes that says that I will be responsible for negotiation.
**Q. Do you have one in this case with Mr. Baer?**
A. No. It was an understood agreement, though.
**Q. Was there any communication sent to Hasbro in writing which told them that they are to negotiate only with you and not with Mr. Baer or Mr. Pelovitz?**
A. No.
**Q. So at the end of the meeting, there was agreement, at least on Mr. Baer's part, that Mr. Baer would get paid on the weed whacker and the chainsaw; is that correct?**
A. No, there wasn't --
MR. KEYHANI: Objection to form.



A. I don't believe that there was an agreement. I think that Ralph had not thought through what -- had not thought of what he said carefully. And when he thought fully and when he had the chance to read the words of the contract, he realized that, in fact, the lawnmower is covered by our contract. So I don't think there was agreement.
**Q. What did Mr. Baer say that gave Hasbro, forget -- you don't know what Hasbro said. What did Mr. Baer say about the lawnmower.**
A. "Nah, that's not a tool."
MR. KEYHANI: Objection to form.
**Q. He said, "Nah, that's not a tool"?**
A. Right.
**Q. What did you understand that phrase to mean?**
A. That in his opinion at that moment, given all the circumstances, that he didn't think it was a tool.
**Q. Did you suggest to Dave Maurer before that meeting concluded that the mower was a tool and needed to be paid on?**
A. Say that again?
MR. KEYHANI: Objection to form.
**Q. Before that meeting concluded, did you suggest to**



**Dave Maurer that the mower was a tool?**
A. No.
**Q. Did you suggest to Dave Maurer that Hasbro needed to pay royalties for the mower?**
A. No. As I explained, we were practically out the door at the point when this was being discussed. And I was not prepared to discuss. I don't think quickly like that on my feet. And I felt I was in total disagreement, but no, I did not say something to Dave before.
I, also, you have to keep in mind, I had a consulting agreement with Hasbro at that time. I had a lot of things going on with Hasbro that I didn't want to jeopardize and rock the boat and had very little success previously in ever getting them to budge on a position.
**Q. Did Dave suggest to you or Ralph, did he throw out this suggestion that Hasbro would compensate you for the weed whacker?**
A. Yes.
**Q. Did Dave suggest to you both that Hasbro would compensate you for the chainsaw?**
A. Yes.
**Q. Did Dave suggest to you both that Hasbro would not**



**compensate for the mower?**
A. Actually, Dave said, "What do you think? This could be a tool or not a tool" is really what his words were. And that's when Ralph spoke out of turn.
**Q. And he said it was not a tool?**
A. Right. But there was no agreement about not being paid. There was no agreement by our team.
**Q. Was there anything that occurred in that meeting that led you to believe that Hasbro was going to pay you folks a royalty on the mower?**
A. Couldn't be certain.
**Q. You've said that Ralph said it was not a tool?**
A. That's right.
**Q. And you said that you didn't speak up one way or the other; is that a correct statement?**
A. That's right.
**Q. So is there anything that you or Ralph said affirmatively that denied Hasbro's position that it was not a tool?**
A. Not at that meeting, but, again, I felt that -- I did not feel that that was a formal agreement going on in that room. So, yeah, I wasn't sure whether we were going to get paid on

Page 121

it. In fact, as you know, we started to get paid on it by the international group. So I wasn't sure what was going on.

**Q. After that meeting, when was the next time you spoke to Dave or anybody at Hasbro about payments on the chainsaw?**

A. Payments on the chainsaw? I don't think we ever talked about it.

**Q. When was the next time you spoke with anybody at Hasbro about payments on the weed whacker?**

A. Never talked about it again.

**Q. And just so that I'm clear, the weed whacker is the trimmer; is that the same thing?**

A. Yes.

**Q. And the chainsaw is Chip the Chainsaw?**

A. Right.

**Q. And the mower is Mike the Mower?**

A. That's right.

**Q. When was the next time you spoke to anybody about payment on the mower?**

A. I think it was early 2004.

**Q. Did you receive information from Hasbro between -- you said the meeting was probably September of 2001, correct?**

Page 122

A. Yes.

**Q. Between then and 2004 to indicate you were receiving payments for Zip the Trimmer?**

A. I'm sorry.

**Q. Sure. I'm just trying to find out between that time period, September of 2001 and 2004, did you get paid on Zip the Trimmer?**

A. Yes.

**Q. Did you receive documents from Hasbro that showed you were getting paid on that?**

A. Yes.

**Q. In that same time period, did you get paid on Chip the chainsaw?**

A. Yes.

**Q. Did you receive documents from Hasbro that showed you were getting paid?**

A. Yes.

**Q. In that same time period, did you get paid domestically from Hasbro for Mike the Mower?**

A. No.

**Q. Were you aware it was out there on the market?**

A. I wasn't aware of when it started to ship. I wasn't aware of when any of it started to ship; but, yes, at some point a year later, I saw it on

Page 123

the shelves.

**Q. Why did you wait until 2004 before you brought up the issue of Mike the Mower?**

A. Well, there was a combination of reasons. One is that my relationship with Hasbro, I always felt they had the upper hand and did not want to rock the boat. As I said, I had a lot of other things going on with Hasbro that were more important to me at the time and meant bread and butter for me. So -- and I had very little success pushing back on negotiating contracts with them. So I didn't do anything but continued to be aggravated by it.

And then I started to look for -- at some point in that time cycle, I started to talk to lawyers. And I couldn't afford to hire anybody, so it had to be on a contingency basis. And once I saw that there was overwhelming agreement on my part that Hasbro was in the wrong, I said, "Well, screw it. I'm just -- I'm going for it." And I knew that they would cut me off, and that's exactly what they did, as you well know. At the pre -- whatever trial we had, the negotiation meeting we had, if I didn't accept that offer, that's it, they're not working with me anymore. So I lost

Page 124

half of my customer base.

So why did I wait three years? Because I didn't want to lose half my customer base.

**Q. What did you have going on with Hasbro that you didn't want to jeopardize in that three year time period?**

A. Part of it was the consulting agreement that I had I mentioned earlier.

**Q. Let me just stop you on that because I want to go one at a time. When did that consulting agreement end?**

A. I'd have to get back to you on that. I just don't know.

**Q. But that was going on during the time that Mike the Mower was --**

A. Absolutely.

**Q. -- on the market? Okay. What's another reason you had with Hasbro that prevented you from wanting to rock the boat?**

A. Well, I work with -- most of my livelihood at this time was based on working with inventors as we talked about earlier. So in order to sign up, if you will, a new inventor, to say to them that -- oh, wait. I guess I'm not answering. You said