UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS,
Plaintiffs,

v. CA NO: 05-246S

HASBRO, INC. and HASBRO INTERNATIONAL, INC.
Defendants.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION OPPOSING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENT

*Page*


**I. BRIEF SUMMARY OF FACTS……………………………………………… 1**

**II. STANDARD OF REVIEW………………………………………………… 7**

**III. LEGAL ARGUMENT…………………………………………………….. 8**

A. DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS TO PLAINTIFFS…………………………………… 8

1. DEFENDANTS BREACHED THEIR AGREEMENT TO HOLD CONFIDENTIAL …………………………………9

2. DEFENDANTS BREACHED THE INVENTOR LICENSE AGREEMENT ……………………….……………12

B. PLAINTIFFS' CLAIMS ARE NOT BARRED UNDER THE STATUTE OF LIMITATIONS …………………………………14

1. AGREEMENT TO HOLD CONFIDENTIAL ………………..15

2. INVENTOR LICENSE AGREEMENT ("Agreement") ……...15

a. Defendants misinterpret the language of 6(b)(iv) of the Agreement ……………………………..15

b. It would be against sound public policy to allow contractual limitations to toll against a party who cannot reasonably be aware of facts given rising to claims covered under the provision ................16

c. When royalties should been reported is question of fact in dispute ………………………………………17

C. DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED …………...18

D. DEFENDANTS BREACHED THEIR OBLIGATIONS UNDER THEIR FIDUCIARY RELATIONSHIP WITH PLAINTIFFS ………20

E. DEFENDANTS HAVE MISAPPROPRIATED PLAINTIFFS' IDEAS UNDER RHODE ISLAND LAW…………....22

**IV. CONCLUSION …………………………………………………………....25**

## TABLE OF AUTHORITIES

***Cases*** ***Page(s)***

A. C. Beals Co. v. Rhode Island Hosp., 110 R.I. 275, 287 (1972) ........................**9**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,
106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..........................................**7, 8**

Antonio Marcaccio, Inc. v. Santurri, 155 A. 571, 572 (R.I. 1931) ........................**9**

Anthony Corrado, Inc. v. Menard & Co. Bldg. Contractors,
589 A.2d 1201, 1201-02 (R.I.1991) ...............................................**19**

APG v. MCI, 436 F.3d 294 (1st Cir. 2006) ...............................................**18**

Ardito v. City of Providence, 263 F.Supp.2d 358 at 367. (D.R.I. 2003) .................**9**

Bouchard v. Price, 694 A.2d 670, 673 (R.I.1997) .........................................**19**

Burt v. Rhode Island Hosp. Trust Nat. Bank,
2006 WL 2089254 (R.I.Super. 2006).........................................**20,21**

Burten v. Milton Bradley Co., 763 F.2d 461 (1st Cir. 1985) ..............................**22**

Celotex Corp. v. Catrett, 477 U.S. 317, 324,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ............................................**8**

Commercial Assocs., 998 F.2d at 1092 (1. Cir (R.I.) 1993) ..............................**19**

Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed. 80 (1957) ...............**22**

Curtis v. Metcalf, 1919, 259 F. 961, affirmed 264 F. 650, affirmed 42 S.Ct. 100,
257 U.S. 260, 66 L.Ed. 222. Federal Courts 423 ..............................**15**

DiIorio v. Abington Mut. Fire Ins. Co., 402 A.2d 745 (R.I. 1979) .......................**14**

Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir.1989) ..............**8**

FDIC v. Singh, 977 F.2d 18, 21 (1st Cir.1992) ..............................................**8**

Feinstein v. Brown, 432 F.Supp.2d 258 (D.R.I. 2006) ......................................**8**

Fryzel v. Domestic Credit Corp., 120 R.I. 92, 385 A.2d 663, 666-67 (1978).......**8, 9, 13**

Gannon v. Narragansett Elec. Co., 777 F.Supp. 167, 169 (D.R.I.1991)......................... **8**

Geary v. Hoffman, 98 R.I. 413 (1964)................................................................... **8**

Greater Providence Trust Co. v. Nationwide Mut. Fire Ins. Co.,
355 A.2d 718 (R.I. 1976)......................................................................**14**

Hay v. Pawtucket Mut. Ins. Co., 824 A.2d 458 (R.I. 2003)..................................**14**

| ***Cases*** | ***Page(s)*** |
|---|---|

Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir.1995)…………**21**

In re Newport Plaza Associates, L.P., 985 F.2d 640 at 644(1[st] Cir. 1993) ……………**8,9**

Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 955 (R.I.1979) ……………………………**8**

Magnum Defense v. Harbour Group ltd., 248 F. Supp.2d 64. (D.R.I 2003)………..**22,23**

Marrapese v. State of R.I., 1984, 749 F.2d 934,
certiorari denied 106 S.Ct. 252, 474 U.S. 921, 88 L.Ed.2d 259 ……………...**15**

Merchants Mut. Ins. Co. v. Newport Hosp., 108 R.I. 86, 272 A.2d 329, 332 (1971) …..**18**

Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir.1995)......................**7**

Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995) …………**8**

O'Connor v. McKanna, 116 R.I. 627, 359 A.2d 350, 353 (1976) …………………….....**8**

Place v. California Webbing Industries, Inc., 249 F.Supp.2d 157 (D.R.I. 2003) ……….**7**

Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.1997) …………………………**8**

Rhode Island Hosp. Trust Nat'l Bank v. Bogosian, 11 F.3d 1092, 1101 (1st Cir.1993)…**21**

Russolino v. A. F. Rotelli & Sons, 85 R.I. 160, 163 (1957)............................................**9**

Simpson v. Dailey, 496 A.2d 126, 129 (R.I.1985) ........................................................**21**

Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 106 (1st Cir.1997)....**7**

Tateosian v. Celebrity Cruise Services, Ltd., 768 A.2d 1248 (R.I. 2001) ………………**14**

Zifcak v. Monroe, 105 R.I. 155, 159 (1969) ……………………………………………..**8**

***Statutes***

Fed.R.Civ.P. 56(c) ..........................................................................................................**7**

McKinney's on New York Law, CPLR 213 (2) …………………………………………**15**

Rhode Island Uniform Trade Secret Act…………………………………………...**22-24**

R.I. Gen. Laws § 6-41-1(2) ………………………………………………………...**23,24**

R.I. Gen. Laws §§ 27-5-2 and 27-5-3 ……………………………………………….....**14**

***Treatises***

American Law Reports (9 A.L.R.3d 665) ………………………………………………**22**

Rest. 2d Contr. § 206 …………………………………………………………………...**9**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS, Plaintiffs, | ) | |
| v. | ) | CA NO: 05-246S |
| HASBRO, INC. and HASBRO INTERNATIONAL, INC. Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**

## I. BRIEF SUMMARY OF FACTS

At the core, this action relates to Defendants' fraudulent misappropriation of Plaintiffs' concept/idea called "Talkin' Tools," breaches of contracts,[1] fraudulent misrepresentation and inducement to contract. Defendants' actions have already enriched Defendants nearly one hundred million dollars ($100,000,000)[2] (see attached Exhibit 33).[3]

In 1997-1998 Plaintiffs Ralph H. Baer,[4] Robert Pelovitz[5] and Gary Carlin,[6] conceived and perfected a novel toy concept/idea styled "Talkin' Tools" – characterized toy tools that

[1] There are two contracts at issue in this case: Agreement to Hold Confidential (See attached Exhibit 7) and the Inventor's License Agreement and Exhibit 14).

