# EXHIBIT 20

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CA NO. 05-246S |
| HASBRO, INC., and HASBRO INTERNATIONAL, INC., | ) | |
| Defendants. | ) | |

DEPOSITION OF DAVID VOSS

DATE: NOVEMBER 17, 2006

TIME: 2:40 P.M.

LOCATION: 200 East Mariposa Avenue
El Segundo, CA 90245-3007

Reported By: Margaret E. Hayward
C.S.R. No. 12459

conversation was that -- you know, that the two of them talked about options on what is available and the idea that, you know, that we would give royalty to the inventor on the tools but not on the tool bench.
That the deal went down with, like, you know, three points on the tools and nothing on the tool bench. So they talked about how that sort of evolved over time.
Q Do you have any independent recollection of those negotiations yourself?
A I do. Like, little snapshots. You mean of the royalty?
Q Yes. Before Mr. White told you what Derek told you about it, did you know this stuff yourself from your memory six years ago?
A Small parts.
Q What part do you remember?
A I remember when we found out that there was -- Steve had come to us and told us that there was an inventor that had shown this a while back, that kind of moment saying "Okay. What are we going to do with this?"
Q Had --
A That -- I'm sorry. So Steve had said that



the inventor had shown an item that could be, you know, part of tool -- Talkin' Tool line and that we wanted to sort of come up with what we wanted to do with regards to that.
Q When did this happen? When did Steve approach you guys?
A From a date standpoint, like a specific date?
Q Well, if you can't get the exact date, maybe the year and then think around the month or the spring or summer or --
A I'd be way out of line just throwing out a date. I prefer not to do that. I can't really remember. Honestly, so much has happened.
Q Fair enough. Maybe when we get through some more details of the chronology, maybe we can refresh that question.
A Yeah.
Q Sure. At any rate, now, you recollected Steve had met with you personally or met with a number of you whatever that date was?
A Yeah. I don't remember Steve meeting with me personally. Steve Toth. No, not personally.
Q Were you in the meeting in which Steve Toth was there when he spoke about this outside inventor?



A When Steve brought forth the idea that an inventor might have shown something similar to something we already had and been working on?
Q Yes.
A I don't know if I was in the first meeting or last meeting or what meeting. At some point I was at a meeting when that discussion was happening.
Q There was more than one meeting that Steve Toth had with you and others in the room?
A I'm not sure of that. It might have been the only meeting. I wouldn't be able to tell you if that's the case or not.
Q What did specifically Steve tell you, Steve Toth tell you guys?
A I don't have the specifics.
Q To the best you can recollect.
A The best I can recollect is that Steve had seen something that we had presented. And he had said, come to us, to warn us that, you know, "I think this might have been inhouse at some point. I have to go back and check my records on when that came inhouse and where, if any, is there an overlap."
Q When you say "it came inhouse," are you saying that it was brought in from the outside?



A Yes.
Q And that means that an outside inventor had submitted that to Hasbro. Correct me if I'm wrong. I'm asking a question.
A The term "brought inhouse" --
Q Yes?
A -- is just that. That's the definition of "inhouse."
Q Can you state it --
A It was brought inhouse.
Q -- what the definition is?
A The definition, as I'm using it, as it was brought inhouse, would be that an inventor had submitted it to Steve; and Steve had brought it into the internal group.
Q And you're speaking of Talkin' Tools?
A Yes.
Q And would that also include the Talkin' Tool Bench?
A No.
Q Is there a distinction between the Talkin' Tool Bench and Talkin' Tools?
A Yes.
Q What's the distinction? Can you explain that?

can't read that.
Q Whose writing is that?
A Joe Drohr. It's very tiny.
Q What is that supposed to be? If you can't read it, what is that supposed to convey?
A That is a definite speech bubble above the tape measure indicating that he's saying something.
Q Is that the tape measure is speaking?
A Well, you could certainly read it that way with a speech bubble and some words in it.
Q Right. Was this drawing -- what is this drawing called?
A It's a concept. Like, we call it?
Q What would you guys call it in your industry?
A It's a concept sketch.
Q Was this drawing put together after or before the introduction of the Talkin' Tools Workbench to the best of your recollection?
A It would had to have been done prior to the introduction being that the -- showing it to the retailers and selling it?
Q Yes or toy fair or any public production.
A Yes. Concept sketch. Have to be done prior.



Q Does it appear to you that, from the concept sketch, that there may have been some tools that were talking, that were being conceived of at the same time that the workbench was being conceived?
A Sure.
Q Would that be a bit in contradiction to your earlier testimony that you believe that the Talkin' Tools Workbench was developed first and then the Talkin' Tools were developed after that?
MR. WHITE: Objection. Mischaracterizes his testimony.
MR. KEYHANI: No. I asked -- I'm asking if it would be.
Q And you can clarify if it is or it is not.
A No.
Q And, please, tell me why.
A Well, because you asked me if the -- if the tools were developed after the tool bench, and they were developed after the tool bench.
Q Okay. Fair enough. But the -- fair enough. So the -- but the concept for them may have been developed together. Is that the distinction?
MR. PAPAGEORGE: I'll object to the extent it calls for speculation.



