# EXHIBIT 21

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R. H. BAER CONSULTANTS,

Plaintiffs,

vs.

HASBRO, INC. and HASBRO INTERNATIONAL, INC.,

Defendants,

CASE NO. 05-246S

DEPOSITION OF: WENDY BUELSING

TAKEN: By the Plaintiff

DATE: October 3, 2006

TIME: Commencing at 11:10 a.m.

PLACE: Cincinnati Marriott Northeast
9664 Mason-Montgomery Road
Mason, Ohio 45040

BEFORE: Barbara J. Enneking, CVR
Notary Public-State of Ohio

Draft Copy

the tool bench.

Q. Is that because Derek told you that?

A. That's just my recollection. I don't know who it was that -- I guess it would be Derek. Yeah. That's who I would have -- yeah.

Q. Based on Derek's conversation with you about royalties?

A. Yeah.

Q. Why is Tonka tool bench in the subject of this e-mail?

MR. WHITE: Objection. You can answer, if you know.

A. I don't know. Let me reread it like that.

Q. Sure. Sure. Take your time.

A. Well, I don't know. I mean I don't know why it says the tool bench specifically, and again, I'm just going off of my recollection. I could be wrong. Maybe there was a royalty on the bench, but I don't remember there being a royalty on the bench.

Q. Could there have been?

MR. WHITE: Objection.

Q. You don't know for a fact that --

A. I just don't know that there was.



Q. You don't know?

A. I don't remember building that in on the bench. So I'm not sure why the subject says tool bench capacity specifically, and then talks about a two percent royalty.

Q. The tool bench was part of the Talking Tools line; correct?

A. Yes. Um-hum.

Q. I know you said you don't know whether the Talking Tools was developed -- the concept came from inside Hasbro or from outside; right?

A. Right. My recollection is, again, that Derek came, and after we had developed this, because we thought we had internally developed it, and said we need to put a royalty on these.

Q. Do you know why the measuring tape and the tool the bench were both part of the Talking Tools line of toys?

A. Why the tape and the tool bench were both part of the line?

Q. Yeah.

A. Well, the tool bench I'm sure was part of the line because you always needed a large anchor item to get anything -- we probably couldn't have sold



individual tools by themselves, for lots of reasons.

The retailer moves wants a certain amount of volume. They want advertising -- advertising against it, all of those sorts of things, and they want a certain margin out of it, and they would get such a pittance on the individual tools by themselves, it wouldn't be worth it for them to take them.

Why the tape measure was there, I mean there were a number -- there were different tools and each one -- we tried to think of tools that children could interact with that would give them some sort of sound back, you know, that you could do something with like a wrench or like a tape measure or whatever.

Q. So really, without the tool bench, it wasn't a very viable line of toys?

A. That's where I would come from, yeah.

Q. The business side of it was in the tool bench?

A. The business side of it was having a full complement, and we did that a lot. I mean we would have large items and then smaller items that would go with it.

So yeah, I mean having the full line was definitely where the retailers wanted us to be and



we wanted to be.

Q. Do you think the Talking Tools line of toys would be successful without a tool bench?

A. You know what, I don't know. I don't even know how successful the line was. Honestly, because I think by the time sales results came in, I probably wasn't there, or working on it.

Q. I understand. If it was or it was not successful, but based on your marketing analysis and thought --

A. Yeah.

Q. -- is it fair to conclude that you believe that the tool bench was the key to the success of the Talking Tools line of toys?

A. I believe that the tool bench allowed us to do some marketing activity that we wouldn't probably have otherwise done, if it was just individual tools, and I also don't think we would have come out with the line at all, unless we had some big item as the hook.

Q. Do you mean price wise, big item? What do you mean by big item?

A. Yeah, price wise. Therefore you could get a larger margin, as a percentage. I mean same

the inventor submission, so I don't know.

Q. What's your basis for thinking that the bench was different than the other Talking Tools? Let me rephrase that to make it more clear. What is your basis for believing that the Talking Tool Bench is different from the other Talking Tools?

A. Again, I didn't see the inventor submission, and I don't know exactly if it was about anything in particular. I don't know if it was specific to a certain type of activity, if it was a specific type of tool. I don't know.

Q. Looking again at Joe's exhibit one.

A. Um-hum.

Q. Talking Tools. Does that --

A. It's just that these, I guess -- I mean if this is all they have as far as the inventor submission, I would think -- don't they usually have a tape or something a little bit more than this? But at any rate, this has a variety of tools, this speech and this was a bench.

I guess that's how they made the basis of distinction on what would be royalty, you know, and what would not.

Q. Other than your conversations with Mr.



Stothard, do you have any other basis for believing that the tool bench should not be paid royalties on?

A. Again, it wouldn't be my decision. I mean this says a variety of tools. We were paying it in all the tools, I believe, and separately was the bench which was -- I don't -- maybe a different idea. It's not the talking tool anymore.

Q. My question wasn't that -- a little different question. I said besides Derek telling you that the bench is not covered by the royalties, do you have any other independent basis for knowing --

A. Oh, sorry.

Q. -- or believing that the Talking Tool Bench should not be subject to royalties?

MR. WHITE: Objection. She gave you her other independent basis which is hers. Now maybe there's some others, too. I don't know.

MR. KEYHANI: Yeah. I don't know. I'm just asking.

A. I don't know of any other -- I haven't seen any other documentation or know of any other information one way or another. No.

Q. Are you saying under oath today --



A. Yeah.

Q. -- that you believe, based on your recollection --

A. Um-hum.

Q. -- that the Talking Tool Bench was independently conceived of than the Talking Tape Measure and other Talking Tools?

A. No. I'm not saying it was independently conceived of. I'm saying that as part of a line, we said we need a big anchor item. What could that anchor item be, and it was developed to make the whole line work.

Q. So your understanding is that the Talking Tool Bench and the tape measure were all part of the same idea conception; is that correct? Is that a fair statement?

A. They were all part of the same line and so whether it was sitting at one table and everything was conceived of at once or not, I don't remember but yeah, I mean -- I don't know. Is that your question?

Q. Well not at the same table necessarily but --

A. I mean at the same sitting. I don't know.



Q. Not at the same sitting necessarily, but they were all part of the same concept?

A. Yes. Yeah, they're all -- absolutely, they're all related. Yeah.

MR. KEYHANI: Okay. That's all I have. Todd, do have any more questions?

MR. WHITE: I think I'm all set. Thank you, Wendy.

THE WITNESS: Sure.

MR. KEYHANI: Thank you. I tried to get this done as quick as we could.

MR. WHITE: Let me put this on the record. Wendy, you have the opportunity to review the transcript that will be made of this, and you will have the opportunity to look at an errata sheet and make changes, if you think that anything is inaccurate.

The changes can be typographical errors or if you think your testimony, for some reason you have more accurate testimony. Generally speaking, witnesses want that opportunity.

What we can do is we can have the transcript sent to you, or I can have it sent