# EXHIBIT 31

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

INVENTOR'S GREENHOUSE, MICRO )
PROS TECHNOLOGY SOLUTIONS, and)
R.H. BAER CONSULTANTS, )
)
Plaintiffs, )
)
vs. ) No. 05-246 S
)
HASBRO, INC. and HASBRO )
INTERNATIONAL, INC., )
)
Defendants. )
)

DEPOSITION OF:

DEREK STOTHARD

THURSDAY, NOVEMBER 16, 2006

Reported by: MARK I. BRICKMAN, CSR, RPR
License No. 5527

bring? Tools as talking characters, they did, and then
the description above describes what they brought.
But -- but his -- but the statement here, which 13:27
is the first to add Chuck-like personality to items other
than vehicles, there -- there were some items that weren't
vehicles that had Chuck-like personality before.
Q. Before what? Before -- 13:27
A. Before this date. 13:27
Q. Well, in this document, it's referring to the 13:27
Talking Tools idea submission; correct?
A. Correct, yeah. 13:27
Q. Okay. Wouldn't that go back to the date that 13:27
the submission was made that's presented in Exhibit 4?
A. Sorry. Say again. 13:27
Q. Wouldn't the idea that's being described or 13:27
identified as the unique innovation in part B of the
license request form be relating to the date of the idea
submission presented in the inventor review record,
Exhibit 4?
MR. WHITE: Objection based on my -- my 13:28
prior -- objection that these aren't his documents, but he 13:28
can --
MR. KEYHANI: Okay. 13:28
MR. WHITE: -- answer if he can. 13:28
THE WITNESS: Okay. I mean, I'm not -- I'm 13:28



not quite sure whether -- how this relates to a date.
I think when I read this or when I read it back 13:28
when I was at Hasbro, it's -- it's a description of what
the inventor brought that Steve Toth has agreed to pay
something on, which is the tools as talking characters and
excluding the other parts of the segments.
That's -- that's what that -- you know, I think 13:28
it does a -- a description of what the item is. I'm not
quite sure what you mean about relating to a date.
MR. KEYHANI: Q. Well, the question is: 13:28
When you -- when you -- strike that.
When you gave an answer, you said that as of 13:28
this date, the date on this form, you don't agree with the
statement in section B.
That's what you said; correct? 13:29
A. This part of section B, which I don't think is 13:29
correct.
Q. And you said "as of the date on this form." 13:29
That was your wording; right?
A. Right. I don't think that these tools as 13:29
talking characters were the first ever non-vehicles that
had a speaking role in -- in Tonka.
Q. As of which date is the question. 13:29
As of the date in this document? 13:29
A. There were -- just in terms of the -- the 13:29



sequence of product being created. In the Chuck line,
there were talking characters that weren't vehicles.
Q. For example. 13:29
A. Petrol gas pumps. 13:29
Q. Okay. 13:29
A. So, I mean, the description here is generally 13:29
accurate, that it's tools as talking characters is what
was brought by the inventor, from what I can see, but
the -- the statement that it was the first time vehicle -- 13:30
other than vehicles that talked within the Tonka brand, I
don't -- I'm not sure that's correct.
Q. So Steve Toth was wrong in writing this, or 13:30
whoever wrote this was incorrect?
A. Yeah. I believe that there were non -- there 13:30
was a -- there was a talking non-vehicle in the Tonka line
before this.
Q. Okay. 13:30
A. Yeah. But the items that are described in 13:30
here, I think the items -- the product description seems
correct.
Q. Have you seen this form before? 13:30
A. You know, I can't remember it, but I can see 13:30
that I signed it, so yes, I must have done it.
Q. Do you typically sign things be -- and not read 13:30
what you sign?



A. Generally I read them. 13:30
MR. WHITE: Objection. 13:30
THE WITNESS: I don't always -- I don't always 13:30
remember six years later what it was that -- everything
that I read.
MR. KEYHANI: No, no. At the time that you -- 13:30
first of all, let's establish one thing.
Q. You did sign this document; correct? 13:30
A. Correct. 13:31
Q. Did you review this document before you signed 13:31
it?
A. I'm sure I did. 13:31
Q. Did you have a problem with any of the 13:31
descriptions in this document when you signed it?
A. What I read when this document was Steve Toth 13:31
had come to an agreement to pay a royalty on those Talking
Tools and I agreed with that.
Q. I understand that. I'm talking about -- 13:31
A. But whether or not every single piece of 13:31
description was exactly accurate, I don't know. Looking
at it now, this one part of that description where I'm not
sure that's correct.
Q. So back then when you signed it, you didn't 13:31
have a problem with it, but now you have a problem with
it?

