EXHIBIT 32

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, AND R.H. BAER CONSULTANTS

vs. : C.A. NO. 05-246S

HASBRO, INC. AND HASBRO INTERNATIONAL, INC.

VOLUME II

DEPOSITION OF RALPH H. BAER

produced, sworn and examined on October 13, 2006, at 2:00 P.M. before Linda S. Taylor, Notary Public, taken on behalf of the Defendant, at the Law Offices of Adler, Pollock & Sheehan, Inc., One Citizens Plaza, 8th Floor, Providence, Rhode Island before:

APPEARANCES

For the Plaintiff:

MEREDITH & KEYHANI, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
BY: DARIUSH KEYHANI, ESQ.

For the Defendant:

ADLER, POLLOCK & SHEEHAN, INC.,
One Citizens Plaza
Providence, Rhode Island 02903
BY: TODD D. WHITE, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366

moment was, except that it referred to tools. We had already built talking tools at that point. I believe we already submitted them to Hasbro. So it seemed like a family relationship.
Q. It seemed like a family relationship?
A. Yeah. Tools are tools, yeah.
Q. And the family would be the family of tools?
A. Well, it would be -- when tools are mentioned, you just submitted -- things are being considered for a license for tools that you submitted, your interest is perked when you see a reference, a toy fair announcement of tools coming onto the market.
Q. Are you aware of whether you or Mr. Carlin submitted this idea to what appears to be Tiger?
A. No. No.
Q. Do you know of any other company besides Hasbro that this idea was submitted to, talking tools?
A. No toy company that I know of.
Q. No toy company?
A. Yeah.
Q. Okay. Let me just ask you to direct your attention to what is Defendant's Exhibit 2 which is also part of the packet of documents that I received today. And I'll just ask you to --



A. I know what it is. I generated it.
Q. Okay, fine. So Exhibit 2 came from your own personal file or whatever?
A. Yeah. I keep a running record of my medical situation.
Q. So this is one of your --
A. This represents, as you can tell, it's a 300 -- it's hard to read, isn't it, the color scheme under the black? The 313th line item to the 318th describes, I can read it for you, a visit from the 4th of October to the 11th of October in 2001 at the Elliot Hospital in Manchester, New Hampshire, and describes in detail the doctors that attended me, the medication that was given me, and I was there because I had a severe case of pneumonia. And then the next line item below is me at home still with pneumonia, and so on and so forth.
Q. If I understand it correctly, this document was submitted by you to me as a result of my inquiry at your last deposition where we tried to determine the date of the meeting at Hasbro?
A. That's correct.
Q. Okay. And if the date you've just identified is 10/4, does that mean the meeting at Hasbro was



10/3?
A. No. The meeting was the same day. I came home and I had a 101, 102 temperature. My wife had taken me to the emergency room. I was there for a week.
Q. So this document would establish that you met at Hasbro on October 4 of 2001, correct?
MR. KEYHANI: Objection. You can answer the question.
A. All I know is that's the date on here. If I made a mistake, it could have been 10/3, but I don't think so. I think it's probably accurate.
Q. Is this a document that you, yourself, created?
A. Yeah. It's a spreadsheet I just keep up. I come back from the doctor's office and I put down what occurred. Of course, when you go to the hospital for ten days, you don't make notices, you don't make -- you don't input anything into your computer until sometime later. So it's always possible that something gets screwed up in the process, but...
Q. Was your normal procedure to input into this format your medical treatment as soon after you were able to put it in?



A. Yeah, because if you don't do it on a running basis, you're bound to forget something.
Q. Is it fair to say based on what you've submitted which is Exhibit 2 that your best recollection would be that the meeting that we discussed at length at Hasbro occurred about October 4, 2001?
A. Yes.
MR. KEYHANI: Objection. I would like for you to specify the meeting, please, for the record.
Q. Are you aware of the meeting I'm talking about?
A. Yeah. It's a meeting where I came in with GI Joe electronics items again, hoping that Hasbro would change their mind and finally do a series of electronic GI Joes. And I think I caught -- the problem was incurred because standing around in Bedford, in the shopping mall in Bedford, Mass. waiting for Gary to come in. I was already sick when I was got there and I think I was running a temperature all through the meeting.
Q. Okay. Other than just helping us determine the date of this meeting, that's the only significance of this document?
A. That's the only relevance except for the fact

