UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS, Plaintiffs, | ) | |
| v. | ) | CA NO: 05-246S |
| HASBRO, INC. and HASBRO INTERNATIONAL, INC. Defendants. | ) | |

**PLAINTIFFS' BRIEF STATEMENT OF FACTS**

## I. FACTS IN DISPUTE

**1. Plaintiffs dispute Defendants' characterization of the dispute in Defendants' statement of fact 1 that:**

The Agreement around which the dispute before this Court revolves is an "Inventor License Agreement," executed by the Plaintiffs and the Defendants, with an effective date of September 29, 2000.

**Plaintiffs disagree with Defendants' characterization of the dispute in Defendants' statement of fact 1 because:**

**A.** The dispute before this Court is about Defendants' conduct and whether Defendants fraudulently misappropriated Plaintiffs' concept "Talkin' Tools," twice submitted by Plaintiffs to Defendants in November 30, 1998 and in January-February of 1999 (see attached Exhibit 1-4), (see attached Exhibit 5, Deposition of Gary Carlin at 60: 8), (see attached Exhibit 6, Amended Complaint) (see attached Exhibit 8, Deposition of Steven Toth at 39: 14-19);

**B.** The dispute before this Court is about whether Plaintiffs were fraudulently induced to sign the Inventor License Agreement whereby Defendants were unjustly enriched (see attached Exhibit 6, Amended Complaint);

**C.** The dispute before this Court is whether Defendants breached their fiduciary duty to Plaintiffs which Defendants described as one of Trust (see attached Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 24:12-16), (see attached Exhibit 9,

Deposition of Mr. D' Aguanno, Hasbro General Manager for Research & Development at 48:12-15 and Exhibit 6, Amended Complaint);

**D.** The dispute before this Court is whether by failing to maintain proper safeguards for protecting the integrity and chain of custody of confidentially disclosed novel concepts and ideas for toys entrusted to them, Defendants breached the non-disclosure/confidentiality agreement entered into in 1997 as well fiduciary duties arising from implied trust in the relationship (see attached Exhibit 7, "Agreement to Hold Confidential" and Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 46:9-25 and 47: 1-16)**;**

**E.** The dispute before this Court is whether Defendants failed to pay royalties for all toys Defendants developed from Plaintiffs' concept "Talkin' Tools" in accordance with the Inventor License Agreement, which Plaintiffs dispute has an effective date of September 29, 2000 because the agreement was not executed until some time in January of 2001 (see attached Exhibit 6, Amended Complaint and Exhibit 5, Deposition of Gary Carlin at 134:23-24 and 135:1-3).

**2. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 2 that:**

On November 30, 1998, the Plaintiffs submitted a model or prototype of a talking toy tape measure with written materials to Steve Toth, an employee of Hasbro's Tonka Group located in Cincinnati, Ohio.

**Plaintiffs disagree with Defendants' characterization in Defendants' statement of fact 2 because:**

**A.** At the November 30, 1998 meeting Plaintiff Mr. Carlin submitted to Steve Toth a concept "Talkin' Tools", called "Talkin' Tools" (see attached Exhibit 1, Inventor Review Record signed by Steve Toth), (see attached Exhibit 2), (see attached Exhibit 3), (see attached Exhibit 5, Deposition of Gary Carlin I at 60: 8) and (see attached Exhibit 9, Deposition of Steven D'Aguanno at 38: 4-8);

**B.** Plaintiffs' idea submission included written examples of various examples of toys accompanied by a single physical example of "talking" toy tape measure (see attached Exhibit 2).

**3. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 3 that:**

On January 19, 1999, the talking toy tape measure model or prototype was returned to Mr. Gary Carlin with a note that the Tonka Group had passed on the submission.

**Plaintiffs disagree with Defendants' characterization in Defendants' statement of fact 3 because:**

**A.** Defendants' January 19th, 1999 rejection letter clearly labeled Plaintiffs' submission as Talkin' Tools" (see attached Exhibit 3);

**B.** The physical model and example of the "Talkin' Tools" idea submission, the model tape measure, was returned to Plaintiffs with Defendants' January 19th, 1999 rejection letter, clearly labeling Plaintiffs' submission as "Talkin' Tools" concept-idea submission (see attached Exhibit 3).

