UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS, Plaintiffs, | : | |
| v. | : | CA NO: 05-246 S |
| HASBRO, INC. and HASBRO INTERNATIONAL, INC. Defendants. | : | |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. PLAINTIFFS HAVE NOT PROFFERED ANY EVIDENCE OF A CONTRACT BREACH OR MISAPPROPRIATION

"A Plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause that cat to bark." Peerless Ins. Co. v. Viegas, 667 A.2d 785, 789 (R.I. 1995). In the case before this Court, Plaintiffs' attempt at describing their "fraud and misrepresentation" action as a "breach of contract" action is equally unavailing.

### A. The Witnesses' Testimony Contradicts Plaintiffs' Position.

During the course of discovery, Plaintiffs deposed nine (9) Hasbro (or former Hasbro) employees. With the exception of one "damages" witness (Hasbro's Manager of Royalty System, Joe Fernandes), Plaintiffs' efforts were focused on attempting to buttress their various theories of liability. To that end, Plaintiffs deposed eight (8) Hasbro "liability" witnesses. Not one of these witnesses supported Plaintiffs' breach of contract theory or buttressed an allegation

of misappropriation. With respect to the conceptualization and/or development of the workbench and the talking tools, this is what the witnesses said:[1]

**Steve D'Aguanno (former Hasbro Senior V.P. of Research & Development)**

> Q. What is the basis for thinking that it [the workbench] was an internal creation?
>
> A. I just don't recollect any reference to any inventor or conversations about this item during this development. I remember a designer working on it and a designer standing there presenting it in meetings.

(Exhibit A at p. 80, l. 1-7.)

**Franklin Labarbara (Hasbro's V.P. of Concept Acquisition)**

> Q. So you're saying the tool bench developed not from talking tools?
>
> A. My opinion is that the whole talking tools or talking role play product line in Tonka evolved out of the "Chuck My Talking Truck" project. That's my opinion, yes.

(Exhibit B at p. 15, l. 20 – p. 16, l. 1.)

**Dave Maurer (Hasbro's Manager of New Concepts Acquisition)**

> Q. Are you aware whether the Talkin' Tool Bench concept came in from an outside inventor or was it created in-house?
>
> A. As far as I know, it didn't come from outside.

(Exhibit C at p. 29, l. 22-25.)

**Derek Stothard (former Tonka Group Team Leader)**

> Q. So the idea of Talking Tools you believe was created within your Group?
>
> A. Yeah.

(Exhibit D at p. 63, l. 15-17.)

[1] The testimony cited below is in response to inquiry by Plaintiffs' counsel.

Q. Do you know who styled that name for the – for the product?

A. The name?

Q. Yeah.

A. No. I am not sure who came up with the name. I know that Carl Christopherson I think was the designer who came up with the project, and from memory, he was the one that presented that idea.

(Exhibit D at p. 69, l. 4-11.)

Q. So prior to the review phase, you were not aware of an idea submission from the outside entitled Talking Tools.

A. I definitely wasn't – wasn't – wasn't aware of that idea submission when the project started and the team started working on it. I was made aware of it by Steve Toth – and I'm not sure whether this review phase is when he raised his hand and told us about that or not. I can't remember when it was he first saw this idea and said he thought he'd seen something similar.

(Exhibit D at p. 86, l. 25 – p. 87, l. 10.)

Q. You know for a fact that nobody from your Group was present when Steve Toth presented talking tools idea to Hasbro in one of those review meetings you discussed earlier.

A. I don't know for a fact, but I don't believe he did. I don't believe anybody on the Tonka team saw this idea.

(Exhibit D at p. 90, l. 24 – p. 91, l. 7.)

**Steve Toth (former Tonka Outside Inventor Relations Liaison)**

Q. Who created this tool bench?

A. A designer at Hasbro's Cincinnati office.

(Exhibit E at p. 64, l. 8-9.)

Q. So you don't know for a fact whether a designer at Hasbro, in fact, created this bench?

A. Yes, I know for a fact that a designer at Hasbro created this bench. Who he is, I do not recall, or she.

(Exhibit E at p. 65, l. 4-8.)

