# EXHIBIT L

(b) Licensor warrants that it has not disclosed to any party, other than in a confidential manner, any proprietary information pertaining to the Licensed Property.

5. EXCLUSIVITY: Licensor agrees that, during the Term, Licensor will not offer or license to any other party any property substantially similar to the Licensed Property, nor will Licensor utilize any such property itself in any manner which may conflict with the exclusive grant of rights hereunder.

6. TERMS OF PAYMENT: The following Advance and Royalty payments are to be divided evenly (three ways) among the above-named Licensors:

(a) Advance: Licensee agrees to pay Licensor, upon execution of this Agreement, the sum of FIFTEEN THOUSAND DOLLARS (U.S. $15,000.00) as an advance payment to be credited in full against the first royalties to be earned for Licensor in connection with Licensee's use of the Licensed Property under this Agreement. Licensor hereby acknowledges receipt of said sum.

(b) Primary Product:

(i) Royalties: Licensee, or its Affiliate, will pay Licensor a sum of money on the sale of products derived from the Licensed Property and sold by Licensee and/or such companies (hereinafter "Primary Product") equal to THREE percent (3%) of Net Sales. In respect of the Domestic Territory only, "Net Sales" is hereby defined as the gross invoice price to third party trade customers, less only returns and a deduction of ten percent (10%) of the gross invoice price to cover all other customary trade discounts and allowances. In respect of the International Territory, "Net Sales" is hereby defined as the invoice price received from unrelated third party trade customers, less deductions for returns from third party customers, allowances for defects, freight allowances, commissions, volume rebates, cash and/or other trade discounts and allowances. The term "sale" means sales by Licensee or its Affiliates to unrelated third parties. Licensee shall not be liable for any royalties hereunder for any products which it may distribute in the ordinary and usual promotion, development, and exploitation of its business such as for review, sample, advertising, publicity, or similar purposes in connection with its merchandising or promotion. With respect to entertainment products and services (which shall not be deemed Primary Products), including but not limited to those described in subparagraph 2(a)(iii), Licensee shall pay to Licensor Three Percent (3%) of its net profits after deduction from revenue of all costs, expenses and overhead of any kind or nature, provided that all entertainment products or services shall be cross-collateralized for the purpose of calculation of this participation. The royalty provisions of this Agreement shall not apply to close out sales made by Licensee or its Affiliates or by a sublicensee. A "close out" sale shall be defined as any sale of the Primary Product effectuated at a price fifty percent (50%) or more below Licensee's standard wholesale "A" price (or that of the Affiliate in question) with the intention of discontinuing the product in question and liquidating inventory.



DJ

(ii) Reports: Licensee and/or its Affiliates will furnish written reports on sales of Primary Product in Licensee's standard format to Licensor on a quarterly basis not later than thirty (30) days after each calendar quarter period ending at the close of March, June, September, and December of each year for sales to third party customers in the Domestic Territory and Canada, and not later than sixty (60) days after each calendar quarter period for sales to customers in the remainder of the International Territory. Such reports shall show the royalties received from sales of products derived from the Licensed Property subject to royalty payments, and sold during the immediately preceding quarterly period.

(iii) Payment: Payment of royalties on sales of Primary Product will accompany the royalty statements described above.

(iv) Records: Licensor or its authorized representative will have the right no more than once per calendar year to an examination of the separate records of Licensee with respect to the sales of Primary Products upon which Licensor receives a royalty and will have free and full access thereto for such purpose on reasonable notice and at a mutually convenient time during all reasonable business hours during which the office of Licensee will be open, and Licensee will retain such separate records for a period of 3 (3) years following rendition of any report. Any such examination will be conducted in such manner as to not unduly interfere with the business of Licensee. Licensor and its representatives will not disclose to any other person, firm, or corporation any information acquired as a result of any such examination; provided, however, that nothing herein contained will be construed to prevent Licensor and/or its duly authorized representatives from testifying in any arbitration or court proceeding with respect to the information obtained as a result of such examination in any proceeding instituted to enforce the rights of Licensor under the terms of this Agreement. Any proceeding to obtain payments claimed under this Agreement will be barred unless commenced, and Licensee is notified, within 3 years of the date upon which such payments should have been reported according to this Agreement. If any examination conducted by Licensor pursuant to this section discloses an underpayment to Licensor, Licensee shall pay the deficiency within 15 business days of the final determination thereof. If any examination discloses a deficiency of 5% or more for the period audited, Licensee shall pay, in addition to the deficiency, the reasonable out-of-pocket costs of the audit, not to exceed $1,500.

(v) International Sales:

[1] For sales in the International Territory, HI will make payment to Licensor in U.S. Dollars based upon the exchange rate in effect on the day the royalty is paid to HI by the Affiliates or sublicensees in the International Territory.

[2] If the payment of royalties to Licensor for sales in any country of the International Territory is blocked or subject to restrictions by governmental authorities, such royalties either may be held in the blocking or restricting country (if permitted by local regulations) or may be removed from such country and paid to