UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| INVENTOR'S GREENHOUSE, MICRO PROS TECHNOLOGY SOLUTIONS, and R.H. BAER CONSULTANTS, Plaintiffs, | **AMENDED COMPLAINT** |
| v. | CA NO: 05-246S |
| HASBRO, INC. and HASBRO INTERNATIONAL, INC. Defendants. | |

## AMENDED COMPLAINT

Plaintiffs, Inventor's Greenhouse, Micro Pros Technology Solutions, and R.H. Baer Consultants, ("Licensors"), allege as follows:

## THE PARTIES

1. Plaintiff, Inventor's Greenhouse, is a company with a place of business at 227 N. Lakeside Drive Lake Worth, FL 33460.

2. Plaintiff, Micro Pros Technology Solutions, is a company with a place of business at 35 Scott Avenue, Nashua, NH 03062.

3. Plaintiff, R.H. Baer Consultants, is a company with a place of business at 134 Mayflower Drive, Manchester, NH 03104.

4. On information and belief, Defendant, Hasbro, Inc. is a corporation organized and existing under the laws of Rhode Island with a place of business at 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059.

5. On information and belief, Defendant, Hasbro International, Inc. is a corporation organized and existing under the laws of Delaware with a place of business at 1027 Newport Avenue, Pawtucket, Rhode Island 02862-1059.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. Plaintiff and each of the Defendants are citizens of different states. The amount in controversy is in excess of $75,000.00.

7. On information and belief, Defendants actively target the Rhode Island market and consumers.

8. On information and belief, Defendants distribute toys in Rhode Island.

9. On information and belief, Defendants distribute toys to retailers and wholesalers in Rhode Island.

10. On information and belief, Defendants conduct substantial business in Rhode Island.

11. On information and belief, Defendants are subject to the jurisdiction of this Court, and venue is proper in this District pursuant to 28 U.S.C. §1391.

## FACTUAL BACKGROUND

12. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 11 as though fully set forth herein.

13. On November 30, 1998 Gary Carlin, the principal of Inventor's Greenhouse met with Stephen Toth, the then director of concept acquisition for the Defendants then Cincinnati division, for a confidential inventor idea submission meeting.

14. At this meeting Mr. Carlin under a confidentiality/non-disclosure agreement disclosed the idea and concept of "Talkin' Tools," a line of "talking" toys that produced electronically created sounds evocative of their function.

15. Plaintiffs entered into an agreement ("License Agreement") with Defendants some time after September 29, 2000.

14. By the terms of the License Agreement, Licensors presented to the Defendants concept, product, design and/or invention known as "Talkin' Tools," a description of which is set forth in paragraph 1 (a) of the License Agreement.

15. By the terms of the License Agreement, Licensors granted the Defendants exclusive rights, privileges, and license to the concept, product, design and/or invention known as "Talkin' Tools."

16. By the terms of the License Agreement, Defendants agreed to pay licensors certain royalties for all profits derived from the use, sale and commercialization of the concept, product, design and/or invention known as "Talkin' Tools."

17. By the terms of the License Agreement, Defendants agreed to pay to Licensors certain royalties on the sale of all products covered by the License Agreement,

as more fully set out in paragraph 6, "TERMS OF PAYMENT," of the License Agreement.

18. By the terms of the License Agreement, Defendants agreed to pay Licensors the sum of Fifteen Thousand Dollars (U.S. $15,000.00) as advance payment to be credited against the first royalties owed to Licensors in connection with Defendants' use of Licensors' concept, product, design and/or inventions.

19. Licensors have performed their obligations under the License Agreement.

20. Licensors have had a long-standing relationship with Defendants.

21. Licensors relied on Defendants to perform their obligations under the License Agreement and to act in the best interest of Licensors.

22. From September 29, 2000, the Defendants have had the use, benefit and enjoyment of the license and rights, privileges and immunities granted to them by the License Agreement.

23. Defendants continue to have the use, benefit, and enjoyment of the license and rights, privileges and immunities granted to them by the License Agreement.

24. Defendants manufactured, sold, and/or distributed pre-school toys categorized as Cool Crew, Yard Crew, and Home Crew.

25. Defendants have manufactured, sold, and/or distributed pre-school toys under the brand names Cool Crew, Yard Crew, and Home Crew.