[2] Please note that the sales figures provided by Defendants for products in at issue appear to cover only up until the middle of September 2006 and do not include the very large holiday sales of November and December that make up most of total annual sales for toys.

[3] Defendants did not move for summary judgment with respect to Plaintiffs' claim for fraud and misrepresentation.

[4] Ralph H. Baer is the owner and principal of Plaintiff R.H. Baer Consultants. Ralph Baer is a named inventor of more than 150 patents around the world. In February 2006, Mr. Baer received the National Medal of Science and Technology (the U.S. equivalent to the Nobel Prize (see attached Exhibit 34) from the President of

incorporate a child friendly personality and make cute phrases relating to the function/activity of the tools. After entering into a non-disclosure and confidentiality agreement (see attached Exhibit 7) with Defendants, Plaintiffs submitted their concept-idea "Talkin' Tools" to Defendants.

Initially, in November of 1998, Mr. Carlin, on behalf of the Plaintiffs, approached Defendants' then Tonka group in Cincinnati, Ohio and pitched "Talkin' Tools" to Stephen M. Toth who was then Defendants' Director of Concept Acquisition. "Talkin' Tools" was presented as a concept/idea for toys along with descriptions of possible examples/models of way to implement the concept including a "talking" hammer, drill, saw, tape measure, and scale (see attached Exhibit 2), as well as a physical sample model of a "talking" tape measure. Mr. Toth expressed interest in reviewing Plaintiffs' concept, filled out an Inventor Review Record form (see attached Exhibit 1) and took the concept in for review. Defendants formally held onto to Plaintiffs' concept submission materials for almost two months before formally rejected the concept in January of 1999 (see attached Exhibit 3).

On February 22, 1999 Plaintiffs re-submitted the same "Talkin' Tools" concept and materials to Defendants' pre-school toy division in Pawtucket, Rhode Island. In a letter dated March 10, 1999, Defendants again formally rejected the concept. Plaintiffs submitted their "Talkin' Tools" concept one last time in June of 1999 with a physical model bear with a tool belt that included "talking" tools attached to it (a different model implementation of the same concept) – this submission was also rejected by Defendants. After receiving three rejections,

---

the United States (See http://www.whitehouse.gov/news/releases/2006/02/print/20060213.html). Mr. Baer's legacy and history of innovation and legendary work in the toys/games industry is on display for the public at the archives of the National Museums of American History at the Smithsonian (see http://invention.smithsonian.org/resources/fa_baer_index.aspx, attached Exhibit 35), The Museum of Science and Industry in Chicago, Tokyo Science Museum, the German Nixdorf Museum, Computerspiel Museum in Berlin, the American Computer Museum in Bozeman, Montana, and Museum of the Moving Image in Astoria, NY.

[5] Robert Pelovitz is the owner and principal of Plaintiff MicroPROS Technology Solutions and the managing partner of Acsiom, LLC. For the past 25 years, Mr. Pelovitz has designed and developed systems, circuitry and software for a wide variety of consumer and commercial electronic products. Mr. Pelovitz has also supported numerous intellectual property disputes, primarily associated with electronic toys and video games, as both a non-testifying and testifying expert since 1983. He is also a named inventor on five United States patent applications and several others worldwide.

.

[6] Gary Carlin is the owner and principal of Plaintiff Inventor's Greenhouse and has been in the business of marketing and developing concepts for toys and games for over two decades.

Plaintiffs were certain that Defendants had no interest in pursuing Plaintiffs' concept. Until, "out of the blue" in late September of 2000 (over a year after receiving their last rejection), Mr. Carlin received an unusual phone call from Mr. Toth who immediately brought up Plaintiffs' "Talkin' Tools" idea submission (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24).

During this telephone conversation, Mr. Toth told Mr. Carlin that Defendants' Tonka group had developed a line of "talking" tools that were almost identical to what Plaintiffs had shown him in their November 30, 1998 idea submission meeting (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24). Mr. Toth also told Mr. Carlin that Defendants had independently and internally conceived of a "talking" "workbench" that had no relationship to Plaintiffs' "Talkin' Tools" idea submission. Id. Mr. Toth expressed Defendants' firm unwillingness to pay Plaintiffs for what described as a standalone "workbench" if a license was to be offered for "Talkin' Tools"[7] (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24 and Exhibit 13, March 20, 2001 letter from Plaintiff Gary Carlin to Defendants).

Unknown to Plaintiffs at the time, at least as early as June 2000 (a year after rejecting Plaintiffs' last "Talkin' Tools" submission) Defendant' then Tonka group was developing a new line of toys styled "**TALKIN' TOOLS**" (see attached Exhibit 12 and Exhibit 16) that included "talking" toy tools that talk including a talking tape measure, hammer, saw, drill that were anchored and/or centered around a workbench (see attached Exhibit 18 and Exhibit 2). At least as early as July 5, 2000, the Tonka group had developed concept sketches for toys a line of toys titled "Talkin' Tools" accompanied with a description that read: "Tonka Talkin' Tools is an interactive workbench filled with friendly 'building buddy' characters that come to like. This exciting playset comes with talkin' tool characters who say funny and encouraging phrases" (see attached Exhibit 18). After discovery in litigation, Plaintiffs

[7] Shortly after the September 2000 telephone conversation with Mr. Carlin, Mr. Toth filled out an internal License Request form in which he described Plaintiffs' "Submission's Unique Innovation" (part B of the form) as "TOOLS AS TALKING CHARACTERS – FIRST TO ADD CHUCK-LIKE PERSONALITY TO ITEMS OTHER THAN VEHICLES FOR TONKA" (See attached Exhibit 15). The form was reviewed and signed on October 5, 2000 by five Senior Managers of Defendants: Chris Connolly, Defendants' VP Marketing, Derek Stothard (Marketing director and leader of the Tonka group that had implemented Defendants' Talkin' Tools line of toys), Marketing Director, Howard Bollinger (Mr. Toth's Supervisor), Senior VP, Product Concepts, and others (see attached Exhibit 15 and Exhibit 31, Deposition of Mr. Stothard 105:8-12). All of these individuals confirmed and executed the document, at the time, with the statement that Plaintiffs' concept-idea submission "tools as talking characters" was "First to add chick-like personality to items other than vehicles for Tonka."

learned that as of July-August of 2000 Defendants were obtaining specific cost quotes for production and manufacturing of "Talkin' Tools."(see attached Exhibit 23). These were specific quotes down to the number of parts for each toy.

Joe Khan, the designer for Defendants' Tonka group, testified that the Talkin' Tools line of toys was a new line of toys that he was approached to develop by his supervisor at the time, lead designer for the group David Voss (not an extension of any previous line) (See attached Exhibit 25, Deposition of Joe Khan at 25:1-17). Mr. Khan also testified that the common feature of the Talkin' Tools line was the fact that "they were shaped like tools. They characterized screwdrivers and workbenches and hammers and nails" (see attached Exhibit 25, Deposition of Joe Khan at 34:20-22). Mr. Khan further testified that the "workbench" was the "advertisable" toy that started the Talkin' Tools line and that the Talkin' Tools line of toys was going to start with a Talkin' Tools workbench (see attached Exhibit 25, Deposition of Joe Khan at 23:1-8). Mr. Voss also testified that talking tools and the workbench were conceived of at the same time (see attached Exhibit 20, David Voss's transcript, p. 31: 1-6 and 32:6-17). Wendy Buelsing who also worked in the same group and on the "Talkin' Tools" line of toys also testified to the same. In response to the question whether the Talkin' Tools workbench and Talkin' Tools "were all part of the same concept?" Ms. Buelsing said **"YES. YEAH, THEY'RE ALL – ABSOLUTELY, THEY'RE ALL RELATED. YEAH"** (see attached Exhibit 21, Deposition of Ms. Buelsing at 45:1-4).