BY MR. KEYHANI:
Q To the extent that you can recollect, was the concept of Talkin' Tools and the Talkin' Tools Workbench developed together?
A No.
Q From this concept sketch, does it not appear to you that there are talking tools alongside a workbench that's being concept sketched?
MR. WHITE: Objection.
THE WITNESS: But this is just a concept sketch. It's not development. You asked me, again, if it was developed at the same time.
MR. KEYHANI: Could you, please, read my last question?
(The question was read.)
THE WITNESS: Oh, oh. Well, yes. Concept at the same time.
MR. KEYHANI:
Q Okay. So you would agree that the Talkin' Tools and the Talkin' Tools Workbench were conceived of together.
MR. WHITE: Objection.
BY MR. KEYHANI:
Q Take your time.
A Yeah. This is a tough question because



everything Joe sent us in this world was talking. So we didn't look at everything that he put a speech bubble above as concepted. Like, he just did that with everything because everything in this world talked. So wouldn't say it was concepted at the same time. Difficult to say.
I think the focus, if I remember correctly, was we wanted a big hero item. So we were really not paying attention to the development or the concepting of tools. That wasn't the focus.
Q When you say Joe, who's Joe again?
A Joe Drohr.
Q Joe Drohr. Did somebody in your group communicate with Joe regarding what --
A Absolutely.
Q Let me finish my question, please. Did somebody from your group communicate with Joe regarding what they wanted him to sketch?
A Yeah. Absolutely.
Q So he didn't come out with these sketches on his own.
A Elements would be added by Joe without complete direction.
Q Would it be fair to say that the concepts being conveyed in this concept sketch was provided

Feel free to answer it again.
BY MR. KEYHANI:
Q I'm saying given now you're looking at this document. I know you answered this question earlier.
A Yeah, yeah, with this document here.
Q Sure. I'm asking now, having looked at this set of documents, what is your feeling about that?
A I guess my best answer would be that everything was talking in these things. So what we decided -- you know, everything was talking, from the tools to the garbage cans, everything in the world of Tonka.
So, you know, what came first the bench or the tools in a concepting state, I think they were all kind of happening at the same time. I don't know at the concepting stage which one went. But from the point of beyond concepting, yeah.
Q So you would say -- it would be correct to say that the concepting stage of the Talkin' Tool Bench and Talkin' Tools were developed together.
MR. PAPAGEORGE: Misstates his testimony.
MR. KEYHANI: I apologize. That was a misstatement.



Q You can't -- you can't -- you don't know for certain whether the Talkin' Tools and the Talkin' Tool Bench were conceived of together or separately.
A As I said, because everything was being developed at once that talked, I guess that you could take that. I can't be clear which one was concepting first or independently. Nothing was done independently. Everything was kind of done all together.
Q Looking at this exhibit and considering your recollection of everything that was going on at the time you were at Hasbro, does it appear that the Talkin' Tools and the Talkin' Tool Bench were conceptualized together?
MR. WHITE: Objection. Now, this is the fourth time, Darius, he's answered the question. It's not my client. He can do what he sees fit.
THE WITNESS: Like I said, everything had faces on it and talked at the same time. So I can't tell you if they were together or separate. Or all the character -- everything had character in it. So we were developing the whole world of talking characters. So it was all kind of happening at the same time.



BY MR. KEYHANI:
Q Are you saying --
A On a concepting stage, it was all -- it was all -- we were asking Joe to bring life to everything. Everything he sent to us had some sort of face and smile on it. He's an expert at that.
Q Before Chuck the Truck and the Talkin' Tools, were there other toys at Hasbro that talked and had faces on them?
MR. PAPAGEORGE: Asked and answered. But go ahead.
THE WITNESS: I would imagine, yeah, at some point. It must have been, you know, around for a long time. Make the assumption that there must have been a face or some character added to it. Sort of toy industry thing to do.
BY MR. KEYHANI:
Q Were those -- okay.
(A short break was taken at 4:33 P.M. to 4:39 P.M.)
BY MR. KEYHANI:
Q Before we went to change the tape, I was asking about products at Hasbro that you may recollect that have personalities and faces on them. Can you try to see if you recollect some of those



products?
A Prior -- prior to Chuck?
Q Prior to Chuck the Truck, yes.
A Specifically, I can't recollect specific products with Hasbro.
Q You believe there were products though.
A Well, just my experience in the industry, it's been around for a while. So I'd done shark eyeballs and teeth on a jet ski prior to that.
Q Would you say that those products -- would you say that toy products that have faces on them and talk are within the same concept of Chuck the Truck?
A I think there was existing product that would be in -- I can't think of any, but I would imagine that there is existing product that had the same flavor or genre and consumer target as Chuck.
Q My question is a little more specific.
Could you read my last question, please?
(The question was read.)
THE WITNESS: Can you repeat that again? I'm sorry.
(The question was read.)
THE WITNESS: From the same concept. I need a definition on what you mean -- I don't know what you