e-mail from David Maurer to Gary Carlin.
Go ahead. 14:10
A. Right. So it looks like Steve is offering two 14:10 percent here, a royalty of two percent.
Q. On what? 14:10
A. He orig -- well, it says he originally offered 14:10 two percent on the whole line, but then it looks like -- who's this to? Gary Carlin, this gentleman pushed back and said he wanted three percent on the tools.
So at some point, Steve's initial thought was 14:11 he was going to give two percent.
Q. And that two percent would have been on Talking 14:11 Tools and the Talking Tool Bench?
A. Right. It says the whole segment is what it 14:11 says.
Q. The whole segment would be Talking Tools and 14:11 the Talking Tool Bench?
A. Right. 14:11
Q. So presumably Steve thought that royalties 14:11 should be paid on the Talking Tool Bench?
MR. WHITE: Objection. 14:11
THE WITNESS: Steve -- it looks like Steve 14:11 offered that and the inventor didn't agree to that and wanted three percent on the tools, which looks like what they originally presented.



MR. KEYHANI: Q. Why would Steve -- why 14:11 would Steve offer to -- to pay royalties on the Talking Tool Bench if Carl Christopherson and others had come up with it?
MR. WHITE: Objection. 14:11
THE WITNESS: I don't -- I don't know why he 14:11 offered two percent on the whole thing. I just know that here he'd assumed that to do the right thing, he was going to make a deal with these guys based on what he was shown, which looks like Talking Tools, and some -- he -- in the negotiation, he first offered two percent on everything and the inventor came back and said, "No, we want three percent on the -- on the tools part."
MR. KEYHANI: Q. How do you know these 14:12 details?
A. I don't. I'm just going by what's in this 14:12 e-mail.
Q. It says the second sentence -- this is in 14:12 Exhibit 6. It says: "My understanding per -- per those e-mails is that Steve offered you two percent on the full line. Apparently when you pushed back on that and you both agreed to three percent on the tools."
A. Right. 14:12
Q. Now this is what David Maurer is representing 14:12 to Mr. Carlin; correct?



A. Right. Based on the e-mails that he saw from 14:12 Steve Toth.
Q. So you have no independent knowledge about what 14:12 Mr. Carlin pushed back on; do you?
A. No. The only thing I can do is by implication 14:12 of this e-mail, it looks like he pushed back on the initial offer of two percent of the whole -- the whole line, right?
Q. That is taking what Mr. Dave Maurer is saying; 14:13 correct?
A. Yeah. 14:13
Q. You have no independent knowledge about whether 14:13 Mr. Maurer represented Mr. Gary Carlin's position on this; do you?
A. Say that once more, please. 14:13
MR. KEYHANI: Why don't you read that for the 14:13 witness.
(Record read). 14:13
MR. WHITE: Objection to the form of the 14:13 question.
MR. KEYHANI: Q. Do you have any independent 14:13 knowledge about Mr. Carlin -- and I'm speaking about Gary Carlin's -- communications with Steve Toth or anybody else?
A. No. Only what -- only what I would have heard 14:13



from Steve Toth. I wasn't in any of those conversations or discussions.
Q. And what you're reading that Mr. Maurer has 14:13 said?
A. Right. 14:13
Q. Okay. Looking back at the exhibit that you 14:14 have in front of you --
A. Mm-hmm. 14:14
Q. -- so paragraph 3, when it talks about a two 14:14 percent royalty hit across the segment, you are referring to a two percent hit that includes the Talking Tools and the Talking Tool Bench?
A. Right. I said I believe we're going to get a 14:14 two percent royalty hit across the segment and that's probably what Steve Toth told me he was going to offer.
Q. I -- I'm not asking about the other thing. I'm 14:14 looking at this e-mail here based on your recollection.
A. Right. 14:14
Q. And your recollection that the segment that you 14:14 were going to get a two percent hit on was to include Talking Tools and the Talking Tool Bench.
A. Right. The assumption in September 2000 was 14:14 that we were going to pay a two percent royalty across everything. Or at least that was as up-to-date as I was from Steve Toth at the time.