Mr. Carlin actually presented the physical bear to someone at Hasbro?
A. I know he did. I just don't know when.
Q. Just don't know when, okay. Do you know if it was someone in Pawtucket?
A. No. I assume so.
Q. Okay. I'm distinguishing that from Cincinnati.
A. From Cincinnati. From Kenner.
Q. Right, from Kenner. You think it was Pawtucket as opposed to Kenner?
A. Yeah. I can't tell you for sure.
Q. Don't know. Okay. I'm just trying to narrow down who may have seen this bear?
A. It could very well have gone to Cincinnati.
Q. Do you have any memory of speaking to someone at Pawtucket who saw the bear?
A. No. I didn't talk to anyone throughout this whole process. That was Gary's job. The only contact I had was during that meeting we referred to earlier, physical contact, conversations.
Q. Do you know when you finished the bear?
A. Yes. The bear? '97 or '98. You'd have to look at the sketches and schematics and drawings we did back then which I'm sure you have in your file



somewhere.
Q. Well, actually, I don't have any schematics of the bear. So that's one of the reasons I'm asking these questions.
A. Well, it ought to be there because they certainly exist.
Q. Okay.
MR. KEYHANI: I believe we did produce whatever was turned over from Mr. Baer including, I believe, disclosures for the bear and the tape measure, if I'm not mistaken. You turned them over to Bob, right?
A. I can draw you a schematic from memory in about five minutes.
Q. That's okay. If the bear was finished before the e-mail of March 11, 1999, was the reason Gary didn't have it --
A. Well, you have to read between the lines in this.
Q. That's what I'm asking you.
A. Yeah. It seems like I was still finishing it and Gary was already promoting it by telephone. Sitting there, waiting for me to ship it to him.
Q. Okay. Thank you. I'm going to ask if you'll look



at what's been premarked Defendant's Exhibit 4 for day two of your deposition testimony. I'll show it to counsel first. I know the type is a little bit small there --
A. No problem.
Q. -- so we'll do the best we can.
A. What's the question?
Q. The question first is did this come from your file?
A. Yes.
Q. Okay. If you need to read through it, please read through it. And my next question is what is this, generally speaking?
A. It's -- basically, it's an e-mail from me to Bob Pelovitz reporting on a conversation I had with Gary regarding the current state of the talking tape measure or measure bear. In fact, it says the subject is Telecom with Gary Carlin 9/25/2000. It goes on and reports on what I think I heard from Gary.
Q. Let me go through. We'll just focus on the first paragraph, and you can just read that yourself and I'll ask you some questions on that. You don't have to read it out loud.
A. "In a conversation between Gary Carlin and



Steve Toth of Hasbro initiated by Hasbro, Toth" -- is it Toth or Toth?
Q. Toth is fine.
A. "Told Gary that Hasbro Tonka had shown a workbench product at toy fair that had an excellent reception and of which they expect to sell two" -- is it two or three, I think it's "300 K pieces in the fall of 2001 at $7 apiece, $10 retail, and which they expect to sell more in 2002."
Q. Do you have an independent recollection of that conversation?
A. No.
MR. KEYHANI: Objection.
A. It's six years ago.
Q. Does your review of that paragraph refresh any recollection you might have had?
A. Well, typically, e-mail like this comes about because I'm on the phone and making pencil notes just as you would if you're talking to someone and then translate the pencil notes into what I think the other guy said. How accurate they are, of course, to what really was said is anybody's guess, and I certainly can't tell you that six years later.

Page 22

A. I don't know, but I would assume it's my line. It's kind of thing I say.
Q. That's all I'm trying to find out is who may have been the author of that line.
A. And remember the time frame, remember my state, my mental state. I've been dealing with the company, meaning Hasbro, for the better part of 20 years. I put in things like Simon that's still in the store 25 years later. How am I in this position where suddenly I'm faced by activities going on inside of the company that I considered, you know, to be populated by friends and makes a remark like this necessary?
Q. At this time, and I'm talking about September 25 of 2000, was your physical health okay?
A. 2000? No, I was still in trouble. This is about my fourth year of remission, 2006. So 2002, I think, I got the infusion stint to help me over my problem.
Q. Did your physical state have any affect on your mental state at all?
A. No, except that towards the end before I finally got infusions, I was in the hospital every two weeks getting two units of blood because I was

Page 23

so anemic. And when you're in that condition, you're very tired and you really can't function. You're not out of it, but you just can't function. You're just too damn tired to do anything.
Q. Now, the next line or two lines down, the next paragraph states, "Steve Toth actually began to negotiate a royalty rate with Gary Carlin on the phone."
Because you're putting Gary Carlin as a third person, it sounds like this is your line; is that correct?
A. This is my repeating my recollection of what Gary tells me and which I pass on to Bob Pelovitz.
Q. Okay. Next line says, "He offered 2 percent which is too low for a start (but better than nothing)."
Is the parenthetical statement, "But better than nothing," is that something you would have authored?
A. Probably me. I always make stupid remarks like this for which I get chastised by my partners.
Q. The next line says, "Gary will negotiate with him further and see if he can get it up to 3 percent for all individual tools or 2 percent for both the tools and the workbench."