**4. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 4 that:**

In February of 1999, the talking toy tape measure model or prototype and written documentation was sent to Dave Maurer of Hasbro's Pre-school Group in Pawtucket, Rhode Island.

**Plaintiffs disagree with Defendants' characterization in Defendants' statement of fact 4 because:**

**A.** In February of 1999 Plaintiffs submitted to Dave Maurer a concept-idea called "Talkin' Tools" (see attached Exhibit 4, printout from Defendants' idea submission tracking system for Plaintiffs' concept-idea titled "Talkin' Tools" and Exhibit 2);

**B.** Plaintiffs' idea submission to Mr. Maurer included written examples of various model toys accompanied by a single physical example of "talking" toy tape measure (see attached Exhibit 2).

**5. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 5 that:**

In March of 1999, the talking toy tape measure model or prototype was returned to Gary Carlin with a note indicating that Hasbro's Pre-school Group had passed on the submission.

**Plaintiffs disagree with Defendants' characterization in Defendants' statement of fact 5 because:**

**A.** In March 1999, Defendants again rejected Plaintiffs' submission for a concept-idea of Talking Tools-type toys, called "Talkin' Tools" (see attached Exhibit 4, Printout from Defendants' idea submission tracking system for Plaintiffs' concept-idea titled "Talkin' Tools" and Exhibit 2);

**B.** The physical example and model of "Talkin' Tools", Talking Tool tape measure, was returned to Plaintiffs along with Plaintiffs' written examples of other Talking Tools-type toys (see attached Exhibit 2 and Exhibit 4).

**6. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 6 that:**

In late September 2000, Steve Toth contacted Mr. Carlin indicating that Hasbro was in the process of developing a talking workbench and talking toy tools. Mr. Toth indicated that he recalled that Mr. Carlin had brought in a submission of a similar toy tool idea a year and a half earlier and indicated Tonka's desire to enter into an Inventor's License Agreement with Mr. Carlin and his business partners.

**Plaintiffs disagree with the characterization in Defendants' statement of fact 6 because:**

**A.** Plaintiff Gary Carlin in his deposition testified that Mr. Toth told him that Defendants' Tonka group developed "a line of talking tools that were almost identical to what we had shown him." Mr. Toth told Mr. Carlin that Defendants' talking "workbench" was standalone item internally created and independently developed from the talking tools with which it was supposed to interact. Mr. Toth expressed Defendants' firm unwillingness to pay Plaintiffs' the "workbench" if any agreement was to be made (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24 and Exhibit 13, March 20, 2001 letter from Plaintiff Gary Carlin to Defendants);

**B.** Plaintiffs dispute the veracity and truthfulness of Mr. Toth's communications to Gary Carlin including that the workbench was independently created (see attached Exhibit 12, a drawing by Defendants depicting as of June 30, 2000 a united concept development of Talking workbench and Talking Tools);

**C.** Plaintiffs agree to the extent that the conversation took place between Gary Carlin and Mr. Toth (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24).

**7. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 7 that:**

Mr. Toth informed Mr. Carlin that Tonka had independently developed a talking workbench but felt obligated to compensate Mr. Carlin and his business partners on the talking tool toys that were developed in conjunction with that workbench.

**Plaintiffs disagree with Defendants' characterization of fact 7 because:**

**A.** Defendants' use of the terms 'independently' and 'in conjunction with' with respect to development of the "workbench" and "talking tools" is contradictory and incomprehensible;

**B.** Plaintiff Gary Carlin in his deposition taken by Defendants' counsel testified that Mr. Toth told him that Defendants' Tonka group developed "a line of talking tools that were almost identical to what we had shown him." Mr. Toth told Mr. Carlin that Defendants' "talking" workbench was standalone item that was separately and internally created and

separately developed from Talking tools with which it was supposed to interact. Mr. Toth expressed Defendants' firm unwillingness to pay Plaintiffs' for talking workbench if any agreement to be made. (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24 and Exhibit 13, March 20, 2001 letter from Plaintiff Gary Carlin to Defendants);

**C.** Plaintiffs dispute veracity and truthfulness of Mr. Toth's communications to Gary Carlin (see attached Exhibit12, a drawing by Defendants depicting as of June 30, 2000 a united concept development of Talking workbench and Talking Tools);

**D.** Plaintiffs agree to the extent that the conversation took place between Gary Carlin and Mr. Toth (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24).