**Joe Kahn (former Tonka Group Toy Designer)**

> Q. The talking tools concept could have come from the outside?
>
> A. I don't think it did because it was not – it wasn't presented in that way.

(Exhibit F at p. 24, l. 13-17.)

> Q. What would be a natural extension of a product line, like talking trucks? [. . .]
>
> A. It was – natural extensions would be the other toys that we came up with.
>
> Q. And what are the other toys that Hasbro came up with?
>
> A. So there was the Talking Robot. There were proposals for a talking farm implement, the Talking Tools.
>
> Q. Do you believe all those ideas were extensions of the concept of the talking trucks.
>
> A. Yes.

(Exhibit F at p. 60, l. 12-24.)

**Wendy Buelsing (former Tonka Group Marketing Manager)**

> Q. Do you have any reason to believe that the Talking Tool Bench is different from Talking Tools? [ . . .]
>
> A. Well, as I understand it – let me back up one. My recollection of it, as I said before, is that we concepted this. We came up with ideas. We presented it and then, you know, it was news back that, hey, someone presented a tool that was similar maybe to something that we had presented. And that because of that we had to work in a royalty on the tools. We had already developed the concept for a bench at that point, and I'm guessing that the bench was separate idea from the tools, or what had been presented. I've never seen what was presented as the Inventor['s] submission, so I don't know.

(Exhibit G at p. 41, l. 10 – p. 42, l. 1.)

**Dave Voss (former Tonka Group Toy Designer)**

> Q. And was the Talkin Tools Workbench developed independently from the Talking Tools in your recollection?
>
> A. Absolutely.

(Exhibit H at p. 23, l. 6-9.)

> Q. What is your recollection of how Talkin' Tools started in your group, the development of Talkin' Tools.
>
> A. The Talkin' Tools specifically?
>
> Q. Whatever you understand Talkin' Tools to mean.
>
> A. Talkin' Tools to me is the line that complimented the tool bench and that was – I think the first conversation I can remember was with Derek Stothard. After presenting the tool bench, as he'd often say to us on big, more expensive items, is "Boy. This would be great if it was a line. How can you make this thing a line for me? Go back and figure it out." You know, what do you do with a tool bench but design tools to go along with it. That's what I can remember.

(Exhibit H at p. 36, l. 11 – p. 37, l. 2.)

> Q. During your time at Hasbro when you worked in the group, did anybody raise their hand and say, "I was the one that came up with the Talkin' Tools"?
>
> A. No, no. Better not have.
>
> Q. Why do you say that?
>
> A. Well, because it was a shared experience. I mean it's hard, you know, to say that one person did it all.

(Exhibit H at p. 34, l. 24 – p. 35, l. 6.)

> Q. Do you think that this idea submission represented in this Inventor Review Record inspired a development of the tape measure that was developed in your group at Hasbro?
>
> A. No.

(Exhibit H at p. 58, l. 20-24.)

> Q. Do you think – do you believe that the idea submission presented in this Inventor Review Record was an inspiration for this tape, Talkin Tape Measure; or do you think there is no relationship?
>
> A. I think there's no relationship at all.

(Exhibit H at p. 59, l. 7-12.)

Plaintiffs attempt to weave together terminology such as "line," "segment," and "relationship," with "concept" and "develop" in order to create a mosaic of "disputed issues." However, none of the witnesses ever testified that Plaintiffs' submission was stolen, co-opted, or used to inspire the conceptualization and/or development of the sundry toys at issue. The uniform and unwavering testimonial evidence establishes an absence of any dispute on the origination of the workbench and the tools that were to be sold in conjunction with it. The witnesses' testimony undermines Plaintiffs' contention that there is a genuine issue of material fact concerning an alleged breach of contract or misappropriation.

### B. Defendants Produced Toys Different From Plaintiffs' Toy Submission.

In their "Brief Summary of Facts", Plaintiffs assert that between 1997 and 1998 they "conceived and perfected a novel toy concept/idea styled 'Talkin' Tools' – characterized toy tools that incorporate a child friendly personality and make cute phrases relating to the functions/activity of the tools." (See Plaintiffs' Brief at pp. 1-2.) In fact, Plaintiffs are fully aware that the "child friendly personality" for which they appear to be taking credit is something known as "Chuck-like personality,"[2] a Tonka Group internal development and a by-product of "Chuck the Talking Dump Truck."