26. Defendants have used and continue to use the concept, product, design and/or invention known as "Talkin' Tools" within the pre-school toys manufactured, sold, and/or distributed under the brand names Cool Crew, Yard Crew, and Home Crew.

27. Defendants sold and continue to sell pre-school toys bearing the names including but not limited to the following names: Zip Trimmer, Big Mike Mower, Chip Chainsaw, Bobby Q. The Magic Talkin' Grill, Lit The Magic Talkin' Lantern, Talkin' Hand Tools Asst., and Rod The Magic Talkin' Fishing Pole, under the brand name Yard Crew.

28. Defendants sold and continue to sell pre-school toys bearing such names as Dusty The Magic Talkin' Vacuum, under the brand name Home Crew.

29. Defendants sold and continue to sell pre-school toys bearing such names as Gab The Talking Telephone, Magic Talkin' Kitchen Crew, Big Mike Mower, Dusty The Talkin' Vacuum Cleaner and Bobby Q The Talkin' Grill, under the brand name Cool Crew.

30. Defendants failed to pay royalties for toys sold under the brand name Yard Crew, including but not limited to royalties for Big Mike Mower, Chip Chainsaw, Bobby Q. The Magic Talkin' Grill, Lit The Magic Talkin' Lantern, Talkin' Hand Tools Asst., and Rod The Magic Talkin' Fishing Pole.

31. Defendants failed to pay royalties for toys sold under the brand Home Crew, including but not limited to royalties for Dusty the Magic Talkin' Vacuum.

32. Defendants failed to pay royalties for toys sold under the brand name Cool Crew, including but not limited to royalties for Gab The Talking Telephone.

33. Licensors notified Defendants by letter that the Defendants, under the terms of the License Agreement owed the Licensor royalties.

34. Defendants have failed to pay and still refuse to pay the royalties due to Licensors under the License Agreement.

35. Defendants have earned profits from the use of the concept, product, design and/or invention known as Talkin' Tools.

36. Defendants continue to gain substantial profits from the use of the concept, product, design and/or invention known as Talkin' Tools. .

37. Plaintiffs have no adequate remedy at law.

## COUNT I - BREACH OF CONTRACT

38. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 37 as though fully set forth herein.

39. The actions and omissions committed by the Defendants as aforesaid, including, but not limited to, the failure to pay profits, earnings and royalties owed pursuant to the License Agreement constitute breach of contract.

40. Defendants' failure to provide quarterly reports on sales constitutes breach of contract.

41. Plaintiffs have been deprived the benefit of their bargain due to Defendants' breaches of contract and have sustained substantial damages as a result of such breaches.

## COUNT II - UNJUST ENRICHMENT

42. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 41 as though fully set forth herein.

43. Defendants have obtained substantial benefits from Plaintiffs.

44. Defendants have derived substantial gain from the use of Plaintiffs' ideas and Defendants have been unjust enrichment.

## COUNT III - BREACH OF FIDUCIARY DUTY

45. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 44 as though fully set forth herein.

46. Defendants owed Licensors certain fiduciary duties, including, but not limited to, a duty of loyalty.

47. The actions and omissions committed by the Defendants as aforesaid, including, but not limited to, failing to provide quarterly reports on sales, and failing to protect Licensors' property interest and rights, constitute a violation of Defendants' duties.

48. The actions and omissions committed by Defendants have substantially damaged Plaintiffs.

## COUNT IV – MISAPPROPRIATION OF IDEAS (Rhode Island common law)

49. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 48 as though fully set forth herein.

50. Plaintiffs entered into the License Agreement with Defendants to create novel and original ideas/concepts for toys.

51. In consideration for royalties under the Licensing Agreement, Plaintiffs invested substantial time and resources into creating original and novel ideas/concepts for toys and disclosed such ideas/concepts to the Defendants.

52. Defendants misappropriated Plaintiffs’ original and novel ideas/concepts without paying the agreed upon royalties/financial compensation as required under the Licensing Agreement.

53. Defendants’ misappropriation of Plaintiffs’ original and novel ideas/concepts without compensation constitutes a breach of contract under the Licensing Agreement.

54. Plaintiffs have suffered substantial damages as result of Defendants’ misappropriation.

**COUNT V – FRAUD AND MISREPRESENATION**

55. Plaintiffs repeat each and every allegation set forth herein in paragraphs 1 through 54 as though fully set forth herein.