Ms. Buelsing additionally testified that the "workbench" was developed subsequently to the discussions on how to make the Talkin' Tools line in order to provide a platform to sell the concept of Talkin' Tools by making the entire line financially feasible: "[DEFENDANTS] **PROBABLY COULDN'T HAVE SOLD INDIVIDUAL TOOLS BY THEMSELVES, FOR LOTS OF REASONS"** (see attached Exhibit 21, Deposition of Ms. Buelsing at 27:19-24, 28:1-16, 29:15-20).

Some time around the September 2000 conversation between Mr. Toth and Mr. Carlin, an email titled "Tonka Tool Bench Capacity," from Derek Stothard, the head of the then Tonka group working on Talkin' Tools, copied to all individuals in his group, alarmingly warned that Defendants "are going to get a 2% royalty hit across this segment" (see attached Exhibit 26). Mr. Stothard at his deposition testified that the reference to "the segment" in the email he then sent referred to Talkin' Tools and the Talkin' Tools Workbench as a group of

toys. (see attached Exhibit 31, Deposition of Mr. Stothard at 126:12-18). Again, confirming the conceptual unity of "Talkin' Tools" and the "workbench" the expectation of the Tonka group developing the line that it had been invented by an outside inventor and were all part of one concept – which is in direct contradiction with Mr. Toth's representation to Mr. Carlin that Defendants had independently and internally conceived of "talking" "workbench" and that it had no relationship to "Talkin' Tools."

It is also indisputable that designers in Defendants' then Cincinnati Tonka group that implemented the "Talkin' Tools" line of toys were presented and reviewed Plaintiffs' "Talkin' Tools" idea submission prior to implementing the line (see attached Exhibit 2). Mr. Toth, in response to the question of who at Hasbro (Defendants) had access to Plaintiffs' idea submission submitted for review, testified that "it was with the Tonka team for them to review and consider further" (see attached Exhibit 8, deposition of Mr. Toth at 60:23 and 61:1). Mr. Voss also this in his testimony, "an inventor had submitted it to Steve and Steve had brought it into the internal group" (see attached Exhibit 20, Deposition of David Voss at 21: 13-15).

Realizing that Plaintiffs would see the Talkin' Tools workbench at the upcoming trade show in February, which at least one of the Plaintiffs regularly attended, Defendants preemptively contacted Plaintiffs (Mr. Carlin) and fraudulently induced them to sign an agreement to exclude the "workbench" – the very toy that was the commercial centerpiece and at the time the only commercial product implementation of Plaintiffs' "Talkin' Tools" idea submission.

During September-December 2000 negotiations over the terms of the Inventor's License Agreement, Defendants continued to insist that the "workbench" been conceived independent from Plaintiffs' "Talkin' Tools" idea submission. Despite some discomfort about the matter, Plaintiffs relying on the expectation of a trusting relationship with Defendants were induced to enter into the Inventor License Agreement with the terms excluding a "workbench." Plaintiffs also trustingly signed an undated License Agreement some time in late December 2000 or early January 2001 that was backdated by Defendants to September 29, 2000.

In February 2001 Mr. Carlin attended the New York Toy Fair, the largest annual toy and game trade show, where Mr. Carlin was surprised to see Defendants' finished "talking"

toy "workbench" that was styled the "Talkin' Tools Workbench" and where it comprised a number of "talking" tools" centered around and interacting with a bench.

Mr. Carlin on behalf of the Plaintiffs wrote a letter to Defendants protesting Defendants' earlier representation that the "workbench" was a standalone toy with no relationship to "Talkin' Tools" (see attached Exhibit 13). Yet, Defendants continued to insist that it had independently conceived toy; having no evidence to the contrary and lacking any bargaining power,[8] Plaintiffs let the issue rest.

In October of 2001, Defendants invited Plaintiffs to pitch new ideas to revive the sales of stagnant G.I. Joe brand (see attached Exhibit 5, Deposition of Gary Carlin I at 105: 17-24 and 106:1-22). Mr. Carlin and Mr. Baer attended the meeting that lasted for about an hour. Plaintiffs were surprised by the relatively cold reception from Mr. Mauer who was the Director of Concept Acquisition and inventor liaison for Defendants at the time and represented them at the meeting. When Plaintiffs' presentation was over and they were preparing to leave the room, Mr. Maurer unexpectedly pulled out three model toys from besides him and demanded answers as to whether they toys were "talking" "tools" or not (See attached Exhibit 32, Deposition of Ralph Baer I at 7: 3-15). Mr. Baer had been seriously ill at the time[9] and at a deposition taken by Defendants testified that he did not actually see the toys from where he was sitting and had no recollection as to what happened at during the last few minutes of the meeting[10] (see attached Exhibit 32, Deposition of Ralph Baer I at 11: 7, 13-16; at 14:22-24; at 17:1-11). Mr. Carlin testified that at that meeting he saw the toy models presented "very quickly" (see Exhibit 5 113:22). Plaintiffs were later to learn that the toys that were pulled out that afternoon were to become new extensions of Defendants' "Talkin' Tools" line: COOL CREW and YARD CREW.

---

[8] There are very few major companies in the toy industry who could serve as potential clients for the Plaintiffs and Plaintiffs were concerned that if challenged Defendants position they may no longer be able to do business with them – which is exactly what Defendants threatened to do and did once Plaintiffs filed a lawsuit against them enforce their rights.

[9] Mr. Baer at the time was over close to eighty years old and was fighting leukemia and had just come down with pneumonia that very evening (see attached Exhibit 32, Deposition of Ralph Baer I at 23: 20-24 and 24:1-2).

[10] Mr. Baer testified that Mr. Carlin had later explained to him what had happened (See attached Exhibit 32, Deposition of Ralph Baer I at 28: 18-24 and 29:1-19).

Plaintiffs learned for the first time that Defendants were selling what they referred to as "Yard Crew toys" in their "Talkin' Tools" line when Plaintiffs received a letter dated January 30th 2003 with a royalty reports representing domestic sales for the fourth quarter of 2002 for the "Yard Crew Weed Trimmer." Plaintiffs also learned for the first time that Defendants were selling a "talking" toy mower when Plaintiffs received a letter dated February 28, 2003 with a royalty report from Defendant Hasbro International representing sales for the fourth quarter of 2002 for the "Big Mike the Mower" (see attached Exhibit 30). Plaintiffs have never received royalty reports providing information regarding domestic sales for "talking" mowers and/or sales information and/or royalty reports on any other "Talkin' Tools" at issue in this case until Plaintiffs filed a lawsuit and requested discovery. Plaintiffs did not receive sales information for any of the toys at issue until 2006 after Plaintiffs filed a Motion to Compel which was granted with respect to the sales information for the toys Plaintiffs claimed were at issue. Defendant Hasbro, Inc. has never paid Plaintiffs royalties for domestic sales for "talking" toy mowers; whereas Defendant Hasbro International paid royalties for "Big Mike the Mower" until this inconsistency was brought to Defendants' attention in litigation; Defendants since stopped paying royalties on the international sales of "Big Mike the Mower." Since 2003 Defendants have continued to bring new "Talkin' Tools" to the market including "talking" toy vacuums, grills, and others toys without paying royalties on them.