Page 24

Is that just your recapsulization of what Gary told you?
A. It must be because I couldn't have originated it.
Q. You weren't involved in those discussions?
A. No.
Q. All right. The next line says, "Don't count your chickens before the eggs are hatched, Bob."
I assume that's your own line?
A. Yup, that's my line.
Q. And then it says, "I am surprised at Hasbro's honorable attitude. Let's see if it lasts and becomes a real agreement."
Again, is that your line?
A. That's my line.
Q. Okay. What was it that surprised you about Hasbro's honorable attitude?
A. When you're approached by somebody who tells you that he thinks he's stepping on your proprietary toes, in this case being in the process of the developing a product whose inception was clearly derived from inventions brought in by independent inventors, and he comes back two to three years later after the item has been rejected

Page 25

and offers to do something, that is mighty strange, right? That tells me that there must have been an internal debate going on about, "Do we pay these guys or don't we pay these guys?" That already stinks of high heaven because that's not how an inventor and Hasbro relationship is supposed to take place. It certainly never did for the 15, 20 years I worked with them.
So after -- when someone offers to pay for something they previously rejected for which they apparently have a product in the mill, that stinks. That raises an awful lot of flags, right? You would say why don't you just shut up about it at this stage of the game.
It seems like if I committed a sin, I wouldn't be -- if I took two years to finally come to the conclusion that I have to fess up to somebody, I have to make that decision whether to fess up or just be quiet, I thought it was kind of stupid to fess up having already done something hokey in between.
Q. If I understand it then, the fact that Hasbro, in your terms, fessed up made you surprised about their honorable attitude?

A. Well, yeah, I was put out by the fact that there's a product out there, by Gary's description, that clearly infringes what we -- that clearly is related to what we showed, and then there's what amounts to an admission that they might -- there may be such a relationship, they owe us something, so that already smells to high heaven. The red lights keep going up all over the place.
Q. What's the product that you just referred to that was clearly related to what Gary showed?
A. Any talking tool that was shown at toy fair, especially talking tool bench and there's talking tools on it.
Q. Did Gary ever inform you that, when he presented the tape measure or the measure bear, that he suggested that a workbench could be made?
A. He suggested?
Q. Did he suggest that?
A. I don't know that.
Q. From any source of information, whether it's Gary or seeing any documents, are you under the impression that Gary suggested a workbench could be made when he showed your tape measure?
A. No.



Q. So it's your position that as a result of Hasbro seeing your tape measure, they directly related that to an extension which could be a workbench?
A. No.
Q. Okay. Is it your position that Hasbro intentionally sat on the idea for a year and a half?
A. No. Besides, you're forgetting measure bear. The direct equivalence, we went through this last time, exists between measure bear and the talking tool bench. Both are platforms, the bear in one case, the bench in the other case, the platforms on which the talking tools are mounted. In fact, the correspondence goes further, as we discussed a couple of weeks ago, because the electronics are in the same place, the speakers are in the same place, the actuators are in the same place, meaning the parts that cause speech to be generated, the speech chips are in the same place. There's total correspondence between the two.
Q. Do you know where the speech chip is for Chuck the Talking Truck?
A. I don't know. I've never looked inside.
Q. Do you know where the speech chip is for Tucker the



Talking Truck Block?
A. I have no idea. I've never seen the product.
Q. Do you know if those are directly related to where the speech chip was put in the workbench?
A. I have no idea.
Q. Okay. So you don't know if the location of the speech chip and the workbench emanated from how they put the speech chip in Chuck the Talking Truck, do you?
A. I'm an engineer.
MR. KEYHANI: Objection.
A. Yeah. I'm not alone in the world of engineers. There are lots of other people who think exactly like I do. When we have to produce a product, we go for minimum cost. Otherwise, it's not going to happen in the real world.
In the case of a bench with tools, a bear with tools on his belt, the logical thing to do is to put the electronics in a common place which is the platform in the bear, the bench, put the speaker there and put the speech chip which is a big part of the electronics. In fact, there's really nothing else because nowadays the speech chip and a minimum functional process is one in the same chip.



Q. How many speech chips are in the workbench that Hasbro initially produced in 2001?
A. I don't know. I've never seen that bench.
Q. How many speech chips are in Chuck the Talking Truck?
A. I don't know.
Q. How many speech chips are in Tucker the Truck Block?
A. I don't know.
Q. As you understand it as an engineer, do more speech chips cause the product to be more costly?
A. Yes. The point is that if you put one into each individual tool, it would obviously increase the price.
Q. And you don't know that there's a speech chip in each individual tool on the workbench, do you?
A. Which workbench?
Q. The first one that came out.
A. I've never seen the first one.
Q. Okay. Are you aware that other companies had come out with talking tool belts before you submitted your idea?
A. No.
Q. Okay. Are you aware that other companies had come