**8. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 8 that:**

An agreement was finally reached on or about December 18, 2000 and was backdated to indicate a date of September 29, 2000.

**Plaintiffs disagree with characterization in Defendants' statement of fact 8 because:**

**A.** Plaintiffs were fraudulently induced to sign the Inventor License Agreement based on material misrepresentations of fact made to them that they relied upon (see attached Exhibit 5, Deposition of Gary Carlin I at 74: 7-8).

**9. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 9 that:**

The Agreement indicated that the Inventors would get paid a 3% royalty on speaking tools and listed versions of the item other than the tape measure to be "hammer, screwdriver and pliers."

**Plaintiffs disagree with characterization in Defendants' statement of fact 9 because:**

**A.** Defendants mischaracterize and take out of context the language of the Inventor License Agreement. The actual language of the Agreement is the following:

> "Item" means the concept, product, design, and/or invention presented by Licensor to Licensee, currently known as "TALKIN' TOOLS" and described as a pre-school tool toy having a fanciful "face" embedded in the operating elements of the tool or its casting and an electronic voice-producing chip which issues audible statements evocative of the function of the tool and triggered by those functions (see attached Exhibit 14, at 1 (a));

**B.** Defendants misrepresent the scope of the language of the Inventor License Agreement. The Agreement's language is one of non-exclusiveness which is explicitly

expressed with phrases such as "[t]he sample disclosed" Defendants misleadingly omit the operative words "could include" when citing language of the Agreement. The actual language of the section is the following:

> The *sample disclosed* is a tape measure [] Other versions of the Item embodying the combined face and voice characteristics of the Item *could include* a hammer, screwdriver and pliers, and *could be sold* individually or in set (see attached Exhibit 14, at 1 (a))(emphasis added).

**10. Plaintiffs dispute Defendants' characterization in Defendants' statement of fact 10 that:**

The Agreement indicated that "the Item does not include non-speaking tools or a speaking workbench or other accessories which speak or which do not speak, but the product is limited to the speaking tool as describe above."

**Plaintiffs disagree with characterization in Defendants' statement of fact 10 because:**

**A.** Defendants mischaracterize and take out of context the language of the Inventor License Agreement. The actual language of the Agreement is the following:

> "Item" means the concept, product, design, and/or invention presented by Licensor to Licensee, currently known as "TALKIN' TOOLS" and described as a pre-school tool toy having a fanciful "face" embedded in the operating elements of the tool or its casting and an electronic voice-producing chip which issues audible statements evocative of the function of the tool and triggered by those functions (see attached Exhibit 14, at 1 (a)).

B. Defendants misrepresent the scope of the language of the Inventor License Agreement. The Agreement's language is one of non-exclusiveness which is explicitly expressed with phrases such as "[t]he sample disclosed" Defendants misleadingly omit the operative words "could include" when citing language of the Agreement. The actual language of the section is the following:

> The *sample disclosed* is a tape measure [] Other versions of the Item embodying the combined face and voice characteristics of the Item *could include* a hammer, screwdriver and pliers, and *could be sold* individually or in set (see attached Exhibit 14, at 1 (a))(emphasis added).

## B. FACTS NOT IN DISPUTE

**11.** Article 4 of the Agreement to Hold Confidential entered into between Plaintiffs and Defendants provides:

> The receiving party acknowledges that, during the period of confidentiality, as specified by Paragraph 13, it WILL NOT USE information identified as being confidential hereunder for commercial purposes WITHOUT THE CONSENT of the disclosing party. "USE" shall mean CONSCIOUS CONSIDERATION of the Information IN CONJUNCTION with deliberate implementation of the Information. "Commercial Purpose" shall mean the incorporation of the Information into products or PRODUCT CONCEPTS which are offered for sale or LICENSE (see attached Exhibit 7).

**12.** Defendants' Tonka Group, at least as early as June of 2000, had been under conscious consideration of developing a line of "talking" tools called "Talkin' Tools" as represented by Tonka Group's concept sketches that included **FOUR OUT OF FIVE EXACTLY-NAMED** examples "Talkin' Tools" described in Plaintiffs' November 1998 "Talkin' Tools" idea submission to Defendants (see attached Exhibit 16 and Exhibit 2).