---

[2] Gary Carlin was employed at Hasbro when the "Chuck-like personality" was being developed and is well aware that Plaintiffs did not create this personality.

In truth, the concept brought by Plaintiffs to Defendants was a "teaching" toy tool. The example disclosed by Plaintiffs was a tape measure that taught the child how to measure objects. However, this "teaching" play pattern - the centerpiece of Plaintiffs' interactive process - was never incorporated by Hasbro. The description of the product that Mr. Carlin presented to Steve Toth indicates: "Variety of tools with speech – tells you what to do – measure, weigh, etc. You do [an] activity – it tells you if you are doing it right or wrong." (See Plaintiffs' Exhibit 1) (emphasis added.) The focus of the submission presented by Plaintiffs was certainly not on the "buddy" interaction that Hasbro developed through its "Chuck-like personality." The focus of Plaintiffs' proposal was a "teaching" play pattern. Nevertheless, Plaintiffs are now seeking compensation for toy tools that they never proposed and that do not incorporate this "teaching" play pattern.

Plaintiffs' liberal interpretation of toys for which they should be compensated is best illustrated by their allegations concerning their "Measure Bear" submission. The "Measure Bear" was a plush bear that wore a tool belt. The tool belt contained a time piece, a scale and a tape measure. These measuring devices verbally informed the child of the time, weight and/or length of objects. In Plaintiffs' Brief, Plaintiffs cite to the "Measure Bear" submission as the "third time" they presented the talking tools idea to Hasbro. Plaintiffs explained: "Plaintiffs submitted their 'Talkin' Tools' concept one last time in June of 1999 with a physical model bear with a tool belt that included 'talking' tools attached to it (a different model implementation of the same concept)." (See Plaintiffs' Brief at p. 2). Apparently, because Plaintiffs submitted a bear with a talking scale, watch, and tape measure on a tool belt, they should be paid royalties on Defendants' talking buddy kitchen set or on a vacuum.

Although this is an obvious stretch, Plaintiffs' claims are even more attenuated in light of Plaintiffs' additional knowledge concerning their "Measure Bear" submission. Plaintiffs are fully aware that: 1) they never submitted this toy to the Tonka Group (the group which purportedly co-opted the toy); 2) the "Measure Bear" submission was rejected out-of-hand by Dave Maurer of the Pre-school Group; and thus, 3) this toy was never seen by any designers in either the Tonka Group or the Pre-school Group. Nevertheless, Plaintiffs still want this Court to infer that their "Measure Bear" submission might have served as a platform or an inspiration for Hasbro's toy workbench or tools.

### C. <u>Steve Toth Fairly and Accurately Informed Gary Carlin of the Product Development</u>.

Finally, the pivot point around which Plaintiffs' allegations of Breach of Contract and Misappropriation turn is the September 25, 2000 telephone conversation between Steve Toth and Gary Carlin. There is no confusion about the nature of this conversation, contrary to what Plaintiffs would have the Court believe. The actual evidence is clear and specific. Mr. Carlin testified: [3]

> Q. What's the best you can remember about what he [Steve Toth] said to you?
>
> A. He said that he recently found out that the Tonka group was developing a line of or had developed a line of talking tools that were almost identical to what we had shown him, what I had shown him, and that he felt that they had a responsibility to pay us royalties on that. And he also said that they had developed a workbench that they created internally, invented internally, and that they didn't want to pay us on that because it was invented internally, and also that it was a standalone item that had a face on it and talked, but that would interact with – the way I understood was that it would interact with the tools that we were getting credit for. So there would be a bench sitting next to our individual tools and that the consumer would buy both, all of them or whatever,

[3] For the purposes of Defendant's Motion for Summary Judgment, and taking all evidence in the light most favorable to the non-moving party, Mr. Carlin's testimony of this conversation will be accepted as accurate.

> hopefully. So they did not want to pay us on that, and they would pay us 3 percent on the tools.

(Exhibit I at p. 60, l. 4-24). Mr. Toth told Mr. Carlin that the toys were already in the process of being developed, and that workbench was created or invented internally. Mr. Toth also explained that the workbench was a stand-alone item with a face, which would interact with the tools for which Mr. Carlin would be receiving credit.