56. Over that past six months Plaintiffs have engaged in substantial discovery including review of thousands of pages of documents and conducting numerous depositions including the deposition of Steve D'Aguanno on August 29, 2006, Stephen Toth on August 22, 2006 and David Maurer on May 23, 2006.

57. Through this discovery it has become apparent that Defendants have engaged in fraud.

58. Defendants' fraudulent acts date back before Defendants first contacted Plaintiffs to invite them to enter into a license agreement.

59. The license agreement that Defendants offered Plaintiffs in September of 2000 was offered under false pretenses and with intent to defraud and entered into in perpetuation of fraud.

60. On November 30, 1998 Gary Carlin, the principal of Inventor's Greenhouse, one of the Plaintiffs in this matter, met with Stephen Toth, the then director of concept acquisition for the Defendants' then Cincinnati division, for a confidential inventor idea submission meeting (See Attached Exhibit A).

61. At this meeting Mr. Carlin, under a confidentiality/non-disclosure agreement, disclosed the idea and concept of "Talkin' Tools," a line of "talking" toys that produced electronically created sounds evocative of their function, including a model "talking" measuring tape as a sample variation of the concept and other examples were described including a "talking" saw, hammer, drill and scale.

62. In a letter dated January 19, 1999 addressed to Mr. Carlin, Defendants indicated that they had no interest in pursuing Plaintiffs' "Talkin' Tools" idea submission.

63. On February 22, 1999, Plaintiffs, under a confidentiality/non-disclosure agreement, at an idea submission meeting with David Maurer, director of concept acquisition at Defendants' Pawtucket division, disclosed the "Talkin' Tools" idea and concept including a model "talking" measuring tape as a sample variation of the concept and other examples were described including a "talking" saw, hammer, drill and scale to Defendants.

64. In a letter dated March 10, 1999, Defendants indicated that they had no interest in pursuing Plaintiffs' "Talkin' Tools" idea submission and were not interested in entering into a license for it.

65. Again, Mr. Carlin on June 6, 1999, under the same confidential/non-disclosure agreement, met with David Maurer, and disclosed the “Talkin’ Tools” idea including a model bear with a tool belt as a variation of the concept, but was rejected on the same day.

66. While formally rejecting Plaintiffs’ “Talkin’ Tools” idea submission multiple times, Defendants misappropriated Plaintiffs’ idea submission and by at least as early as July of 2000 were developing a line of toys styled “Talkin’ Tools” including a “talking” workbench as the focus that would interact with a “talking” toy tape measure, hammer, screwdriver, wrench and other toy tools (See Attached Exhibit B).

67. In fact by August 21, 2000 Defendants had already undertaken detailed production, marketing, and financial and profits analysis of the “Talkin’ Tools” line of toys including a “Talkin’ Tools Tape Measure,” “Talkin’ Tools Sledge Hammer,” “Talkin’ Tools Screwdriver,” and “Talkin’ Tools Ratchet Wrench” and other toys tools (See Attached Exhibit C).

68. On or about September 20, 2000 Mr. Toth, on behalf of the Defendants, intentionally mislead and misrepresented to Mr. Carlin and Plaintiffs the nature and origin of a toy “workbench” about to be introduced into the market as a stand-alone toy that had been independently and internally conceived by the Defendants and that had no relationship with Plaintiffs’ “Talkin’ Tools” idea submission that had been rejected by Defendants almost two years before.

69. Defendants, through Mr. Toth, intentionally misrepresented that the “workbench” that was about to be introduced into the market had been independently and internally developed while full knowing that it had in fact been directly misappropriated from Plaintiffs’ “Talkin’ Tools” idea submission and was in fact the center piece and one and the same with Defendants’ “Talkin’ Tools” line of toys that Defendants had already been working on for over a year.

70. It is now apparent that Mr. Toth, on behalf of the Defendants, had in fact intentionally mislead and misrepresented the nature and origin of the “workbench” in his September 2000 conversation with Mr. Carlin to induce Mr. Carlin and the Plaintiffs to sign a agreement to explicitly exclude the center piece of Defendants’ “Talkin’ Tools” line of toys that Defendants knew originated form Plaintiffs’ “Talkin’ Tools” idea submission.