## II. STANDARD OF REVIEW

In deciding a motion for summary judgment Courts are obligated to construe all facts and make all inferences in favor of non-moving party. Place v. California Webbing Industries, Inc., 249 F.Supp.2d 157 (D.R.I. 2003) (citing Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 106 (1st Cir.1997)). Because granting such motion caries dire consequences for the non-moving party's action, the Court must find that there is not a single set of facts or there is not a single legal theory upon which jury could find for non-moving party. Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A fact is material if it might affect the outcome of the suit." Place v. California Webbing Industries, Inc., 249 F.Supp.2d 157 (D.R.I. 2003) (citing

Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir.1995), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The Court "must view all facts and draw all inferences in the light most favorable to the nonmoving party." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.1997). The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." Gannon v. Narragansett Elec. Co., 777 F.Supp. 167, 169 (D.R.I.1991) (citation omitted).

## III. LEGAL ARGUMENT

### A. DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS TO PLAINTIFFS

The law for contract interpretation is clear. The first governing principle is that the summary judgment is only appropriate when the contract's terms are totally **conclusive** as to their meaning. Even a slight possibility of more than one interpretation will defeat a motion for summary judgment. In re Newport Plaza Associates, L.P., 985 F.2d 640 at 644(1st Cir. 1993) (The key is the lack of any ambiguity. See FDIC v. Singh, 977 F.2d 18, 21 (1st Cir.1992); see also Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir.1989) (same rule applies in directed-verdict context). The First Circuit has held that the requirement for the moving party to **conclusively** prove lack of any ambiguity before Court may decide contract issues is in harmony with Rhode Island's jurisprudence. See, e.g., Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 955 (R.I.1979); Fryzel v. Domestic Credit Corp., 120 R.I. 92, 385 A.2d 663, 666-67 (1978); O'Connor v. McKanna, 116 R.I. 627, 359 A.2d 350, 353 (1976)." Id. at 644. See also Geary v. Hoffman, 98 R.I. 413 (1964); Russolino v. A. F. Rotelli & Sons, 85 R.I. 160, 163 (1957). This Court just recently applied this principle in Feinstein v. Brown,

432 F.Supp.2d 258 (D.R.I. 2006) (If this Court finds an ambiguity, then "the construction of that provision is a question of fact." Fryzel v. Domestic Credit Corp., 120 R.I. 92, 385 A.2d 663, 666 (1978)(An ambiguity that creates a genuine issue of material fact, therefore, precludes summary judgment).

The second governing principle is when there is an ambiguity as to a term, the term's interpretation must be read against the drafter. Fryzel v. Domestic Credit Corp., 120 R.I. 92 (1978), A. C. Beals Co. v. Rhode Island Hosp., 110 R.I. 275, 287 (1972); Zifcak v. Monroe, 105 R.I. 155, 159 (1969); Russolino v. A. F. Rotelli & Sons, 128 A.2d 337 (R.I. 1957); Antonio Marcaccio, Inc. v. Santurri, 155 A. 571, 572 (R.I. 1931); Ardito v. City of Providence, 263 F.Supp.2d 358 at 367. (D.R.I. 2003); Rest 2d Contr § 206; In re Newport Plaza Associates, L.P., 985 F.2d 640 (1st Cir. 1993).

**1. DEFENDANTS BREACHED THEIR AGREEMENT TO HOLD CONFIDENTIAL**

Defendants breached their "Agreement To Hold Confidential" entered into on November 12, 1997 (see attached Exhibit 7, "Agreement to Hold Confidential"). By failing to maintain proper safeguards for protecting the integrity and chain of custody of Plaintiffs' confidentially disclosed novel concepts for toys, improperly "**using**" these concepts, and then falsely representing the nature of **"use"** of these concepts that were improperly used in the first place, Defendants breached their Agreement To Hold Confidential.

Paragraph 4 of the Agreement to Hold Confidential provides:

> The receiving party acknowledges that, during the period of confidentiality, as specified by Paragraph 13, it **will not use** information identified as being confidential hereunder for **commercial purposes without the consent** of the disclosing party. ***Use*** **shall mean conscious consideration** of the Information in conjunction with deliberate implementation of the Information (See attached Exhibit 7) (emphasis added).

Paragraph 13 of the Agreement to Hold Confidential Provides:

> The obligation of confidentiality imposed by this Agreement **shall extend**, with respect to each identified item of confidential information, for **two (2) years** from the **date of initial disclosure** of such information; provided, however, that in the case of disclosures by Inventors of an Amusement, and in the event that Company **elects not to license** the Amusement from Inventor, such obligations of confidentiality **shall extend** for **two years from** the date that such election is **communicated** to the Inventor (See attached Exhibit 7) (emphasis added).

In March of 1999 Defendants formally rejected Plaintiffs' submission styled **"Talkin' Tools"** (see attached Exhibit 4, printout from Defendants' idea submission tracking system for Plaintiffs' concept/idea titled "Talkin' Tools" and Exhibit 2). Despite rejecting the concept, Defendants' Tonka Group, at least as early as June of 2000, had been under "conscious consideration" and development of a line of "talking" tools styled **"Talkin' Tools"** (exact same name as Plaintiffs' confidential idea submission) as represented by Defendants' Tonka group's concept sketches that included **four out of the five identical** examples of the "Talkin' Tools" including a "talking" hammer, drill, tape measure, saw described in Plaintiffs' November 1998 and January 1999 "Talkin' Tools" idea submissions to Defendants (See attached Exhibit 16 and Exhibit 2). Mr. Toth testified and confirmed that members of Defendants' Tonka Group were presented and **REVIEWED** Plaintiffs' "Talkin' Tools" idea submission (see attached Exhibit 8, Deposition of Steven Toth at 61: 2-4).

At least as early as July 5, 2000 Defendants were drafting toy sketches titled "Talkin' Tools" accompanied with a description that read: "Tonka Talkin' Tools is an interactive workbench filled with friendly 'building buddy' characters that come to like. This exciting play set comes with talkin' tool characters who say funny and encouraging phrases" (see attached Exhibit 18). At least as early as August of 2000 Defendants had already completed pre-manufacturing product cost analysis for "Talkin' Tools" toys including a Screwdriver, Sledge Hammer, Tape Measure, and Ratchet (see attached Exhibit 23). Defendants had completed pre-manufacturing Product Cost analysis for the Talkin' Tools Workbench by August 29, 2000 (see attached Exhibit 24).

Joe Khan, Defendants' Tonka group signer that was charged with implementing "Talkin' Tools," testified that the common feature of the Talking Tools line was the fact that "they were shaped like tools. They characterized screwdrivers and workbenches and hammers

and nails" (See attached Exhibit 25, Deposition of Joe Khan at 34:20-22). In July 31, 2000, the Senior Designer for Defendants' Tonka group, David Voss, filled out a Concept Brief form, which he titled "Tonka's Talkin' Tools" (See attached Exhibit 19). Joe Khan additionally testified that the common feature of the Talking Tools line was the fact that "they were shaped like tools. They characterized screwdrivers and workbenches and hammers and nails" (see attached Exhibit 25, Deposition of Joe Khan at 34:20-22). David Voss testified at his deposition that he did not come up with an idea for the "Talkin' Tools Workbench" and that "Talkin' Tools" and the "Talkin' Tools Workbench" were conceived of together, "**NOTHING WAS DONE INDEPENDENTLY. EVERYTHING WAS KIND OF DONE ALL TOGETHER"** (See attached Exhibit 20, Deposition of Mr. Voss at 83:1-10).