**13.** Article 13 of Agreement to Hold Confidential entered into between Plaintiffs and Defendants provides:

> The obligation of confidentiality imposed by this Agreement shall extend, with respect to each identified item of confidential information, for TWO (2) YEARS from the date of INITIAL DISCLOSURE of such information; …. In the event that Company ELECTS NOT TO LICENSE the Amusement from Inventor, such obligations of confidentiality shall extend for TWO YEARS from the date that such election is communicated to the Inventor (see attached Exhibit 7).

**14.** Shortly after the September 2000 telephone conversation with Mr. Carlin, Mr. Toth filled out an internal License Request form, in which he described Plaintiffs' "Submission's Unique Innovation" (part B of the form) as "**TOOLS AS TALKING CHARACTERS – FIRST TO ADD CHUCK-LIKE PERSONALITY TO ITEMS OTHER THAN VEHICLES FOR TONKA.**" (see attached Exhibit 15).

**15.** The License Request form filled out by Mr. Toth was reviewed and signed on October 5, 2000 by five Senior Managers of Defendants: Chris Connolly, Defendants' VP Marketing, Derek Stothard (Marketing director and leader of the Tonka group that had implemented Defendants' Talkin' Tools line of toys), Marketing Director, Howard Bollinger (Mr. Toth's Surpervisor), Senior VP, Product Concepts, and others. (see attached Exhibit

15),(see attached Exhibit 31, Deposition of Mr. Stothard at 105:8-12). All of the individuals confirmed and executed the document, at the time, with the statement that Plaintiffs' concept-idea submission "tools as talking characters" was "First to add chick-like personality to items other than vehicles for Tonka.

**16.** Mr. Toth at his deposition confirmed that what he had represented on the License Request form was true**.** (see attached Exhibit 8, Deposition of Mr. Toth at 39: 14-19).

**17.** All the concept sketches/drawings from the Tonka group produced by Defendants dated as early as June of 2000 illustrate "talking" tools centered around a workbench and interacting with each other. (see attached Exhibit 16).

**18.** Each drawing in the set of drawings done by Defendants' Tonka R&D group dated as early as June of 2000 has at least four out of five exactly-named examples of "Talkin' Tools" described and disclosed in Plaintiffs' submission (see attached Exhibit 16), (see attached Exhibit 2).

**19**. Defendants have not produced a single drawing or evidence of conception or development of a standalone "workbench" as Mr. Toth represented to Plaintiffs in the September of 2000 telephone call he made to Mr. Carlin (see attached Exhibit 8, Deposition of Steven Toth at 68: 8-14), (see attached Exhibit 11, Deposition of Gary Carlin II at 60: 4-24), (see attached Exhibit 13, March 20, 2001 letter from Plaintiff Gary Carlin to Defendants).

**20.** Plaintiffs reluctantly relied on Defendants' representation of the nature, character and origin of the "Talkin' Tools workbench" up until Defendants were forced to produce documents, such as Exhibit 16, well into the current litigation sometime in the Fall of 2005 **WHERE IT BECAME CLEAR THAT MR. TOTH HAD MISREPRESENTED THE TRUE NATURE AND ORIGIN OF TOY.**

**21.** In response to Plaintiffs' interrogatories defendant identified seven individuals, Derek Stothard, Todd Patrick, Joe Kahn, David Voss, Wendy Buelsing, Steve Toth and Karl Christopherson, as "the following employees appear to have been involved in some aspect of [Talkin' Tool Bench] conceptualization or development" (see attached Exhibit 17).

**22.** The identified individuals in fact 21 were part of the then Defendants' Cincinnati Tonka group (see attached Exhibit 17) (see attached Exhibit 20, Deposition of Mr. Voss at 24:1-12).

**23.** Mr. Toth testified that members of Defendants' Tonka Group **REVIEWED** Plaintiffs' submission (see attached Exhibit 8, Deposition of Steven Toth at 61: 2-4).

**24.** The development of Defendants' Talkin' Tools line of toys progressed **"VERY QUICKLY"** from creation and development to production stage (see attached Exhibit 25, Deposition of Joe Khan at 44:13-15).

**25.** At least as early as July 5, 2000, Defendants' Tonka group produced toy sketches titled "Talkin' Tools" which used the identical name of Plaintiffs' November 30, 1998 "Talkin' Tools" idea submission as well as subsequent submissions. (see attached Exhibit 18), (see attached Exhibit 2).