Plaintiffs have failed to produce any evidence to establish that Mr. Toth inaccurately described circumstances surrounding the development of the workbench and tools. Moreover, Plaintiffs fail to point to any specific misrepresentation made by Defendants.

Mr. Carlin further testified that when he informed Ralph Baer of this conversation, Mr. Baer stated that Mr. Toth's claim of Tonka's independent development of the workbench was "BS." (Exhibit I at p. 70, l. 16-21.) In their Brief, Plaintiffs characterize Mr. Baer's apparent consternation about the development of the workbench as "some discomfort about the matter." (See Plaintiffs' Brief at p. 5.) Therefore, prior to solidifying any of the terms of the Agreement, Mr. Carlin was aware that there was at least some "discomfort" on the part of one of his business partners. He was also aware that Tonka was already developing the tools and the workbench. With that as a backdrop, Mr. Carlin could have asked for clarification from Hasbro. He could have required an even more precise description of the workbench in the Agreement or he could have used the fact that Defendants were already developing the tools and bench as leverage to negotiate a higher royalty rate. Additionally, if Mr. Carlin or his business partners truly believed that Hasbro was impermissibly utilizing their toy submission as a platform for the workbench and other toys, Mr. Carlin had legal options.

Despite all of these options, Mr. Carlin chose to negotiate with Hasbro for the specific terms that are memorialized in the Agreement. These terms expressly carve out the workbench

and provide a relatively detailed description of certain aspects of it. Mr. Carlin, a former Vice President at Hasbro, cannot claim to be unsophisticated in the process of negotiating such agreements.

Plaintiffs are now trying to have it both ways. Plaintiffs have been unable to show how Mr. Toth's representations were false or misleading in any way. In fact, according to Mr. Baer's contemporaneously written account of the negotiation history of the Agreement, Mr. Carlin was going to "negotiate with him [Mr. Toth] further and see if he can get it up to 3% for all individual tools or 2% for both the tools and the workbench." (See Exhibit K.) Now, after successfully negotiating the higher rate on the tools, and without any evidence of a breach of contract, Plaintiffs want this Court to refashion the Agreement and pay Plaintiffs on, *inter alia,* a product that was specifically carved out of the terms of the Agreement.

## II. ALLEGED AMBIGUITY IN THE AGREEMENT

In an effort to create ambiguity and an adverse construction against Hasbro, Plaintiffs' incorrectly portray Hasbro as the "drafter" of the Inventor License Agreement. However, the Agreement at issue is not a contract of adhesion. In fact, Gary Carlin actively participated in crafting the Agreement; he wrote to Hasbro's counsel, Jim Kipling, and requested multiple revisions throughout the Agreement. (See Defendants' Exhibit J.) This Agreement was a mutually-crafted document. Mr. Carlin even participated in drafting the definition of the "Licensed Property." (See Defendant's Exhibit J, pp. 4-5.) Plaintiffs' assertion that "any ambiguity with respect to its definition must be read against the Defendants" is unsupported by the evidence and would be contrary to established principles of contract interpretation. Plaintiffs, through Gary Carlin, were co-draftsmen of the Agreement. As co-draftsmen,

Plaintiffs may not argue that an ambiguity in the Agreement must be interpreted against Defendants.

Plaintiffs also contend that the essential meaning of the definition section of the Agreement can be pared down to two words: “could” and “concept.” By making this assertion, Plaintiffs attempt to sidestep the critical fact that only specific tools are listed within the Agreement. Contrary to Plaintiffs’ assertion, the word “could”, as it is used in the Agreement, simply indicates that there are other specific versions of the “Item” that Hasbro might develop. “Could” must be viewed in juxtaposition with the mandatory implication of the verb “shall.” In this proper context, the use of the word “could” simply provides for the *possibility* of three other items. It certainly cannot and should not be understood to lead to an unfettered opening of an infinite number of toys.

Plaintiffs are equally incorrect in their definition of the word “concept.” The word “concept” in the Agreement is one of four sequential terms (“concept, product, design, and/or invention”), which were simply used to sufficiently canvass what was presented to the Tonka Group. Just like “could”, the word “concept” should not and cannot be read to indicate an open-ended Agreement that stretches Defendants’ royalty payments obligation to toys as expansive as Plaintiffs’ desire. The actual “product” submitted by Plaintiffs was a tape measure. Other “products” referenced in Plaintiffs’ written submission were limited to hand tools of a similar variety.