71. Defendants, through Mr. Toth, only contacted Mr. Carlin and Plaintiffs on or about September 20, 2000 to intentionally mislead and fraudulently induce Plaintiffs to sign an agreement, by misrepresenting the nature and origin of the “workbench,” to attempt to cover-up and protect Defendants against being held liable for the fraud and theft of ideas that had already occurred and Plaintiffs were about to become aware of when Defendants were to introduce the “Talkin’ Tools Workbench” to the public at the upcoming Toy Fair.

72. Defendants were later to introduce to the public at the February 2001 Toy Fair a toy "talking" workbench styled "Talkin' Tools Workbench" that was not a stand-alone bench, but rather a "talking" tool workbench that interacted with other toy tools including talking a toy hammer, vice, etc. and made audio transmissions evocative of their function that was a direct implementation of Plaintiffs' "Talkin' Tools" idea submission.

73. On March 19, 2001, after attending the February Toy Fair and observing a functional demonstration of the "Talkin' Tools Workbench," Mr. Carlin sent a letter to Defendants expressing great concern that the toy he observed was in fact very different from what Mr. Toth had represented in their September of 2000 conversation, that he had been mislead and that the "Talkin' Tools Workbench" had clearly originated from Plaintiffs' "Talkin' Tools" idea submission.

74. In response to Mr. Carlin's letter, Defendants' continued to deny any relationship between Plaintiffs' "Talkin' Tools" idea submission and the "Talkin' Tools Workbench" and continue to insist that the "Talkin' Tools Workbench" had been independently and internally conceived by the Defendants.

75. The toy "workbench" that Defendants, through Mr. Toth, had intentionally misrepresented in his September 2000 communication with Mr. Carlin as being independently and internally conceived by Defendants was in fact not independently and internally conceived by Defendants.

76. The toy "workbench" that Defendants, through Mr. Toth, had intentionally misrepresented to Mr. Carlin on or about September 20, 2000 was in fact at the center and one and the same with the "Talkin' Tools" line of toys that was a direct implementation of Plaintiffs' "Talkin' Tools" idea submission.

77. Mr. Toth at his deposition under oath on August 22, 2006 conceded that that the "Talkin' Tools Workbench" had been created in 1999 after Plaintiffs' "Talkin' Tools" idea submission.

78. There is already clear evidence that practically everyone in Defendants' "Talkin' Tools" project knew that "Talkin' Tools Workbench" <u>had not been</u> created by the Defendants internally, but in fact was created by an outside inventor(s) and thus subject to the payment of royalties.

79. The leader of the "Talkin' Tools" project, Derek Stothard, in an email with the subject heading "Increasing Capacity: Talkin' Tool Bench" sent to others in the "Talkin' Tools" toys group expressed concern about a "2% royalty hit" and motivation to increase the GM [gross margin] for the segment from 58% to 59% to "absorb half the royalty that way" (Exhibit D).

80. Plaintiffs have been substantial damaged by Defendants' fraudulent acts and misrepresentations.

81. Defendants' fraud and intentional misrepresentation warrants the application of punitive or exemplary damages.

**WHEREFORE**, Plaintiffs prays for judgment in its favor, including punitive and exemplary damages, attorneys' fees, cost, and interest and any and all other relief which the Court may deem just and appropriate in this matter.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues properly trial by jury in this action.

Date: September 25, 2006

Respectfully submitted,
Plaintiffs,
By their attorneys,

/s/ Mark B.Morse
MARK B. MORSE
RI Bar Registration Number 3003
111 Wayland Avenue
Providence, RI 02906
(401) 831-0555 (telephone)
(401) 273-0937 (facsimile)
Mark@morselawoffice.com

/s/ Dariush Keyhani
DARIUSH KEYHANI
Meredith & Keyhani, PLLC
5 Independence Way
Suite 300
Princeton, NJ 08540
(609) 945-7406 (telephone)
(609) 228-4031 (facsimile)
dkeyhani@meredithkeyhani.com
(Appearing *Pro Hac Vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on this March 29, 2007 the within was filed electronically with the Court and that the attorneys of record are as listed below:

John Tarantino, Esq.
Todd D. White, Esq.
Jeffrey Tecehntin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

/s/Dariush Keyhani
Dariush Keyhani