Ms. Buelsing, who was a marketing person in Defendants' Tonka group working on the "Talkin' Tools" line, testified in response to the question whether the Talkin' Tools Workbench and Talkin' Tools "were all part of the same concept stated, **"YES. "YEAH, THEY'RE ALL – ABSOLUTELY, THEY'RE ALL RELATED. YEAH"** (see attached Exhibit 21, Deposition of Mrs. Buelsing at 45:1-4). Mr. Kahn also testified that "**THE TALKING TOOL BENCH IS THE ADVERTISABLE TOY THAT STARTED THE TALKING TOOL LINE**" (see attached Exhibit 25, Deposition of Joe Khan at 25:1-17).

Despite all the evidence that "Talkin Tools Workbench" was an implementation and one and the same with the "Talkin' Tools" concept, in September of 2000 Mr. Toth, misrepresented[11] to Mr. Carlin that Defendants' "talking" "workbench" was a standalone item internally created and independently developed from the talking tools with which it was supposed to interact (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24 and Exhibit 13, March 20, 2001 letter from Plaintiff Gary Carlin to Defendants).

Defendants continue to implement new extensions of Plaintiffs' "Talkin' Tools" idea submission such as Cool Crew toys. Defendants' promotional material for Cool Crew toys reads: "**ARE THEY TOOLS OR ARE THEY BUDDIES? THEY'RE BOTH**" and lists the "Tool Bench," "Dusty the Vacuum", Bobby Q. Grill, "Mike the Mower" all toys that the Plaintiffs believe are "Talkin' Tools" and should be paid royalties for, but have not been paid (see attached Exhibit 27). Defendants' internal documents describe "Big Mike Mower" as a

[11] Mr. Toth's telephone call to Mr. Carlin in September of 2000 was the first time Defendants had made communications with Plaintiffs since rejecting Plaintiffs' idea submission over a year before.

"tool," "**BIG MIKE MOWER IS THE LEADER OF A TOUGH BUT EFFICIENT CREW OF YARD POWER TOOLS"** (see attached Exhibit 28). Mr. Labarbara, Defendants' Vice-President for Concept Acquisition, testified that "Big Mike Mower" is a part of the Talkin' Tools line of toys (See attached Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 38:12-14).

The above described evidence demonstrates that there clearly exists a genuine issue of material fact as to whether Defendants breached the "Agreement to Hold Confidential" by (1) improperly "using" Plaintiffs' idea submission in the place; (2) consciously considering the information in conjunction with deliberate implementation (including obtaining cost quotes, writing scripts for the toys, holding consumer testing groups); and (3) then later misrepresenting the nature of their use by falsely representing the origin and nature of the "Talkin' Tool bench" and true relationship to "Talkin' Tools" which is that they are one and the same concept, the latter being the commercial product implementing the same.

### 2. DEFENDANTS BREACHED THE INVENTOR LICENSE AGREEMENT

The definition and the scope of what constitutes a "tool" within the concept of "Talkin' Tools" is very broad and any ambiguity with respect to its definition must be read against Defendants, who originally drafted of the Agreement (see attached Exhibit 8, Deposition of Mr. Toth at 39: 14-19). The paragraph 1(a) of the Inventor's License Agreement reads:

> "Item" means **the concept**, product, design, and/or invention presented by Licensor to Licensee, currently known as "TALKIN' TOOLS" and described as a pre-school tool toy having a fanciful "face" embedded in the operating elements of the *tool* or its casting and an electronic voice-producing chip which issues audible statements evocative of the function of the tool and triggered by those functions … (See attached Exhibit 14, at 1 (a))(emphasis added).

It further states in the same paragraph that:

> The *sample disclosed* is a tape measure [] Other versions of the Item embodying the combined face and voice characteristics of the Item *could include* a hammer, screwdriver and pliers, and *could be sold* individually or in sets … (see attached Exhibit 14, at 1 (a))(emphasis added).

The operative words that define the substance of this paragraph are **"concept"** defining the meaning of "Item" and **"could"**[12] indicate the opened nature of the potential "Talkin' Tools." The inherent ambiguity of what "tools" are "Talkin' Tools" is best supported by the fact that two Defendants themselves (Hasbro, Inc. and Hasbro International) have interpreted the scope of which differently - Defendants Hasbro International paid royalties on "Big Mike the Mower" whereas Defendant Hasbro did not pay for domestic sales for the fourth quarter of 2002 (see attached Exhibit 30).[13] Where there is an ambiguity, then "the construction of that provision is a question of fact." Fryzel v. Domestic Credit Corp., 120 R.I. 92, 385 A.2d 663, 666 (1978)(an ambiguity that creates a genuine issue of material fact, therefore, precludes summary judgment).

Mr. Labarbara, Defendants' Vice-President for Concept Acquisition, himself testified at his deposition that "Big Mike Mower" is a part of the "Talkin' Tools" line of toys (See attached Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 38:12-14). Defendants' internal documents describes "Big Mike Mower" as a toy "tool," "**BIG MIKE MOWER IS THE LEADER OF A TOUGH BUT EFFICIENT CREW OF YARD POWER TOOLS"** (see attached Exhibit 28). Defendants' promotional material for Cool Crew toys reads: "**ARE THEY TOOLS OR ARE THEY BUDDIES? THEY'RE BOTH**" and lists the "Tool Bench," "Dusty the Vacuum", Bobby Q. Grill, "Mike the Mower" yet Defendants never even disclosed the existence of these products until discovery in litigation and have never paid royalties on them[14] (see attached Exhibit 27).

---

[12] Webster dictionary definition of word "could': "an alternative to *can* suggesting less force or certainty."

[13] Plaintiffs dispute the Defendants' characterization of the fall 2001 meeting (see Plaintiffs' Statement of Facts in Dispute). Furthermore, the validity of Defendants' alleged Fall 2001 agreement would be invalid per Inventor's License Agreement and Statute of Fraud, because their were not memorialized in writing.

[14] With the exception of "Big Mike the Mower" in Defendants represented payment on royalties for international sales with in their February 28, 2003 report, but after then after litigation resume Defendants stopped paying on them as well.

Mr. Toth, who, was the original point of contract negotiations with Plaintiffs, testified that the Agreement "Talkin' Tools" should have been limited to "hand-held tools" (see attached Exhibit 8, Deposition of Mr. Toth at 40: 12-15) – again supporting Plaintiffs' contention as to the broadness of the term "tools" in the Agreement and/or at the very least the ambiguity in the term. In July 31, 2000, the Senior Designer for Defendants' Tonka group, David Voss filled out a Concept Brief form, which he titled "Tonka's Talkin' Tools" (See attached Exhibit 19). In the Concept Brief form Mr. Voss stated in Line Strategy Summary section: "Opportunity to build a new and unique character segment for Tonka. Will allow the brand to expand the line into different areas of tough boy toys" (see attached Exhibit 19). In the Product Features section of the Concept Brief form, Mr. Voss stated: "Interactive workbench and tool characters will truly "come to life" with funny phrases and sounds" (see attached Exhibit 19).

Joe Khan, the signer charged with implementing "Talkin' Tools," testified that the common feature of the Talking Tools line was the fact that "they were shaped like tools. They characterized screwdrivers and workbenches and hammers and nails" (see attached Exhibit 25, Deposition of Joe Khan at 34:20-22).