**26.** At least as early as July 5, 2000, the Tonka group had produced toy sketches titled "Talkin' Tools" which was accompanied by a description that reads: "Tonka Talkin' Tools is an interactive workbench filled with friendly 'building buddy' characters that come to like. This exciting play set comes with talkin' tool characters who say funny and encouraging phrases" (see attached Exhibit 18).

**27**. As early as July 5, 2000, Tonka group had produced toy sketches titled "Talkin' Tools" which already contained at least four out of five exactly-named examples of Talkin' Tools, described in Plaintiffs' earlier "Talkin' Tools" idea submissions. (see attached Exhibit 18), (see attached Exhibit 2).

**28.** Joe Khan testified that the Talking Tools line was not an extension of any existing line of Tonka toys (see attached Exhibit 25, Deposition of Joe Khan at 22:1-2).

**29.** Joe Khan additionally testified that the common feature of the Talking Tools line was the fact that "they were shaped like tools. They characterized screwdrivers and workbenches and hammers and nails" (see attached Exhibit 25, Deposition of Joe Khan at 34:20-22).

**30**. In July 31, 2000, the Senior Designer for Defendants' Tonka group, David Voss filled out a Concept Brief form, which he titled "Tonka's Talkin' Tools" (see attached Exhibit 19).

**31**. In the Concept Brief form Mr. Voss stated in Line Strategy Summary section: "Opportunity to build a new and unique character segment for Tonka. Will allow the brand to expand the line into different areas of tough boy toys" (see attached Exhibit 19).

**32**. In the Product Features section of the Concept Brief form, Mr. Voss stated: "Interactive workbench and tool characters will truly "come to life" with funny phrases and sounds" (see attached Exhibit 19).

**33**. In the Concept Brief form Mr. Voss selected fall 2001 as a Line Year to release the "Talkin' Tool" line (see attached Exhibit 19).

**34.** Mr. Voss testified that he did not come up with an idea for the "Talkin' Tools Workbench and that Talkin' Tools and the Talkin' Tools Workbench were conceived of together, "**NOTHING WAS DONE INDEPENDENTLY. EVERYTHING WAS KIND OF DONE ALL TOGETHER"** (see attached Exhibit 20, Deposition of Mr. Voss at 83:1-10).

**35.** Mrs. Buelsing who was a Marketing person for Defendants' Tonka Group testified in response to the question whether the Talkin' Tools Workbench and Talkin' Tools "were all part of the same concept stated, **"YES. "YEAH, THEY'RE ALL – ABSOLUTELY, THEY'RE ALL RELATED. YEAH"** (see attached Exhibit 21, Deposition of Mrs. Buelsing at 45:1-4).

**36.** Mrs. Buelsing additionally testified that the Talkin' Tools Workbench was developed in order to provide a platform to sell the concept of Talkin' Tools by making the entire line financially feasible," **[DEFENDANTS] PROBABLY COULDN'T HAVE SOLD INDIVIDUAL TOOLS BY THEMSELVES, FOR LOTS OF REASONS"** (see attached Exhibit 21, Deposition of Mrs. Buelsing at 27:19-24, 28:1-16, 29:15-20).

**37.** Joe Kahn, a former designer with Defendants' Tonka group who developed Defendants' "Talkin' Tools" line of toys, testified that sometime in 2000 during a group meeting, Mr. Voss announced that the group would develop a line of talking tools starting with a "talking" Workbench (see attached Exhibit 25, Deposition of Joe Khan at 25:1-17).

**38.** Mr. Kahn also testified that "**THE TALKING TOOL BENCH IS THE ADVERTISABLE TOY THAT STARTED THE TALKING TOOL LINE**" (see attached Exhibit 25, Deposition of Joe Khan at 25:1-17).

**39.** Joe Kahn also testified that "**MY RECOLLECTION IS THAT DAVE VOSS CAME TO ME AND ASKED ME TO DESIGN A TALKING TOOL BENCH**" (see attached Exhibit 25, Deposition of Joe Khan at 24:13-19).

**40.** According to handwritten designers' notes and play pattern notes made by members of Defendants' Tonka group dated July and August of 2000, the Talkin' Tools Workbench and other Talkin' Tool toys were all part of one concept (see attached Exhibit 22), (see attached Exhibit 12), (see attached Exhibit 18), (see attached Exhibit 19).