The description simply does not include any overt language indicating versions of the “Item” beyond a tape measure, hammer, screwdriver and pliers. There is nothing in the plain language of the Agreement that can be construed to extend versions of the “Item” to a phone, a kitchen set, a grill, a fishing pole, a vacuum or anything of such magnitude or function.

## III. DEFENDANTS' RESPONSE TO PLAINTIFFS' FURTHER LEGAL ARGUMENTS

### A. Defendants Did Not Breach Any Contractual Obligation To Plaintiffs.

#### 1. The "Agreement to Hold Confidential"

The Defendant, Hasbro, Inc. may have had an "Agreement to Hold Confidential" (the "agreement") with Gary Carlin as President of Inventor's Greenhouse. However, it is beyond dispute that the other Defendant in this matter, Hasbro, International, Inc., did not. The other Plaintiffs were not parties to this agreement either. Hasbro International, Inc. could not breach a contract to which it was never a party. For this reason alone, Plaintiffs' assertion of breach of this agreement by Hasbro International, Inc. must fail.

Plaintiffs' breach of contract claim must also fail because Hasbro, Inc. did not breach this agreement. Under the agreement, Hasbro, Inc. was precluded from using confidential information provided by Mr. Carlin. According to the agreement, Defendants "will not use information identified as being confidential hereunder for commercial purposes without the consent of the disclosing party." (See Plaintiffs' Exhibit 7.) In the agreement, "use" is defined as "conscious consideration of the information in conjunction with the deliberate implementation of the information." (See Plaintiffs' Exhibit 7).

As previously outlined, Plaintiffs offer no evidence of any "conscious consideration" of their submission by Defendants with respect to any toy at issue. None of the witnesses testified that they had seen or were even aware of Plaintiffs' submission. The uniform testimony from all of the witnesses is that the workbench was an independent development and that the tools simply were an extension of that development for commercial purposes. Simply put, the development of the workbench sprang from the success of "Chuck My Talking Dump Truck." Therefore,

Plaintiffs have failed to satisfy one of the constituent elements of the agreement: "conscious consideration" by Hasbro.

Additionally, pursuant to the agreement, Hasbro, Inc. was permitted to utilize the information provided by Mr. Carlin for commercial purposes provided that Hasbro, Inc. received consent to do so. Even if a representative of Hasbro, Inc. had seen Plaintiffs' submission (of which there is no evidence), Hasbro, Inc. did not breach this aspect of the agreement because it received Mr. Carlin's consent in the form of the signed Inventor License Agreement with Plaintiffs.

Ultimately, the "Agreement to Hold Confidential" is an agreement to ensure that information is not disclosed to third parties. There is no evidence that any information was disclosed to any of the workbench/tool designers at the Tonka group, no less to any third parties. There has been no breach of this agreement by either Defendant.

**2. The "Inventor License Agreement"**

Attached to Plaintiffs' Brief is Exhibit 2, Plaintiffs written invention submission captioned: "Talkin' Tools . . . get the job done!!" In this text, which is the only written work presented that contains the exemplar tape measure, Plaintiffs set forth five tool ideas in this order: tape measure, scale, hammer, saw and drill. By specifically listing five tool ideas, Plaintiffs expressly limited the items contained in the submission. Additionally, the text drafted by Mr. Carlin contains another limitation on the invention submission. After describing the teaching potential of the first four tools, Mr. Carlin concludes with this reference to a talking drill: "***Finally***, there is talking drill." (See Plaintiffs' Exhibit 2.) Thus, even Plaintiffs' text to their own submission suggests that they were not presenting an open-ended concept, but rather a finite group of related "teaching" tools.