The plain language of the Agreement provides the term "Talkin' Tools" without any limitations with respect to the definition of the term "tools" and thus should be interpreted broadly against the drafters of the Agreement. Given the contradictory and multiple interpretations, even amongst the Defendants and their executives, of what "tools" should be deemed "Talkin' Tools," at the very least ambiguity must be construed with respect to the definition of "tools" within the concept of "Talkin' Tools." As the contract is not **"conclusive"** as to meaning of the term "tools" under the controlling law, a genuine issue of material fact exists with respect to its interpretation and summary judgment on this issue and breach of contract should be denied.

### B. PLAINTIFFS' CLAIMS ARE NOT BARRED UNDER THE STATUTE OF LIMITATIONS

The cases cited by Defendants on the issue of contractual limitations in their Motion for Partial Summary Judgment are not appropriate for the contractual interpretation in the context of the current dispute. In Hay v. Pawtucket Mut. Ins. Co., 824 A.2d 458 (R.I. 2003),

Greater Providence Trust Co. v. Nationwide Mut. Fire Ins. Co., 355 A.2d 718 (R.I. 1976) and DiIorio v. Abington Mut. Fire Ins. Co., 402 A.2d 745 (R.I. 1979), the Supreme Court of Rhode Island dealt with the contractual "time to file the suit" clause specifically mandated by statute to be included with each insurance contract. See R.I. Gen. Laws §§ 27-5-2 and 27-5-3. In the case of Tateosian v. Celebrity Cruise Services, Ltd., 768 A.2d 1248 (R.I. 2001), the Supreme Court of Rhode Island specifically stressed that the contract at issue in Tateosian was "a maritime contract, the interpretation and enforcement of which is governed by federal maritime law." Id. at 1250.

Limitations should not bar claimant before a party has reasonable basis for believing it has a claim. Marrapese v. State of R.I., 1984, 749 F.2d 934, certiorari denied 106 S.Ct. 252, 474 U.S. 921, 88 L.Ed.2d 259. Where party fraudulently concealed facts, a time period limitation for bringing a claim shall not be deemed to accrue until the party entitled to sue shall first discover its existence. Curtis v. Metcalf, 1919, 259 F. 961, affirmed 264 F. 650, affirmed 42 S.Ct. 100, 257 U.S. 260, 66 L.Ed. 222. Federal Courts 423.

### 1. AGREEMENT TO HOLD CONFIDENTIAL

The "Agreement to Hold Confidential" is governed by New York State law (see attached Paragraph 14 of Exhibit 7). Under New York law, a breach of contract is subject to a six-year statute of limitations. McKinney's on New York Law, CPLR 213 (2).

Plaintiffs only learned that Defendants breached their "Agreement To Hold Confidential" through discovery in 2005 and 2006. Even if tolling of the New York statute began in June of 2000, when Defendants first engaged in misappropriation,[15] Defendants' breach is within the six-year statute of limitations under New York State law as Plaintiff filed their law suit in June of 2005.

### 2. INVENTOR LICENSE AGREEMENT ("Agreement")

#### a. Defendants misinterpret the language of 6(b)(iv) of the Agreement

[15] Statutes of Limitations in New York and generally are interpreted to toll when a party knew or reasonably should have known of the wrongful acts.

Defendants' claimed "contractual limitations" language (6(b)(iv) of the Agreement) has been taken out of context as it is in the "Records" section which is a subsection of the "Primary Product" section that is in turn under the provision for the "Terms of Payment" **(**<u>see</u> attached <u>Exhibit 14</u>**,** 6(b)(iv) of the Agreement)**.** The language that Defendants rely on for their proposition is not a standalone "contract limitations" provision and cannot be interpreted as such to override the Rhode Island legislature's tatute of limitations law for contract disputes.

Provision 6(b)(iv) titled "Records" is a records housekeeping provision relating to Plaintiffs' right to review original sales records for verification of payment for toys under the Agreement for which Defendants **<u>have made payments on</u>**:

> 6. TERMS OF PAYMENT:
>
> (iv) Records: Licensor or its authorized representative will have the right no more than once per calendar year to an examination of the separate records of Licensee WITH RESPECT TO THE SALES OF PRIMARY PRODUCTS **UPON WHICH LICENSOR RECEIVES A ROYALTY**" … licensor will retain such separate record for a period of three (3) years following rendition of any report … Any proceeding to obtain payments claimed under this Agreement will be barred unless commenced, and Licensee is notified, within 3 years of the date upon which such payments should have been reported according to this Agreement. (**6(b)(iv)**, <u>Exhibit 14</u>) (emphasis added)**.**

Paragraph 6(b)(iv) relates to proceedings to enforce/challenge the accuracy of payments made with respect to "products upon which licensor receives royalties." The plain language of 6(b)(iv) provides a 3 year the time period to dispute "payments" for products, but the "products" that are covered by this provision are limited to **"Primary Products upon which licensor receives a royalty"** - not products for which Licensor never received royalties on. In the present case, Plaintiffs at no point received "payments"[16] on any of the products at issue in this case including the "talking" vacuum, grill kitchen etc.[17] – Plaintiffs' breach of

---

[16] With the exception that Plaintiffs first received payments in a royalty report (<u>see</u> attached <u>Exhibit 30</u>). representing internationals sales for "Big Mike the Mower" for the last quart of 2002 with a letter dated February 28, 2003 some time shortly after that date.

[17] For most of the products at issue the first date of sale (based on the sales information obtained in litigation discovery) is within the three years from when Plaintiffs filed their lawsuit, though Plaintiffs would have never known such information if they had not had the benefit of a Motion to Compel production in discovery.

contracts claims in this action apply to products that Defendants never provided payments for and thus this provision has no bearing on Plaintiffs' claims. Plaintiffs do not dispute sales for any products upon which Plaintiffs (licensor) received a royalty reports (sale information) prior to June 8, 2002 (three years before the filing of this action)[18].

**b. It would be against sound public policy to allow contractual limitations to toll against a party who cannot reasonably be aware of facts given rising to claims covered under the provision**

Aside from being an incorrect reading of the Agreement on its face, to interpret 6(b)(iv) in the manner advocated by Defendants would be against public policy underlying statutes of limitations and/or "contractual limitations" because a contractual limitation could run against party without the party ever getting notice that it has run, thus barring the party from bringing a claim as a result of the other sides' concealed wrongful acts - to extend the language of 6(b)(iv) to products that "should have been reported" but were not and for which Plaintiffs never received any "payments" for would prevent Plaintiffs from bringing claims against Defendants for products developed that were extensions of Plaintiffs' idea submission, but since Defendants never made payments on them (never included payments for them in royalty reports), Plaintiff would never become aware that they were ever even sold (unless by chance) and clearly could never know when royalties for these products "should have been reported." Plaintiffs were unaware of the existence of many of the products and combinations of products that Plaintiffs now seek royalties under the Agreement and only have become aware as result of discovery in litigation. Defendants products are sold all over the world and it would be impossible and unreasonable for Plaintiffs to when each product was sold, where the product was sold and when it would have been reported by Hasbro unless Plaintiffs received information about the products from Defendants. To allow a contract provision to run from a series of dates ("when the payments should have been reported") for products and sales of which only the Defendants are privy to would be contrary to public policy and encourage Licensees to hide products and not pay royalties for products covered under the Agreement and then after three years escape liability.

**c. When royalties should have been reported is a question of fact in dispute**

[18] This would **<u>ONLY</u>** include the chainsaw, weed trimmer, screwdriver, hammer, hacksaw, tape measure and vice.