**41.** Defendants provided documents dated August 21, 2000 for pre-manufacturing Product Cost analysis for Talkin' Tools toys including Screwdriver, Sledge Hammer, Tape Measure, and Ratchet (see attached Exhibit 23).

**42.** Defendants' pre-manufacturing Product Cost analysis for the Talkin' Tools Workbench is dated August 29, 2000 (see attached Exhibit 24).

**43.** Some time around the conversation between Mr. Toth and Mr. Carlin, an email titled "Tonka Tool Bench Capacity," from Derek Stothard, the head of the then Cincinnati Tonka division working on Talkin' Tools, copied to all individuals in his group, alarmingly warned that Defendants "are going to get a 2% royalty hit across this segment" (see attached Exhibit 26). Mr. Stothard at his deposition testified that the reference to "the segment" in the email he sent referred to Talkin' Tools and the Talkin' Tools Workbench **as a group** (see attached Exhibit 31, Deposition of Mr. Stothard at 126:12-18).

**44.** Defendants are continuously developing new extensions of Plaintiffs' Talkin' Tools submission such as Cool Crew toys. Defendants' promotional material for Cool Crew toys reads: "**ARE THEY TOOLS OR ARE THEY BUDDIES? THEY'RE BOTH**" (see attached Exhibit 27).

**45.** Defendants are continuously developing new extensions of Plaintiffs' Talkin' Tools submission such as Big Mike Mower tool toy. Defendants' internal documents describes "Big Mike Mower" as a toy "tool," "**BIG MIKE MOWER IS THE LEADER OF A TOUGH BUT EFFICIENT CREW OF YARD POWER TOOLS"** (see attached Exhibit 28).

**46.** Mr. Labarbara, Defendants' Vice-President for Concept Acquisition, testified that "Big Mike Mower" is a part of the Talkin' Tools line of toys (see attached Exhibit 10, Deposition of Mr. Labarbara, Hasbro VP Concept Acquisition at 38:12-14).

**47.** Plaintiffs learned that Defendants first started to sell Yard Crew tool toys from the Talkin' Tools line of toys when Plaintiffs received a letter dated January 30, 2003 with a royalty report representing domestic sales for Yard Crew Weed Trimmer the fourth quarter of 2002 (see attached Exhibit 29).

**48.** Plaintiffs first learned that Defendants were selling a "taking" toy mower when Plaintiffs received a letter dated February 28, 2003 with a royalty report from Defendants Hasbro International representing international sales for "Big Mike the Mower" for the fourth quarter of 2002 (see attached Exhibit 30).

**49.** Plaintiffs never received royalty reports and/or any other sales information regarding domestic sales for a "talking" mower and/or sales information and/or royalty reports on any other toys at issue in this case until Plaintiffs filed a lawsuit and requested discovery and even then not until Plaintiffs' motion to compel production of sales information was granted with respect to the "talking" mower and other products at issue.

**50.** Defendant Hasbro, Inc. never paid royalties to Plaintiffs for "Big Mike Mower tool toy" whereas Defendant Hasbro International paid royalties beginning in the fourth quarter of 2002 (see attached Exhibit 29 and Exhibit 30).

Date: December 18, 2006

Respectfully submitted,
Plaintiffs,
By their attorneys,

MARK B. MORSE

/s/ Mark B.Morse
RI Bar Registration Number 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555 (telephone)
(401) 273-0937 (facsimile)
Mark@morselawoffice.com

DARIUSH KEYHANI

/s/ Dariush Keyhani
DARIUSH KEYHANI
Meredith & Keyhani, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
(609) 945-7406 (telephone)
(609) 228-4031 (facsimile)
dkeyhani@meredithkeyhani.com
(Appearing *Pro Hac Vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2006 I electronically filed the attached Memorandum of Law in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment with the court using the ECF system. The following counsel of record are registered with the court and will be served electronically through the ECF system:

John Tarantino, Esq.
Todd D. White, Esq.
Jeffrey Tecehntin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

/s/ Dariush Keyhani
Meredith & Keyhani, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
(609) 945-7406 (telephone)
(609) 228-4031 (facsimile)
dkeyhani@meredithkeyhani.com