This understanding is confirmed by Steve Toth. When asked by Plaintiffs' counsel if the description of the "Item" in the Agreement was consistent with the scope of Gary Carlin's submission, Mr. Toth stated, "Not quite. As I said before, the word <u>hand-held</u> should have been in there." (<u>See</u> Defendants' <u>Exhibit E</u>, p. 74, l. 3-8) (emphasis added.) Mr. Toth amplified his statement when he explained, "A tool to me has always been a small, hand-held item, typically fitting in – or, typically like a hammer, screwdriver, pliers, that fit in a toolbox used at a workbench." (<u>Exhibit E</u>, p. 40, l. 12-15.) Therefore, lacking any contradictory evidence, the Agreement was to be limited to the hand-held tools described above.

No evidence has been presented that demonstrates or establishes a breach of contract. Although Plaintiffs have suggested mistrust, misrepresentation, misappropriation and even fraud, they have also failed to demonstrate a disputed issue of material fact concerning breach of contract.

**B. <u>Plaintiffs' Claims Are Barred Under The Statute of Limitations Within The Agreement</u>.**

Plaintiffs try to discount the express three-year limitations period contained in Section 6, subsection (b)(iv) of the Agreement by arguing that it is inapplicable to the present dispute relating to unpaid royalties and should not be upheld for public policy reasons. Plaintiffs' analysis of the application of the express limitations period is incorrect. Plaintiffs essentially ignore the express limitations period contained in the Agreement and focus on other, irrelevant language. The language highlighted by Plaintiffs relates to a licensor's examination of records of the licensee. In contrast, the specific sentence setting forth the express contractual limitations period begins, "<u>*Any proceeding* to obtain payments *claimed under* this *Agreement*</u> . . . ." (<u>Exhibit L</u> at Section 6, subsection (b)(iv)) (emphasis added.) Thus, contrary to Plaintiffs' contention, the application of the three-year contractual limitations period is not limited to

payment disputes relating to certain products or to payments already made. Instead, under the plain language set forth above, the three-year contractual limitations period relates to payment disputes or claims for payments, which arise under the Agreement. Because Plaintiffs seek to recover for breach of contract, the present dispute regarding payments clearly arises under the Agreement and the three-year contractual limitations period bars Plaintiffs' claims.

Additionally, Plaintiffs' public policy argument is flawed. Plaintiffs base their argument on the fact that it would be unfair to enforce a duly-negotiated three-year limitations period that could run prior to Plaintiffs receiving notice that they may have a claim regarding payments made (or allegedly not made) under the Agreement. Plaintiffs' argument fails because, at the time the duly-negotiated Agreement was executed, Plaintiffs had notice that the Agreement contained a three-year limitations period for initiating proceedings relating to payments claimed under the Agreement. Moreover, as more specifically articulated in Defendants' Motion for Summary Judgment, Plaintiffs had notice on March 20, 2001, that Hasbro was allegedly selling toys for which Plaintiffs currently claim unpaid royalties. Specifically, on March 20, 2001, Mr. Carlin wrote a letter to Hasbro regarding his observation of a toy workbench at the New York ToyFair in February of 2001. Plaintiffs cannot argue that a duly-negotiated three-year limitations period should not be enforced because Defendants' products were "hidden" or "undiscoverable" when, in fact, Plaintiffs clearly had knowledge in 2001 that Hasbro was manufacturing and producing the disputed products.

**C. Defendants Have Not Been Unjustly Enriched.**

Plaintiffs' assertion that Defendants have been unjustly enriched to the tune of approximately "One Hundred Million ($100,000,000.00) Dollars" would be absurd even if it was just hyperbole. As previously indicated, Plaintiffs' Exhibit 33 shows that their claimed damages

are completely inaccurate. First, Exhibit 33 contains sales totals for all products, including the chainsaw, the trimmer, the Talkin' Tools basic assortment and the Yard Crew Hand Tools assortment. Plaintiffs have been and continue to be paid on each of these products. Thus, the sales figures touted by Plaintiffs do not exclude the products on which Plaintiffs have received full compensation over the last six years.

A more glaring error is the fact that Plaintiffs continuously argue that Defendants' unjust enrichment is in an amount equal to the total gross sales of the items at issue. Apparently, Plaintiffs forget that there are significant costs associated in the development, manufacture, advertising, shipping, distribution and sale of these products. By making claims for such substantial damages, Plaintiffs conflate profits with gross sales. But even if Plaintiffs were not making such a fundamental error, their overreaching is obvious because there is no reasonable nexus between the Defendants' successful sales of many of these products and anything Plaintiffs ever did or presented to Defendants.