When royalties should have been reported is a question of fact. Defendants' own motion applies two different sets of analysis to arrive at different dates the Plaintiffs would be barred from bringing suit on the workbench under the license agreement. Defendants' Motion for Summary Judgment, Pages 12-13. The first analysis determines the breach of contract claim under the Agreement, with respect to the Workbench, would have to be brought prior to March 19, 2004 and the second analysis provides any breach of contract claim under the license agreement would have to be brought by November 29, 2004.

The first time that Plaintiffs in fact became aware that Defendants were selling a "taking" toy mower was when Plaintiffs received a letter dated February 28, 2003 with a royalty report from Defendants Hasbro International representing international sales for "Big Mike the Mower" for the fourth quarter of 2002 (see attached Exhibit 30).[19] Thus, any lawsuit with respect to breach of contract, even under Defendants' interpretation of the 6(b)(iv), would have allowed Plaintiffs to bring their lawsuit on or before February 28, 2006 which Plaintiffs did.[20]

## C. DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED

Defendants cannot be allowed to enjoy the benefit of almost one hundred million dollars ($100,000,000) of sales after having fraudulently misappropriated Plaintiffs' idea submission. The Rhode Island Courts stress a strong justification for enforcement of the claim for unjust enrichment: "**it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another.**" Merchants Mut. Ins. Co. v. Newport Hosp., 108 R.I. 86, 272 A.2d 329, 332 (1971). The First Circuit Court in APG v. MCI, 436 F.3d 294 (1st Cir. 2006) citing to Rhode Island law for a claim of unjust enrichment:

> To establish a claim for unjust enrichment under Rhode Island law, a plaintiff must prove three elements: " '(1) a benefit must be

[19] Defendants inaccurately represent a critical date – international sale for Mike the Mower were only first represented to Plaintiffs in letter dated February 28, 2003 (presumably received by Plaintiffs days after) for sales for the last quarter of 2002 (not February of February 28, 2002) as Defendants represent in their Motion for Summary Judgment.

[20] Defendants have only moved for summary judgment on the issue of statute of limitations with respect to two (2) toys. There are presently almost thirty toys at issue, but Defendants argue to strike two (2) of the toys as being barred by the statute of limitations.

> conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof.' "Bouchard v. Price, 694 A.2d 670, 673 (R.I.1997) (quoting Anthony Corrado, Inc. v. Menard & Co. Bldg. Contractors, 589 A.2d 1201, 1201-02 (R.I.1991)); see also Commercial Assocs., 998 F.2d at 1100. Id. at 305.

In reversing the ruling for summary judgment on the unjust enrichment claim, the First Circuit noted that Plaintiffs need only satisfy three basic elements of the claim where as in order to succeed on summary judgment Defendants must **conclusively** prove the absence of any plausible interpretation of facts. Id. at 306.

Following Rhode Island law's factors in the present case: (1) a benefit – Defendants conferred upon Plaintiffs' the concept-idea Talkin' Tools when they took in and exposed the concept-idea to the designers and marketing from Hasbro's Tanka group -- (2) appreciation by the defendant of such benefit - Defendants used the concept in implementing their "Talkin' Tools" line of toys including the "Talkin' Tools Workbench (3) acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof - Defendants came out with a Talkin' Tools Workbench and other Talkin' Tools including Mike the Mower and Dusty the vacuum and many other toys based as extensions of the "Talkin' Tools" concept that has already generated close to $100, 000,000.

With respect to the first factor, Mr. Toth testified that members of Defendants' Tonka Group reviewed Plaintiffs' submission (see attached Exhibit 8, Deposition of Steven Toth at 61: 2-4).

With respect to factor two, according to handwritten designers' notes and play pattern notes made by members of Defendants' Tonka Group dated July and August of 2000, the Talkin' Tool bench and Talkin' Tools toys were all part of one concept (see attached Exhibit 22, Exhibit 12, Exhibit 18 and Exhibit 19). Defendants' Tonka Group at least as early as June of 2000 had been intensively developing the Talkin' Tools line of toys without the knowledge of Plaintiffs and after sending out several rejection letters a year earlier. Tonka's Group concept sketch drawings had at least four out of the five examples of Talkin' Tools, described in Plaintiffs' submissions of the concept-idea for Talkin' Tools (see attached Exhibit 7, Exhibit 16 and Exhibit 2).

Defendants are continuously developing new extensions of Plaintiffs' Talkin' Tools idea submission including Cool Crew toys. Defendants' promotional material for Cool Crew toys reads: **"ARE THEY TOOLS OR ARE THEY BUDDIES? THEY'RE BOTH"** (see attached Exhibit 27). Mr. Labarbara, Defendants' Vice-President for Concept Acquisition testified that Big Mike Mower is a part of the Talkin' Tools line of toys. (See attached Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 38:12-14). Plaintiffs learned for the first time that Defendants began selling Yard Crew tool toys from Talkin' Tools line when Plaintiffs received a letter dated January 30, 2003 with a royalty report with a representation of domestic sales for the fourth quarter of 2002 for the Yard Crew Weed Trimmer (see attached Exhibit 29). Plaintiffs learned for the first time that Defendants had started to sell Big Mike Mower when Plaintiffs received a letter dated February 28, 2003 with a royalty report from Defendant Hasbro International on Big Mike Mower representing sales for the fourth quarter of 2002 (see attached Exhibit 30). Plaintiffs never received royalty reports providing information regarding domestic sales for Big Mike the Mower and/or sales information and/or royalty reports on any other toys at issue in this case until Plaintiffs filed a lawsuit and requested discovery.

With respect to the third factor, the sales information (only up until October 2000) that Defendants have provided for "Talkin' Tools" that Plaintiffs believe are at issue totals $91,454,562.24. Based on the evidence in the record, there is clearly a dispute of fact as to whether Defendants misappropriated Plaintiffs' idea submission after agreeing not to "use" it an Agreement to Hold Confidential and/or subsequently were unjustly enriched when they failed to pay royalties under the Inventor's License Agreement for "Talkin' Tools."

## D. DEFENDANTS BREACHED THEIR OBLIGATIONS UNDER THEIR FIDUCIARY RELATIONSHIP WITH PLAINTIFFS

Defendants incorrectly state the law for a claim of breach of fiduciary duty under Rhode Island law. In Burt v. Rhode Island Hosp. Trust Nat. Bank, 2006 WL 2089254 (R.I.Super. 2006), the Court instructively summarizes the current status of Rhode Island law on the finding breach of a fiduciary duty. As the Court points out in Burt, a fiduciary duty arises not only in the obvious context indicated by Defendants, but can also be imputed in common law based on facts of a given case ("a common law theory of breach of fiduciary

duty that is not dependent on such relationship." Id. at *16.) In denying Defendants' motion for summary judgment on breach of fiduciary duty, the Court acknowledged the highly "fact-intensive" nature of inquiry into the presence of fiduciary duty, ruling that such inquiry must be decided by jury. Id. at * 18.

As Burt's Court stated:

> A fiduciary relationship between the parties may exist at common law depending upon: (1) whether there is reliance by one party on another; (2) the relationship between the parties prior to the incidents that gave rise to the underlying lawsuit; (3) the relative business capacities of the parties; and (4) the readiness of one party to follow the other's guidance in complicated transactions. See Rhode Island Hosp. Trust Nat'l Bank v. Bogosian, 11 F.3d 1092, 1101 (1st Cir.1993); Simpson v. Dailey, 496 A.2d 126, 129 (R.I.1985). As such, "[t]he question of whether, in a particular factual setting, a fiduciary relationship exists is a question of fact." Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir.1995). Id. at *16.