More specifically, however, any unjust enrichment would only be the amount that Defendants received that should have been paid to Plaintiffs. The Inventor License Agreement permitted the Defendants to exploit the ideas presented by Plaintiffs at its own pleasure, requiring only that Defendants pay Plaintiffs 3% of net sales as a royalty. Therefore, Defendants could only have been unjustly enriched (and Defendants do not concede that they have been) in an amount equal to 3% of the net sales of all the products upon which Plaintiffs have not already been paid and which are determined to fit within the license agreement. This number, if any at all, would be only a tiny fraction of the $100,000,000.00 that Plaintiffs invoke in a blatant effort to bring some significance to their meritless claims.

**D. Defendants Have No Fiduciary Obligation To Plaintiffs.**

Plaintiffs have not cited to a single fiduciary duty case with facts remotely close to this case. There may be some non-traditional fiduciary relationships that require a factual assessment, but this is not one of them. A business relationship between two parties, in which there is no indicia of a fiduciary role undertaken by one party for another, may be determined as a matter of law not to give rise to a fiduciary duty.

Plaintiffs had contractual rights. For example, they had the right to audit the books of Hasbro. Plaintiffs also had the right to review the royalty statements that were received. The subject Agreement in this case is purely a commercial arrangement between unrelated parties. Plaintiffs negotiated the subject Agreement through their representative Gary Carlin. The terms of the final Agreement took three months to complete because of the language changes that were inserted. There is nothing in any agreement between the parties that indicates or creates a fiduciary relationship, nor have Plaintiffs pointed out any such language. Therefore, as a matter of law, Plaintiffs' claim for breach of fiduciary duty must fail.

**E. Defendants Have Not Misappropriated Plaintiffs' Ideas Under Rhode Island Law.**

Plaintiffs failed to articulate an existing theory of recovery under their misappropriation claim. Although Plaintiffs may want to reinvent the theory upon which they have proceeded, the misappropriation of trade secrets as articulated by Plaintiffs does not exist in the matter before this Court. Plaintiffs claim that they presented "detailed evidence" to support this allegation. (See Plaintiffs' Brief at p. 23.) However, there is no detailed evidence of such misappropriation. Plaintiffs' sole rationale – and it is just a rationale, not evidence – offered to support their misappropriation claim is that an entity like Hasbro could not independently conceptualize the idea of a talking workbench. Plaintiffs may not be able to fathom that a natural extension of a

talking workbench would be tools for the workbench, but again, Plaintiffs have put forth no evidence to establish anything to the contrary.

According to Plaintiffs' expert, the idea of talking toys is close to one hundred (100) years old. The idea of toy tools has been around for at least half as long. Even the idea of talking vehicles well-preceded Hasbro's development of "Chuck the Talking Dump Truck." The concept presented by Plaintiffs is not so unique that it could not be derived independently by a group of toy designers. Nevertheless, Defendants have seen fit to pay Plaintiffs because they presented a submission that is similar to that which Defendants were developing. This, by itself, is not evidence of a misappropriation and Plaintiffs have not provided any evidence to this Court to show that there is an issue of material fact that precludes judgment as a matter of law.

## IV. CONCLUSION

WHEREFORE, Defendants respectfully request that this Court grant summary judgment on the counts articulated in the Defendants' Motion for Summary Judgment and Memorandum in Support thereof.

For the Defendants,

HASBRO, INC. and HASBRO
INTERNATIONAL, INC.
By their Attorneys,

/s/ Todd D. White

John A. Tarantino (# 2586)
Todd D. White (# 5943)
Jeffrey K. Techentin (#6651)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604/ 351-4607
jtarantino@apslaw.com
twhite@apslaw.com
jtechentin@apslaw.com

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December 2006, I electronically filed the attached document with the court using the ECF system. The following counsel of record are registered with the court and will be served electronically through the ECF system:

Mark B. Morse, Esq.
The Law Offices of Mark B. Morse
111 Wayland Avenue
Providence, RI 02906

Dariush Keyhani, Esq.
Meredith & Keyhani, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540

_/s/ Todd D. White_____________

*403357_1*