Defendants are multi-bullion leaders in the global toy industry. Plaintiffs clearly relied on the Defendants in all dealings with them. Defendants should not be allowed to renege on their words about a special relationship of trust that Defendants have with their outside investors for which the relationship and the integrity of ideas submitted by inventors to the company relies on presumption this trust – because inventors inherently have unequal bargaining power and access information and must rely on Defendants to be truthful about their use of inventors ideas once they have submitted in confidence (they are like genies out of the bottle). As Mr. Labarbara, Defendant's Hasbro Vice President Concept Acquisition, affirmatively testified: "**I basically would say it's based on trust .**" Defendants claim to act as "Protector" of inventors' idea. (See attached Exhibit 10 at 24:12-16). In response to a question on how Defendants' concept acquisition staff follows safeguards to maintain the integrity of ideas submitted to Defendants by outside inventors, Mr. D'Aguanno, Defendant Hasbro General Manager for Research & Development, testified: "**They [Concept Acquisition staff] are very diligent about making sure that the most honest and fair thing is done with the inventor's ideas, that means PROTECTING the ideas.**" See attached Exhibit 9 at 48:12-15. Plaintiffs relied on Defendants' fraudulent misrepresentation about the concept of "Talkin' Tools" bench, specifically because of Defendants' touted image

as Inventors' Protector. Mr. Toth testified that it is a very small community of outside inventors and designers whom Defendants call upon for ideas. (See attached Exhibit 8, Deposition of Mr. Toth at 24: 3-10). At the heart of this case are Defendants' fraudulent misrepresentations about the "independent conception" of the "Talkin' Tools" bench on which Plaintiffs relied while being fraudulently induced into signing the License Agreement giving up any royalties on the Talkin' Tool bench. The Defendants' performance of the License Agreement is also clearly based on Defendants' veracity in reporting what sales on new tool toys from "Talkin' Tools" segment that Defendants are bringing on the market.[21]

In this case Plaintiffs overwhelmingly met the basic common law requirements to establish a fiduciary relationship which Defendants violated with their breaches of the Non-Disclosure Agreement, fraudulent Inducement and Consequential breach of the License Agreement. As a result, Defendants enriched themselves to the tune of at least hundred millions Dollars ($100,000,000) paying Plaintiffs not even an equivalent of "one cent on the dollar."

## E. DEFENDANTS HAVE MISAPPROPRIATED PLAINTIFFS' IDEAS UNDER RHODE ISLAND LAW

Plaintiffs have stated a valid claim for misappropriation of ideas under Rhode Island law that has been codified in Rhode Island Uniform Trade Secret Act ("RIUTS").[22] In Rhode Island the tort of "misappropriation of ideas" is codified in RIUTS.[23] The legislative history behind the codification indicates that Rhode Island legislature draw upon cases and principles presented in American Law Reports (9 A.L.R.3d 665) to guide itself in designing RIUTS. In its turn, ALR cites Burten v. Milton Bradley Co., 763 F.2d 461 (1st Cir. 1985). The RIUTS underlining test that the legislature transferred into RIUTS from ALR and Burten is a two-

[21] In accordance with the License Agreement, Plaintiffs can only ask for sales records on tools toys on which Defendants report to Plaintiffs. So Plaintiffs must constantly rely on Defendants' representations regarding their royalties.

[22] According to the well-established principle of "notice" pleading , parties are not limited to any particular legal theory at the pleading stage and as long as the fact alleged in the complaint give rise to a cause of action under some legal theory, the cause of action should be sustained. Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102 2 L.Ed. 80 (1957).

[23] Magnum Defense v. Harbour Group ltd., 248 F. Supp.2d 64. (D.R.I 2003). Defendants' counsel represented Plaintiffs in Magnum, arguing Misappropriation of Ideas under Rhode Island law.

prong test of (a) having an access to or being disclosed to a trade secret and (b) subsequent unauthorized production or commercializing of a concept or an idea similar to one hidden in the trade secret. R.I. Gen. Laws § 6-41-1(2). Plaintiffs alleged facts to support Plaintiffs' claim under RIUTS.

As This Court held in Magnum:

> Under the RIUTSA a person can misappropriate a trade secret in two ways. First, a person misappropriates a trade secret by acquiring a trade secret with the knowledge--actual or constructive--that the secret was obtained by improper means. *See* R.I. Gen. Laws § 6-41-1(2).
>
> Second, a person misappropriates a trade secret if he *discloses or uses* the secret when he (1) *used improper means* to acquire knowledge of the secret; (2) *knew or had reason to know that the secret had been acquired by improper means*; or (3) knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by mistake or acciden*t*. *See* R.I. Gen. Laws § 6-41-1(2) (emphasis supplied).

Plaintiffs presented detailed evidence that Defendants used improper means to acquire Plaintiffs' "Talkin' Tools" idea submission and that they knew or should have known the concept-idea was acquired by improper means.

For the purposes of brevity Plaintiffs will incorporate the evidence and arguments as stated previously (in section IIIA.1 addressing breach of the "Agreement to Hold Confidential") and briefly summarize. After receiving three rejections of their "Talkin' Tools" concept, Plaintiffs were certain that Defendants had no interest in pursuing Plaintiffs' concept-idea for Talkin' Tools. To the contrary, Defendants were in fact obtaining detailed cost estimates and developing a line of tools based on Plaintiffs concept. Mr. Toth, in response to the question of who at Hasbro (Defendants) had access to Plaintiffs' idea submission submitted for review that had been rejected, testified that "it was with the Tonka team for them to review and consider further." (Exhibit 8, Deposition of Mr. Toth 60:23 and 61:1). David Voss testified "an inventor had submitted it to Steve and Steve had brought it into the internal group." (Exhibit 20, deposition of Mr. Voss, page 21, lines 13-15). The confidential trade secret was misappropriated when Hasbro used Defendants concept, despite telling its owners it was rejected, to develop the Talkin' Tools line.

Plaintiffs' claim under RIUTS is also timely within the statute. According to RIUTS' statute of limitations provision, the time does not toll until the "misappropriation is discovered or by exercise of reasonable diligence should have been discovered." § 6-41-6 RIUTS. Due to Plaintiffs' reliance on Defendants' representations, Plaintiffs did not become aware of the Defendants' conduct constituting misappropriation until well into discovery, in the fall of 2005, in the present case **(see Plaintiffs' Statement of Facts in Dispute)**. The earliest date that Plaintiffs could have reasonably discovered Defendants' misappropriation was in February of 2004 when they first became aware that Defendants received a royalty report representing for the first time international sales for "Big Mike the Mower" **(see Plaintiffs' Statement of Facts in Dispute).**

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be dismissed in its entirety and Plaintiffs should be given an opportunity to present evidence before a jury for a determination on all disputes of fact.

Date: December 18, 2006

Respectfully submitted,
Plaintiffs,
By their attorneys,

/s/ Mark B.Morse
MARK B. MORSE
RI Bar Registration Number 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555 (telephone)
(401) 273-0937 (facsimile)
Mark@morselawoffice.com

/s/ Dariush Keyhani
DARIUSH KEYHANI
Meredith & Keyhani, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
(609) 945-7406 (telephone)
(609) 228-4031 (facsimile)
dkeyhani@meredithkeyhani.com
(Appearing *Pro Hac Vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18 day of December, 2006 the within was filed electronically with the Court and that the attorneys of record are as listed below:

John Tarantino, Esq.
Todd D. White, Esq.
Jeffrey Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

/s/ Dariush Keyhani
Dariush Keyhani